**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| J. PATRICK COLLINS, MARCUS J. LIOTTA, and WILLIAM M. HITCHCOCK,<br><br>Plaintiffs,<br><br> vs.<br><br>THE FEDERAL HOUSING FINANCE AGENCY, in its capacity as Conservator of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, MELVIN L. WATT, in his official capacity as Director of the Federal Housing Finance Agency, THE DEPARTMENT OF THE TREASURY, and JACOB J. LEW, in his official capacity as Secretary of the Treasury,<br><br>Defendants. | **PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs J. Patrick Collins, Marcus J. Liotta, and William M. Hitchcock ("Plaintiffs"), by and through their undersigned counsel, hereby allege as follows:

**I.
INTRODUCTION**

1.      In August 2012, at a time when the housing market was recovering from the financial crisis and the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (respectively, "<u>Fannie</u>" and "<u>Freddie</u>," and, together, the "<u>Companies</u>") had returned to stable profitability, the federal government took for itself the entire value of the rights held by Plaintiffs and Fannie's and Freddie's other private shareholders by forcing these publicly-traded, shareholder-owned Companies to turn over their **<u>entire</u>** net worth (i.e., *all* contributed capital by shareholders, *all* retained earnings, and *all* future profits), less a small and

diminishing capital reserve, to the federal government on a quarterly basis **forever**—an action the government called the "Net Worth Sweep" and that effectively nationalizes the Companies. Plaintiffs bring this action to put a stop to the federal government's naked, unauthorized, and ongoing expropriation of private property rights.

2.      Fannie and Freddie are two of the largest privately owned *insurance* companies in the world. They are *not* banks. Unlike the big banks, Fannie and Freddie did not commit any consumer fraud in the run-up to the financial crisis. The Companies do not originate mortgages and they do not deal directly with individual homeowners. Instead, Fannie and Freddie *insure* trillions of dollars of mortgages and provide essential liquidity to the residential mortgage market. The Companies have helped tens of millions of American families buy, rent, or refinance homes even during the toughest economic times when banks and other lenders shun mortgage risk. Fannie and Freddie operate for profit, and their debt and equity securities are privately owned and publicly traded. The Companies' shareholders include community banks, charitable foundations, mutual funds, insurance companies, pension funds, and countless individuals, including Plaintiffs.

3.      During the 2008 financial crisis, Fannie and Freddie helped *save* America's home mortgage system and resuscitated our national economy by continuing to provide liquidity when credit and insurance markets froze solid. Among other things, federal regulators encouraged the Companies to initiate massive purchases of home mortgages and mortgage bonds to stem declines in those markets and alleviate pressures on the balance sheets of private firms, particularly overburdened banks. Throughout the financial crisis, Fannie and Freddie were capable of meeting all of their obligations to insureds and creditors and were capable of absorbing any losses that they might reasonably incur as a result of the downturn in the financial

markets. As mortgage insurers, Fannie and Freddie are designed to generate ample cash to cover their operating expenses—and indeed this was the case for the Companies throughout the financial crisis. In contrast to other market participants, the Companies took a relatively conservative approach to investing in mortgages during the national run up in home prices from 2004 to 2007. As a result, the Companies (i) experienced substantially lower mark-to-market credit losses during the financial crisis than other mortgage insurers, (ii) were never in financial distress, and (iii) remained in a comparatively strong financial condition. Indeed, the Companies' ability to pay any outstanding claims—a fundamental principle for all insurers—was never in doubt. Despite the Companies' relative financial health, the Department of the Treasury ("Treasury") implemented a deliberate strategy to *seize* the Companies and operate them for the exclusive benefit of the federal government.

4.      In July 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"). HERA created the Federal Housing Finance Agency ("FHFA") (Treasury and FHFA are sometimes collectively referred to herein as the "Agencies") to replace Fannie's and Freddie's prior regulator and authorized FHFA to appoint itself as conservator or receiver of the Companies in certain statutorily specified circumstances. Under HERA, FHFA is an independent agency headed by a single Director who is only removable by the President for cause. As conservator, HERA charges FHFA to *rehabilitate* Fannie and Freddie by taking action to put the Companies in a *sound* and *solvent* condition while *preserving* and *conserving* their assets. Only as receiver does HERA authorize FHFA to wind up the affairs of Fannie and Freddie and liquidate them. HERA's distinctions between the authorities granted to conservators and receivers are consistent with longstanding laws and practices of financial regulation.

5.     HERA also granted Treasury temporary authority to invest in the Companies'
stock until December 31, 2009. Congress made clear that in exercising this authority Treasury
was required to consider the "need to maintain [Fannie's and Freddie's] status as . . . private,
shareholder-owned compan[ies]."

6.     These limitations on FHFA's and Treasury's authority make clear that Congress
did not intend for the Agencies to operate Fannie and Freddie in perpetuity, and certainly not for
the exclusive financial benefit of the federal government.

7.     On September 6, 2008—despite prior public statements assuring investors that the
Companies were in sound financial shape—FHFA abruptly forced Fannie and Freddie into
conservatorship. Under HERA, and as FHFA confirmed in its public statements beginning in
September 2008, conservatorship is necessarily temporary, and FHFA must conduct the
conservatorships with the objective of returning the Companies to normal business operations.
At the time, neither of the Companies was experiencing a liquidity crisis, nor did they suffer
from a short-term fall in operating revenue. Moreover, the Companies had access to separate
credit facilities at the Federal Reserve and at the Treasury, and the Companies held hundreds of
billions of dollars in unencumbered assets that could be pledged as collateral if necessary.
Nevertheless, FHFA forced the Companies into conservatorship to further the government's
unspoken policy objectives. Indeed, a receivership that liquidates the Companies would have
more economic value to the private shareholders than the conservatorship as it was structured
and operated in practice.

8.     Immediately after the Companies were forced into conservatorship, Treasury
exercised its temporary authority under HERA to enter into agreements with FHFA to purchase
securities of Fannie and Freddie ("Preferred Stock Purchase Agreements," "Purchase

Agreements," or "PSPAs") in lieu of permitting the Companies to access the available credit facilities. Under these PSPAs, Treasury received an entirely new class of securities in the Companies, known as Senior Preferred Stock ("Government Stock"), which came with very favorable terms for Treasury. At the outset, Treasury received $1 billion of Government Stock (via one million shares) in each Company and warrants to acquire 79.9% of the common stock of the Companies at a nominal price in return for its commitment to acquire Government Stock in the future.

9.      The PSPAs served a function similar to the credit facilities described above, but carried much more punitive terms. If Treasury acquired additional Government Stock, such purchases would not add to the one million shares held by Treasury, but would instead increase the liquidation preference of Treasury's stock—the economic equivalent of purchases of stock. The purpose and effect of this arrangement was to attempt to evade the sunset of Treasury's purchase authority in December 2009.

10.     The Government Stock entitled Treasury to collect dividends at an annualized rate of 10% if paid in cash or 12% if paid in kind. The Government Stock was entitled to receive cash dividends from each Company only to the extent declared by the Board of Directors "in its sole discretion, from funds legally available therefor." If the Companies did not wish to—or legally could not—pay a cash dividend, the unpaid dividends on the Government Stock could be capitalized (or paid "in kind") by increasing the liquidation preference of the outstanding Government Stock—an option Treasury publicly acknowledged in the fact sheet it released upon entering into the PSPAs. Therefore, the Companies were *never* required to pay cash dividends on Government Stock. There was *never* any threat that the Companies would become insolvent by virtue of making cash dividend payments, both because dividends could be paid with stock and

because state law (which the Companies are subject to) prohibits the payment of dividends if it would render a company insolvent. Unlike most preferred stock, which imposes temporal limits on a company's ability to exercise a payment in kind option, the PSPAs specifically allowed the Companies to utilize this mechanism throughout the life of the agreements, thereby foreclosing any possibility that they would exhaust Treasury's funding commitment because of a need to make a dividend payment to Treasury.

11.     The Government Stock diluted, but did not eliminate, the economic interests of the Companies' private shareholders. The warrants to purchase 79.9% of the Companies' common stock gave Treasury "upside" via economic participation in the Companies' profitability, but this upside would be *shared* with preferred shareholders (who had to be paid before any payment could be made on common stock purchased with Treasury's warrants) and private common shareholders (who retained rights to 20.1% of the Companies' residual value). James Lockhart, the Director of FHFA, accordingly assured Congress shortly after imposition of the conservatorship that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest.

12.     Under FHFA's supervision, the Companies were forced to excessively write down the value of their assets, primarily due to FHFA's wildly pessimistic assumptions about potential future losses over many years. Despite the Companies' objections, FHFA flagrantly disregarded standard insurance company accounting principles and caused the Companies to incur substantial non-cash accounting losses in the form of gargantuan loan loss provisions. To be clear, tens of billions of dollars of these provisions—processed immediately by the Companies as expenses—were completely unnecessary since the potential loan losses never

materialized into actual losses. Nonetheless, by June 2012, the Agencies had forced Fannie and Freddie to issue $161 billion in Government Stock to make up for the balance-sheet deficits caused by the Agencies' unrealistic and overly pessimistic accounting decisions, even though there was no indication that the Companies' actual cash expenses could not be met by their cash receipts. The Companies were further forced to issue an additional $26 billion of Government Stock so that Fannie and Freddie would be able to pay *cash* dividends to Treasury even though, as explained above, the Companies were never required to pay cash dividends. Finally, because (i) the Companies were forced to issue Government Stock to Treasury that they did not need to continue operations and (ii) the structure of Treasury's financial support did not permit the Companies to repay and redeem the Government Stock outstanding, the amount of the dividends owed on the Government Stock was artificially—and permanently—inflated.

13.     As a result of these transactions, Treasury amassed a total of $189 billion in Government Stock. But based on the Companies' performance in the second quarter of 2012, it was apparent that there was still value in the Companies' private shares. The Agencies' attempt to drown the Companies' other shareholders by extending to the Companies a *concrete* "life preserver" had failed. By that time, the Companies were thriving and could easily pay 10% annualized cash dividends on the Government Stock without drawing additional capital from Treasury. And based on the improving housing market and the high quality of the newer loans backed by the Companies, it was apparent that they had returned to stable profitability. Indeed, the Agencies had specific information from the Companies demonstrating that this return to profitability was inevitable because the Companies would soon be reversing many of the non-cash accounting losses they had incurred under FHFA's supervision. In light of that information and the broad-based recovery in the housing industry that had occurred by the middle of 2012,

the Agencies fully understood that the Companies were on the precipice of generating huge profits, far in excess of the dividends owed on the Government Stock. Moreover, when the Net Worth Sweep was suddenly imposed on the Companies in August 2012, the financial crisis had clearly passed and there was absolutely no need for "drastic emergency action" by the Agencies.

14.     The Agencies were not content to share the value of the Companies with private shareholders and were committed to ensuring that, unlike all other companies that received financial assistance from the federal government during the financial crisis, Fannie and Freddie would be operated for the exclusive benefit of the federal government. Indeed, unbeknownst to the public, Treasury had secretly resolved "to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." By the middle of 2012, however, it was apparent that even the large amount of Government Stock outstanding—the proverbial "concrete life preserver"—would not achieve this unlawful policy goal.

15.     Therefore, on August 17, 2012, just days after the Companies announced their record-breaking quarterly earnings, the Agencies unilaterally imposed the Net Worth Sweep to expropriate for the federal government the value of Fannie and Freddie shares held by private investors. Treasury itself said that the Net Worth Sweep was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers." With the stroke of a pen, the Agencies had nationalized the Companies and taken all the value of the Companies for Treasury, thereby depriving the private shareholders of all their economic rights, well in excess of the authority granted to the FHFA as conservator. Indeed, under the Net Worth Sweep private shareholders are guaranteed never to receive any return *of* their investments or any return *on* their investments (i.e., in the form of dividends). No equivalent wipeout of private

shareholder investments was imposed on other financial institutions that received assistance during the 2008 financial crisis, much less four years *after* that crisis was over.

16.     The Companies received no incremental investment by Treasury or other meaningful consideration in return for the Net Worth Sweep, which restricts them to a small and diminishing maximum capital level above which any profits they generate must be paid over to Treasury. All of this was in blatant violation of "the path laid out under HERA," which, as even Treasury acknowledged internally, was for FHFA to *rehabilitate* Fannie and Freddie, thus allowing them to "becom[e] adequately capitalized" and "exit conservatorship as private companies."

17.     Despite the transparent fact that the Net Worth Sweep was designed to expropriate private property rights, the government has claimed both in public and before the courts that the Net Worth Sweep was necessary to prevent the Companies from falling into a "death spiral" in which the Companies' increasing dividend obligations to Treasury would consume Treasury's remaining funding commitment to the Companies. For example, on the date the Net Worth Sweep was announced FHFA publicly stated that "the continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs." And in litigation in the Court of Federal Claims, *Fairholme Funds, Inc. v. United States*, No. 13-465C (the "CFC case"), the Government has asserted that the Net Worth Sweep was necessary because Fannie and Freddie "found themselves in a death spiral." This made-for-litigation defense narrative is wholly unsubstantiated.

18.     Defendants' factual account for the Net Worth Sweep is misleading and belied by inconvenient truths. As an initial matter, the government did not impose the Net Worth Sweep at a time when the Companies were struggling to generate enough income to pay the dividend on

Treasury's stock.  Rather, the Net Worth Sweep was imposed just days after the Companies disclosed that they had returned to stable profitability and had earned several billion dollars more than was necessary to pay the Treasury dividend in cash. And it was by then virtually inevitable, thanks to a strengthening housing market and the improving quality of loans guaranteed by the Companies, that they would soon reverse the non-cash accounting adjustments that were responsible for the great majority of the losses that they had experienced in the preceding years, thereby generating massive profits. More importantly, quite apart from the Companies' improved financial outlook, the Companies were contractually protected from a scenario in which their dividend obligation to Treasury could cause a death spiral: the Companies were entitled under the PSPAs to pay dividends to Treasury "in kind," with additional senior preferred stock, rather than in cash.

19.     Given these facts, it is clear from the government's false death spiral narrative either that the Agencies that adopted the Net Worth Sweep were incompetent or that worry about the Companies exhausting Treasury's funding commitment was not the true reason for the Net Worth Sweep. Materials produced in discovery in the CFC case rule out incompetence. Indeed, that discovery has revealed that the Net Worth Sweep was adopted not out of a concern that the Companies would earn too little, but rather out of concern that the Companies would make *too much* and thus would complicate the Administration's plans to keep Fannie and Freddie in perpetual conservatorship and to prevent their private shareholders from seeing any return on their investments. As a senior White House official stated in an email to a senior Treasury official on the day the Net Worth Sweep was announced, "we've closed off [the] possibility that [Fannie and Freddie] ever[] go (pretend) private again."  That same official stated in another email that Peter Wallison of the American Enterprise Institute, who spoke with Bloomberg News

about the Net Worth Sweep, was "exactly right on substance and intent" when he said that "[t]he most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government. . . . What the Treasury Department seems to be doing here . . . is to deprive them of all their capital so that doesn't happen." An internal Treasury document dated August 16, 2012, expressed the same sentiment: "By taking all of their profits going forward, we are making clear that the GSEs will _not_ ever be allowed to return to profitable entities . . . ."

20.    Extensive evidence supports this understanding of the purpose and effect of the Net Worth Sweep. Perhaps the most striking relates to a meeting that occurred on August 9, 2012, between senior Treasury officials, including Under Secretary Mary Miller, and Fannie's executive management team. At the August 9 meeting, Treasury was given very specific, non-public information about Fannie's deferred tax assets: Fannie CFO Susan McFarland testified in a deposition in the CFC case that she told Under Secretary Miller that release of the valuation allowance on her company's deferred tax assets likely would happen in mid-2013 and that it likely would generate profits in the range of $50 billion—a forecast that proved remarkably accurate. It thus is no surprise that Ms. McFarland also testified that Fannie was not on the precipice of any purported "death spiral" when the Net Worth Sweep was announced in mid-August 2012.

21.    The Agencies knew in advance of Treasury's August 9 meeting with Fannie that the company was likely entering a period of "golden years" of earnings. In July 2012, the minutes of a Fannie executive management meeting during which that precise sentiment was expressed were circulated broadly within FHFA, including to Acting Director Edward DeMarco.

Projections attached to those minutes showed that Fannie expected that its dividend payments to Treasury would exceed its draws under the PSPAs by 2020 and, more important for the implausible "death spiral" narrative, that over $115 billion of Treasury's commitment would remain after 2022. Fannie management shared similar projections with Treasury in advance of the August 9 meeting described above.

22.     Fannie's July 2012 projections did not account for reversal of the Company's massive deferred tax assets valuation allowance. As Ms. McFarland predicted, that item alone would add over $50 **billion** dollars to Fannie's balance sheet. Treasury was keenly aware of this impending addition to earnings. Indeed, by late May 2012 Treasury was privately discussing with its consultant the topic of returning the deferred tax asset to Fannie's and Freddie's balance sheets, and a key item on Treasury's agenda for the August 9 meeting was how quickly Fannie forecasted releasing its reserves.

23.     Treasury's knowledge of Fannie's expectations for its deferred tax assets wholly discredits the declaration FHFA submitted to another district court asserting that "neither the Conservator nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013, resulting in a sudden and substantial increase in Fannie Mae's net worth, which was paid to Treasury in mid-2013 by virtue of the net worth dividend." That declaration was signed under penalty of perjury by Mario Ugoletti, who participated in the creation and implementation of the PSPAs while at Treasury, later moved to FHFA, and at the time of the Net Worth Sweep served as the principal liaison with Treasury concerning the PSPAs. Yet in his deposition in the CFC case, Mr. Ugoletti expressly contradicted his sworn declaration, disclaiming any knowledge at the time of the Net Worth Sweep of Treasury's understanding of the deferred tax asset issue, and he also denied

knowing what anyone else at FHFA thought about the issue at that time. This evidence shows that Mr. Ugoletti's earlier declaration is unreliable and that Defendants' public explanation for the Net Worth Sweep is inaccurate.

24.     The Net Worth Sweep was announced just eight days after Treasury's August 9, 2012, meeting with Fannie—and internal email traffic indicates that Treasury was making a "renewed push" to finalize the Net Worth Sweep the same day it met with Fannie's management. In light of all of this, it is utterly implausible for the Agencies to claim that there was imminent concern of a "death spiral" when the Net Worth Sweep was announced. Indeed, in an internal document authored the day before the sweep was announced, Treasury specifically identified the Companies' improving operating performance and the potential for near-term earnings to *exceed* the 10% dividend as reasons for imposing the Net Worth Sweep.

25.     The Net Worth Sweep has resulted in a massive and unprecedented financial windfall for the federal government at the expense of the Companies' private shareholders. From the fourth quarter of 2012, the first fiscal quarter subject to the Net Worth Sweep, through the second quarter of 2016, the most recently reported fiscal quarter, Fannie and Freddie generated $195 billion in comprehensive income. But rather than using those profits to prudently build capital reserves and prepare to exit conservatorship, Fannie and Freddie instead have been forced to pay $195 billion in "dividends" to the federal government under the Net Worth Sweep—$124 billion more than the government would have received under the original PSPAs. Adding Net Worth Sweep dividends to the dividends Fannie and Freddie had already paid, Treasury has now recouped a total of over $250 billion—$63 billion *more* than it invested in the Companies. Yet, according to the Agencies, the amount of outstanding Government Stock remains firmly fixed at

$189 billion, and the Agencies continue to insist that Treasury has the right to all of Fannie's and Freddie's future earnings *in perpetuity*.

26.      Since the Net Worth Sweep was imposed, the Companies' dividend payments to Treasury have so far exceeded the 10% cash dividend they paid under the prior arrangement that, had they instead used the excess Net Worth Sweep dividends to pay down the principal of Treasury's investment, Treasury's remaining investment would today be less than $20 billion.  In other words, the Companies have been so immensely profitable in recent years that they could have continued to pay a 10% cash divided on Treasury's investment and still had sufficient funds left over to retire most of Treasury's senior preferred stock. The Agencies anticipated these profits, and they purposely adopted the Net Worth Sweep so that those monies would be transferred to Treasury's coffers and not used to rebuild capital at the Companies.

27.      The Net Worth Sweep blatantly transgresses the limits Congress placed on FHFA's and Treasury's authority. As conservator of Fannie and Freddie, FHFA is charged with rehabilitating the Companies with the goal of returning them to private control. The Net Worth Sweep guarantees that this *never* can be accomplished. Indeed, contrary to its statutory requirements and statements that it made when the conservatorship was initiated, FHFA has now indicated that it will operate Fannie and Freddie for the exclusive benefit of the government until Congress adopts housing finance legislation. Holding the Companies hostage in a perpetual conservatorship while awaiting potential legislative action was never an option for FHFA contemplated under HERA. And Treasury's decision to exchange its existing equity stake in the Companies for the new and different equity stake granted to it by the Net Worth Sweep years *after* its temporary authority to acquire the Companies' stock had expired is a direct affront to HERA's plain requirements.

28.     By entering the Net Worth Sweep, FHFA violated HERA in at least four ways. First, FHFA failed to act as a "conservator"—indeed it has acted as an anti-conservator—because no conservator is allowed to brazenly confiscate billions of dollars from companies under its care and then funnel all that cash to a sister federal agency. Second, FHFA is required to put Fannie and Freddie in a *sound* and *solvent* condition, but the Net Worth Sweep perversely pushes the Companies to the edge of insolvency by stripping the capital out of the Companies on a quarterly basis. Third, FHFA is required to *preserve* and *conserve* Fannie's and Freddie's assets, but the Net Worth Sweep requires the dissipation of assets by forcing the Companies to pay their net worth to Treasury every three months. Fourth, FHFA is charged with rehabilitating Fannie and Freddie and seeking to return them to private control, but the Net Worth Sweep has the intent and effect of making any such outcome impossible.

29.     FHFA's duties as conservator are similar to those of a physician—to heal, rehabilitate, and always act with a view to what is best for those in its care.  FHFA chose instead to slowly poison its patients; first by ordering the Companies to make accounting decisions that gratuitously ran up their dividend obligations to Treasury, and later by compelling the Companies to simply turn over their entire net worth—all existing capital *and* future profits—to Treasury in perpetuity.  These are *not* the actions of a conservator.

30.     FHFA's adoption of the Net Worth Sweep was also unlawful for an even more fundamental reason: the Constitution's separation of powers does not permit an independent agency with far-reaching powers such as FHFA to be headed by a single Director rather than a multi-member Board. HERA's concentration of power in one person who is only removable by the President for cause is unconstitutional, and the Net Worth Sweep must be vacated because it was adopted by this unconstitutionally structured agency.

31.     Treasury's violation of HERA is straightforward: the Net Worth Sweep, by changing the fundamental economic characteristics of Treasury's investment, created new securities, and HERA explicitly prohibited Treasury from acquiring Fannie and Freddie securities in 2012. After 2009, Congress authorized Treasury *only* to "hold, exercise any rights received in connection with, or sell" the Companies' securities, and the Net Worth Sweep does not fit into any of these carefully circumscribed categories.  12 U.S.C. § 1719(g)(2)(D).

32.     This Court must set aside the Net Worth Sweep and restore to Plaintiffs the property rights the federal government has unlawfully expropriated for itself.

## II.
## JURISDICTION AND VENUE

33.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706, HERA, PUB. L. NO. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. §§ 1455, 1719, 4617), and the U.S. Constitution. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331. The Court is authorized to issue the relief sought pursuant to 5 U.S.C. §§ 702, 705, and 706.

34.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because this is an action against officers and agencies of the United States, Plaintiffs reside in this judicial district, and no real property is involved in the action.

## III.
## PARTIES

35.     Plaintiff J. Patrick Collins is a citizen of the United States and a resident of Montgomery County, Texas. Mr. Collins has continuously owned shares of Freddie's preferred stock since before the Net Worth Sweep was announced in 2012 and has continuously owned shares of Fannie's preferred stock since before the conservatorship was imposed in 2008.

16

36.     Plaintiff Marcus J. Liotta is a citizen of the United States and a resident of Dallas County, Texas. Mr. Liotta owns shares of common stock in both Companies.

37.     Plaintiff William M. Hitchcock is a citizen of the United States and a resident of Harris County, Texas. Mr. Hitchcock owns shares of Fannie's preferred stock.

38.     Defendant FHFA is, and was at all relevant times, an independent agency of the United States Government headed by a single Director or acting Director and subject to the APA. *See* 5 U.S.C. § 551(1). FHFA was created on July 30, 2008, pursuant to HERA. FHFA is located at Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.

39.     Defendant Melvin L. Watt is the Director of FHFA. His official address is Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024. He is being sued in his official capacity. In that capacity, Director Watt has overall responsibility for the operation and management of FHFA. Director Watt, in his official capacity, is therefore responsible for the conduct of FHFA that is the subject of this Complaint and for the related acts and omissions alleged herein.

40.     Defendant Department of the Treasury is, and was at all times relevant hereto, an executive agency of the United States Government subject to the APA. *See* 5 U.S.C. § 551(1). Treasury is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

41.     Defendant Jacob J. Lew is the Secretary of the Treasury. His official address is 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220. He is being sued in his official capacity. In that capacity, Secretary Lew has overall responsibility for the operation and management of Treasury. Secretary Lew, in his official capacity, is therefore responsible for the conduct of Treasury that is the subject of this Complaint and for the related acts and omissions alleged herein.

# IV.
# FACTUAL ALLEGATIONS

## Fannie and Freddie

42.     Fannie is a for-profit, stockholder-owned corporation organized and existing under the Federal National Mortgage Act. Freddie is a for-profit, stockholder-owned corporation organized and existing under the Federal Home Loan Corporation Act. The Companies' business includes purchasing and guaranteeing mortgages originated by private banks and bundling the mortgages into mortgage-related securities that can be sold to investors.

43.     Fannie and Freddie are owned by private shareholders and their securities are publicly traded. Fannie was chartered by Congress in 1938 and originally operated as an agency of the Federal Government. In 1968, Congress reorganized Fannie into a for-profit corporation owned by private shareholders. Freddie was established by Congress in 1970 as a wholly-owned subsidiary of the Federal Home Loan Bank System. In 1989, Congress reorganized Freddie into a for-profit corporation owned by private shareholders.

44.     Before being forced into conservatorship, both Fannie and Freddie had issued common stock and several series of preferred stock that were marketed and sold to community banks, insurance companies, and countless other institutional and individual investors. The several series of preferred stock of the Companies are in parity with each other with respect to their claims on income (i.e., dividend payments) and claims on assets (i.e., liquidation preference or redemption price), but they have priority over the Companies' common stock for these purposes. The holders of common stock are entitled to the residual economic value of the firms.

45.     Prior to 2007, Fannie and Freddie were consistently profitable. In fact, Fannie had not reported a full-year loss since 1985, and Freddie had never reported a full-year loss since

becoming owned by private shareholders. In addition, both Companies regularly declared and paid dividends on their preferred and common stock.

### Fannie and Freddie Are Forced into Conservatorship

46.     The Companies were well-positioned to weather the decline in home prices and financial turmoil of 2007 and 2008. While banks and other financial institutions involved in the mortgage markets had heavily invested in increasingly risky mortgages in the years leading up to the financial crisis, Fannie and Freddie had taken a more conservative approach that meant that the mortgages that they insured (primarily 30-year fixed rate conforming mortgages) were far safer than those insured by the nation's largest banks. And although both Companies recorded losses in 2007 and the first two quarters of 2008—losses that largely reflected a temporary decline in the market value of their holdings caused by declining home prices—both Companies continued to generate enough cash to easily pay their debts and retained billions of dollars of capital that could be used to cover any future losses. Neither Company was in danger of insolvency. Indeed, during the summer of 2008, both Treasury Secretary Henry Paulson and Office of Federal Housing and Enterprise Oversight ("OFHEO") Director James Lockhart publicly stated that Fannie and Freddie were financially healthy. For example, on July 8, 2008, Director Lockhart told CNBC that "both of these companies are adequately capitalized, which is our highest criteria." Two days later, on July 10, Secretary Paulson testified to the House Committee on Financial Services that Fannie's and Freddie's "regulator has made clear that they are adequately capitalized." And on July 13, Director Lockhart issued a statement emphasizing that "the Enterprises' $95 billion in total capital, their substantial cash and liquidity portfolios, and their experienced management serve as strong supports for the Enterprises' continued operations."

47.     Thanks to their healthy financial condition, the Companies in mid-2008 had the capacity to raise additional capital through the financial markets. Indeed, at this time Fannie had roughly $700 billion in unencumbered liquid assets that were available to be pledged as collateral for purposes of raising capital, and it had identified a number of private investors who were prepared to provide additional capital.

48.     The Companies' sound financial condition in the weeks leading up to imposition of the conservatorships is further illustrated by the decision by Fannie's Board of Directors to declare dividends on both its preferred and common stock in August 2008 and by FHFA's subsequent decision as conservator to direct Fannie to pay those dividends out of cash available for distribution in late September 2008. It is a fundamental principle of corporate law that a company may not declare dividends when it is insolvent, and dividends that a company improperly declares when insolvent may not be lawfully paid. Fannie's Board thus could not have lawfully declared dividends in August 2008 unless the Company was solvent at that time, and the Board's decision to declare those dividends showed its confidence that Fannie was financially healthy. Furthermore, it is evident that both FHFA and Treasury agreed that Fannie was solvent when it declared dividends in August 2008 because, rather than halting or voiding the dividends that the outgoing Fannie Board had declared, both agencies publicly took the position that Fannie was legally obligated to pay them even *after* conservatorship was imposed in early September 2008.

49.     Despite (or perhaps because of) the Companies' comparatively strong financial position amidst the crisis, the Agencies initiated a long-term policy of seeking to seize control of Fannie and Freddie and operate them for the exclusive benefit of the federal government. To that end, as early as March 2008, Treasury was internally discussing "potential costs and benefits of

20

nationalization" of the Companies. Around the same time, a Treasury official was the off-the-record source for a Barron's article that inaccurately claimed that the Companies' books overstated assets and understated liabilities.

50.     During the summer of 2008, Treasury officials promoted short-selling of the Companies' stock by leaking word to the press that Treasury might seek to place the Companies into conservatorship. On July 21, 2008, Treasury Secretary Paulson personally delivered a similar message to a select group of investment managers during a private meeting at Eton Park Capital Management. Although at odds with Treasury's on-the-record statements to the press, the leaks and tips had the intended effect of manipulating the market prices of the Companies' securities—driving down the Companies' stock prices and creating a misperception among investors that the Companies were in financial distress.

51.     Also during the summer of 2008, Congress passed HERA, which established FHFA as the successor to OFHEO, the Companies' prior regulator.  Unlike its predecessor, FHFA is an "independent" agency, 12 U.S.C. § 4511(a), and it is headed by a single Director who is only removable "for cause by the President," *id.* § 4512(b)(2).  Under HERA, FHFA enjoys "[g]eneral supervisory and regulatory authority" over Fannie, Freddie, and the Federal Home Loan Banks, 12 U.S.C. § 4511(b); 12 U.S.C. 4501 note—institutions that play a vital role in the Nation's housing sector by providing more than $5.8 trillion in funding to U.S. mortgage markets and financial institutions. FHFA is thus the primary regulator for the U.S. housing sector, which is responsible for between 15% and 18% of annual Gross Domestic Product.

52.     HERA authorized FHFA to place the Companies into either conservatorship or receivership under certain statutorily prescribed and circumscribed conditions. In enacting HERA, Congress took FHFA's conservatorship mission verbatim from the Federal Deposit

Insurance Act ("FDIA"), *see* 12 U.S.C. § 1821(d)(2)(D), which itself incorporated a long history of financial supervision and rehabilitation of troubled entities under common law. HERA and the FDIA, as well as the common law concept on which both statutes draw, treat conservatorship as a process designed to stabilize a troubled institution with the objective of returning it to normal business operations. Like any conservator, when FHFA acts as a conservator under HERA it has a fiduciary duty to safeguard the interests of the Companies and their shareholders.

53.     According to HERA, FHFA "may, as conservator, take such action as may be—(i) necessary to put the regulated entity in a sound and solvent condition, and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). Thus, as Mr. Ugoletti has testified, preserving and conserving the Companies' assets is "a fundamental part of conservatorship."  FHFA has likewise acknowledged that "[t]he purpose of conservatorship is to preserve and conserve each company's assets and property and to put the companies in a sound and solvent condition," and "[t]o fulfill the statutory mandate of conservator, FHFA must follow governance and risk management practices associated with private-sector disciplines." FHFA, REPORT TO CONGRESS 2009 at i, 99 (May 25, 2010).

54.     FHFA's powers and duties as conservator must be read in harmony with its regulatory duties, one of the most important of which is "to ensure that [the Companies] operate[ ] in a safe and sound manner, *including maintenance of adequate capital*."  12 U.S.C. 4513(a)(1)(B) (emphasis added). Thus, whether acting as conservator or regulator, FHFA is obligated to seek to ensure that the Companies are in a sound financial condition, and by definition, soundness includes maintaining adequate capital.

55.     As FHFA has acknowledged, HERA *requires* and *mandates* FHFA as conservator to preserve and conserve Fannie's and Freddie's assets and to restore them to a sound and solvent condition. FHFA 2009 Annual Report to Congress at 99 (May 25, 2010), http://goo.gl/YOOgzC ("The statutory role of FHFA as conservator requires FHFA to take actions to preserve and conserve the assets of the Enterprises and restore them to safety and soundness."); FHFA Strategic Plan at 7 (Feb. 21, 2012), http://goo.gl/uXreKX. (acknowledging "'preserve and conserve' mandate"). Indeed, former Director Lockhart indicated in a written statement to Congress that, "[a]s conservator, FHFA's most important goal is to preserve the assets of Fannie Mae and Freddie Mac over the conservatorship period. That is our statutory responsibility." The Present Condition and Future Status of Fannie Mae and Freddie Mac: Hearing Before the H. Comm. on Fin. Servs., Subcomm. of Capital Markets, Ins. & Gov't Sponsored Enters. 111th Cong. (2009); *see also* FHFA, STRATEGIC PLAN 2009–2014, at 33, http://goo.gl/UjCxf6 (FHFA as conservator "preserves and conserves the assets and property of the Enterprises . . . and facilitates their financial stability and emergence from conservatorship."); Letter from Edward DeMarco, Acting Director, FHFA to Senators at 1 (Nov. 10, 2011), http://goo.gl/hbBe25 ("By law, the conservatorships are intended to rehabilitate [Fannie and Freddie] as private firms.").

56.     Under HERA, conservatorship is a status distinct from receivership, with very different purposes, responsibilities, and restrictions. When acting as a receiver, but *not* when acting as a conservator, FHFA is authorized and obliged to "place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity." *Id*. § 4617(b)(2)(E). The only "post-conservatorship outcome[] . . . that FHFA may implement today under existing law," by contrast, "is to reconstitute [Fannie and Freddie] under their current charters." Letter

from Edward J. DeMarco, Acting Director, FHFA, to Chairmen and Ranking Members of the Senate Committee on Banking, Housing, and Urban Affairs and to the House Committee on Financial Services 7 (Feb. 2, 2010). In other words, receivership is aimed at winding down a company's affairs and liquidating its assets, while conservatorship aims to rehabilitate it and return it to normal operation. This distinction between the purposes and authorities of a receiver and a conservator is a well-established tenet of financial regulation and common law. In our nation's history, there has *never* been an example of a regulator forcing a healthy, profitable company to remain captive in a perpetual conservatorship (in this instance, for almost eight years) while facilitating the looting and plundering of the company's assets by another federal agency *and* simultaneously avoiding the organized claims process of a receivership.

57.    In promulgating regulations governing its operations as conservator versus receiver of the Companies, FHFA specifically acknowledged the distinctions in its statutory responsibilities as conservator and as receiver: "A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition." 76 Fed. Reg. at 35,730. In contrast, when FHFA acts as a receiver, the regulation specifically provides that "[t]he Agency, as receiver, *shall* place the regulated entity in liquidation . . . ." 12 C.F.R. § 1237.3(b) (emphasis added). Consistent with this interpretation of HERA, a FHFA Advisory Bulletin describes "the conservator's or receiver's powers and responsibilities" as including "in the case of a conservator, to put the regulated entity in a sound and solvent condition, and to carry on its business and preserve and conserve its assets, and in the case of a receiver, to liquidate the regulated entity."

58.    On September 6, 2008, FHFA directed the Companies' boards to consent to conservatorship. Given that the Companies were not in financial distress and were in no danger

24

of defaulting on their debts, the Companies' directors were confronted with a Hobson's choice: face intense scrutiny from federal agencies for rejecting conservatorship or submit to the demands of Treasury and FHFA. The Agencies ultimately obtained the Companies' consent by threatening to seize them if they did not acquiesce and by informing them that the Agencies had already selected new CEOs and had teams ready to move in and take control.

59.    In publicly announcing the conservatorship, FHFA committed itself to operate Fannie and Freddie as a fiduciary until they are stabilized. As FHFA acknowledged, the Companies' stock remains outstanding during conservatorship and "continue[s] to trade," *FHFA Fact Sheet, Questions and Answers on Conservatorship* 3, https://goo.gl/DV4nAt, and Fannie's and Freddie's stockholders "continue to retain all rights in the stock's financial worth," *id.* Director Lockhart testified before Congress that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest. Sept. 25, 2008, Hearing, U.S. House of Representatives, Committee on Financial Servs, H.R. Hrg. 110-142 at 29-30, 34.

60.    FHFA also emphasized that the conservatorship was temporary: "Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship." *FHFA Fact Sheet, Questions and Answers on Conservatorship* 2. Investors were entitled to rely on these official statements of the purposes of the conservatorship, and public trading in Fannie's and Freddie's stock was permitted to, and did, continue.

61.    In short, the Companies were not in financial distress when they were forced into conservatorship. The Companies' boards acquiesced to conservatorship based on the understanding that FHFA, like any other conservator, would operate the Companies as a

25

fiduciary with the goal of preserving and conserving their assets and managing them in a safe and solvent manner. And in publicly announcing the conservatorships, FHFA confirmed that the Companies' private shareholders continued to hold an economic interest that would have value, particularly as the Companies generated profits in the future.

### FHFA and Treasury Enter into the Purchase Agreements

62.     On September 7, 2008, Treasury and FHFA, acting in its capacity as conservator of Fannie and Freddie, entered into the Preferred Stock Purchase Agreements.

63.     In entering into the Purchase Agreements, Treasury exercised its temporary authority under HERA to purchase securities issued by the Companies. *See* 12 U.S.C. §§ 1455(*l*), 1719(g). To exercise that authority, the Secretary of the Treasury ("Secretary") was required to determine that purchasing the Companies' securities was "necessary . . . to provide stability to the financial markets; . . . prevent disruptions in the availability of mortgage finance; and . . . protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B). In making those determinations, the Secretary was required to consider six factors:

> (i) The need for preferences or priorities regarding payments to the Government.
> (ii) Limits on maturity or disposition of obligations or securities to be purchased.
> (iii) *The [Companies'] plan[s] for the orderly resumption of private market funding or capital market access.*
> (iv) The probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment.
> (v) *The need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies].*
> (vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C) (emphasis added).

64.     In analyzing HERA, the Congressional Budget Office emphasized that only "before the temporary authority expired" could Treasury "provide funds to the [Companies]." CBO's Estimate of Cost of the Administration's Proposal to Authorize Federal Financial Assistance for the Government-Sponsored Enterprises for Housing at 2–3 (July 22, 2008) *available at* https://goo.gl/pWawgv. "Consequently, if the Treasury purchased equity in Fannie Mae or Freddie Mac, that purchase cost would also be recorded on the budget as budget authority and outlays in 2009 or during the first few months of fiscal year 2010, before the temporary financial assistance authority expired." *Id.* at 7.

65.     Treasury's authority under HERA to purchase the Companies' securities expired on December 31, 2009. *See* 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4). After that date, HERA authorized Treasury only "to hold, exercise any rights received in connection with, or sell" previously purchased securities. *Id.* §§ 1455(*l*)(2)(D), 1719(g)(2)(D). HERA's legislative history underscores the temporary nature of that authority. Secretary Paulson testified to Congress that HERA would give "Treasury an 18-month *temporary* authority to purchase—only if necessary—equity in either of these two [Companies]." *Recent Developments in U.S. Financial Markets and Regulatory Responses to Them: Hearing before the Comm. on Banking, Housing and Urban Dev.*, 100th Cong. (2008) (statement of Henry M. Paulson, Secretary, Dep't of the Treasury) at 5 (emphasis added). In response to questioning from Senator Shelby, Secretary Paulson reiterated that Treasury's authority to purchase Fannie and Freddie stock was intended to be a "short-term" solution that would expire at "the end of 2009." *Id.* at 11-12.

66.     Treasury's PSPAs with Fannie and Freddie are materially identical. Under the original unamended agreements, Treasury committed to provide up to $100 billion to each Company to ensure that it maintained a positive net worth. In particular, for quarters in which

either Company's liabilities exceed its assets under Generally Accepted Accounting Principles, the PSPAs authorize Fannie and Freddie to draw upon Treasury's commitment in an amount equal to the difference between its liabilities and assets.

67.     In return for Treasury's funding commitment, Treasury received 1 million shares of Government Stock in each Company and warrants to purchase 79.9% of the common stock of each Company at a nominal price. Exercising these warrants would entitle Treasury to up to 79.9% of all future profits of the Companies, subject to the Companies' obligation to satisfy their dividend obligations with respect to the preferred stock and to share the remaining 20.1% of those profits with private common shareholders. As Treasury noted in entering the PSPAs, the warrants "provide potential future upside to the taxpayers." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

68.     Treasury's Government Stock in each Company had an initial liquidation preference of $1 billion. This liquidation preference increases by one dollar for each dollar the Companies receive from Treasury pursuant to the PSPAs. In the event the Companies liquidate, Treasury is entitled to recover the full liquidation value of its shares before any other shareholder may recover anything.

69.     Upon entering the PSPAs, Treasury did not disburse any funds to the Companies. It is only when Fannie and Freddie draw upon the funding commitment that funds are disbursed, and Treasury's liquidation preference is increased accordingly. Thus, when Treasury disburses funds to Fannie and Freddie under the funding commitment it effectively purchases additional Government Stock. Secretary Paulson has admitted that when Treasury provides money to Fannie and Freddie under the PSPAs, it is "purchasing preferred shares." PAULSON, ON THE BRINK 168. *See also* Action Memorandum for Secretary Paulson (Sept. 7, 2008) ("Treasury's

[PSPA] provides for the purchase of up to $100 billion in [Government Stock] from each [Company] to help ensure that they each maintain a positive net worth.").

70.     In addition to the liquidation preference, the original unamended PSPAs provided for Treasury to receive either a cumulative cash dividend equal to 10% of the value of the outstanding liquidation preference or a stock dividend. If the Companies decided not to pay the dividend in cash, the value of the dividend would be added to the liquidation preference— effectively amounting to an in-kind dividend payment of additional Government Stock. After an in-kind dividend payment, the dividend rate would increase to 12% until such time as full cumulative dividends were paid in cash, at which point the rate would return to 10%. The plain terms of the PSPAs thus make clear that Fannie and Freddie never were required to pay a cash dividend to Treasury but rather had the discretion to pay dividends in kind. *See, e.g.*, U.S. TREASURY DEP'T OFFICE OF PUB. AFFAIRS, FACT SHEET: TREASURY SENIOR PREFERRED STOCK PURCHASE AGREEMENT, Sept. 7, 2008 ("The senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash . . . ."); Treasury Presentation to the U.S. Securities and Exchange Commission, GSE Preferred Stock Purchase Agreements (PSPA), Overview and Key Considerations at 9, June 13, 2012 ("Dividend Rate Cash 10%; if elected to be paid in kind ('PIK') 12%."). Moreover, there was never any risk that payment of dividends would render the Companies insolvent since it would have been illegal under state law for either Company to pay a dividend that would render it insolvent.

71.     Numerous materials prove beyond any reasonable doubt that the Agencies recognized that the PSPAs were designed, as their express terms plainly provide, to allow the payment of dividends in kind—in additional senior preferred stock—rather than in cash. Jeff

Foster, one of the architects of the Net Worth Sweep at Treasury, has testified in a deposition in the CFC case that he could not identify any "problems of the circularity [in dividend payments that] would have remained had the [payment-in-kind] option been adopted." In an internal October 2008 email to Mario Ugoletti—who was then a Treasury official, but later moved to FHFA and was a key point of contact with Treasury in the development of the Net Worth Sweep—another Treasury official indicated that Treasury's consultant wanted to know "whether we expect [Fannie and Freddie] to pay the preferred stock dividends in cash or to just accrue the payments." Mr. Ugoletti did not forget about this feature of the PSPAs when he moved to FHFA. Indeed, he acknowledged the option to pay dividends "in kind" in an email that he sent the very day the Net Worth Sweep was announced. In a similar vein, a document attached to a September 16, 2008, email between FHFA officials expressly states that PSPA dividends may be "paid in-kind." In an October 2008 email to Treasury and FHFA officials, a Treasury consultant sought to clarify whether Fannie and Freddie "intend[ed] to pay cash at 10 percent or accrue at 12 percent as a matter of policy." An internal Treasury document says that the dividend rate "may increase to the rate of 12 percent if, in any quarter, the dividends are not paid in cash." And an internal FHFA document says that Treasury's senior stock pays "10 percent cash dividend (12 percent payment-in-kind)."

72.      Documents that the Agencies placed in the public domain also support this understanding of the payment-in-kind option. Upon entering the PSPAs Treasury released a fact sheet stating that, "[t]he senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash . . . ." U.S. TREASURY DEP'T OFFICE OF PUB. AFFAIRS, FACT SHEET: TREASURY SENIOR PREFERRED STOCK PURCHASE AGREEMENT (Sept. 7, 2008), https://goo.gl/ynb3TC; *see also* Treasury Presentation to SEC, GSE

Preferred Stock Purchase Agreements (PSPA), Overview and Key Considerations at 9, June 13, 2012 (Treasury presentation stating that dividend rate of the PSPAs would be 12% "if elected to be paid in kind").

73.     The Companies shared this understanding of the terms of their agreements with Treasury. Fannie's and Freddie's CFOs have testified in the CFC case that they were aware of the payment-in-kind option. Various Freddie documents say that "[t]he dividend becomes 12% if Freddie Mac is unable to pay the dividend through organic income," that "[t]he senior preferred stock will pay quarterly cumulative dividends at a rate of 10% per year or 12% in any quarter in which dividends are not paid in cash," that Treasury's stock "[p]ays quarterly cumulative dividend rate at 10% per year, or 12% in any quarter in which dividends are not paid in cash," and that Treasury's stock "will pay quarterly cumulative dividends at a rate of 10% per year, or 12% in any quarter in which dividends are not paid in cash." Similarly, Fannie documents say that "Treasury's preferred stock "has an annual dividend rate of 10%, which could increase to 12% if not paid in cash," and that "[i]f at any time . . . the Company does not pay the cash dividends in a timely manner, . . . the annual dividend rate will be 12%."

74.     Moreover, even if the Agencies and the Companies had taken a different view of the express terms of the PSPAs, there was never any risk that payment of dividends would render the Companies insolvent since it would have been illegal for either Company to pay a dividend that would render it insolvent.

75.     An in-kind dividend payment would not decrease Treasury's funding commitment because only when the Companies receive "funding under the Commitment" does its size decrease. Fannie and Freddie Amended and Restated Senior Preferred Stock Purchase Agreements ("PSPA") § 1. Thus, as the Congressional Research Service has acknowledged,

under the PSPAs' original terms the Companies could "pay a 12% annual senior preferred stock dividend indefinitely." N. ERIC WEISS, CONG. RESEARCH SERV., RL34661, FANNIE MAE'S AND FREDDIE MAC'S FINANCIAL PROBLEMS (Aug. 10, 2012). In other words, because of the payment-in-kind option, there was no risk—none whatsoever—that the PSPAs would force Fannie and Freddie to exhaust Treasury's funding commitment to facilitate the payment of dividends.

76.      Finally, the PSPAs provided for the Companies to pay Treasury a quarterly periodic commitment fee "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." PSPA § 3.2(a). The periodic commitment fee was to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive it for up to a year at a time. Treasury has exercised this option and has never received a periodic commitment fee under the PSPAs. Even if the fee had been charged, the Companies were always free under the express terms of the PSPAs to pay the fee in-kind with additional senior preferred stock rather than in cash, a fact that Freddie's auditor recognized in a document produced in the CFC case. *See* PSPA § 3.2(c) ("At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock . . . .").

77.      The PSPAs were "structure[d]" to "enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts owed." Action Memorandum for Secretary Paulson (Sept. 7, 2008). Nevertheless, while Treasury's commitment remains outstanding, Fannie and Freddie generally are prohibited from paying down amounts added to the liquidation preference due to draws from Treasury's commitment. *See* Fannie and Freddie Government Stock Certificates § 3(a).

78.     The PSPAs prohibit Fannie and Freddie from declaring and paying dividends on any securities junior to Treasury's Government Stock unless full cumulative dividends have been paid to Treasury on its Government Stock for the then-current and all past dividend periods.

79.     In approving the exercise of Treasury's temporary authority under HERA to purchase securities of the Companies, Treasury Secretary Paulson determined (1) "[u]nder conservatorship, Fannie Mae and Freddie Mac will continue to operate as going concerns"; (2) "Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent operations"; and (3) "[c]onservatorship preserves the status and claims of the preferred and common shareholders." Action Memorandum for Secretary Paulson (Sept. 7, 2008).  But as explained below, the Net Worth Sweep annihilates the status and claims of the Companies' preferred and common shareholders.

### Treasury and FHFA Amend the Purchase Agreements
### To Increase Treasury's Funding Commitment

80.     On May 6, 2009, the Agencies amended the terms of the Purchase Agreements to increase Treasury's funding commitment to both Fannie and Freddie. In particular, under the amendment Treasury's total commitment to each Company increased from $100 billion to $200 billion.

81.     On December 24, 2009—one week before Treasury's temporary authority under HERA expired—the Agencies again amended the terms of Treasury's funding commitment. Instead of setting that commitment at a specific dollar amount, the second amendment established a formula to allow Treasury's total commitment to each Company to exceed (but not fall below) $200 billion depending upon any deficiencies experienced in 2010, 2011, and 2012, and any surplus existing as of December 31, 2012.

82.     Treasury's authority under HERA then expired on December 31, 2009. As Treasury acknowledged, expiration of this authority meant that its "ability to make further changes to the PSPAs . . . [was] constrained." Action Memorandum for Secretary Geithner at 3 (Dec. 22, 2009).

### The Agencies Force Accounting Changes To Increase the Companies' Draws From Treasury

83.     Beginning in the third quarter of 2008—when FHFA took control of the Companies as conservator—the conservator began to make wildly pessimistic and unrealistic assumptions about the Companies' future financial prospects. Those assumptions triggered adjustments to the Companies' balance sheets, most notably write-downs of significant tax assets and the establishment of large loan loss reserves, which caused the Companies to report non-cash losses. Although reflecting nothing more than faulty accounting assumptions about the Companies' future prospects and having no effect on the cash flow the Companies were generating, these non-cash losses temporarily decreased the Companies' reported net worth by hundreds of billions of dollars. For example, in the first year and a half after imposition of the conservatorship, Fannie reported $127 billion in losses, but only $16 billion of that amount reflected actual credit-related losses. Upon information and belief, FHFA directed Fannie and Freddie to record these excessive non-cash losses, which resulted in excessive purchases of Government Stock by Treasury.

84.     By the end of 2011, the Companies' reported net worth had fallen by $100 billion as a result of the decision made shortly after imposition of the conservatorship to write down the value of their deferred tax assets. A deferred tax asset is an asset that may be used to offset future tax liability. Under Generally Accepted Accounting Principles, if a company determines that it is unlikely that some or all of a deferred tax asset will be used, the company

must establish a "valuation allowance" in the amount that is unlikely to be used. In other words, a company must write down a deferred tax asset if it is unlikely to be used to offset future taxable profits. Shortly after FHFA took control of the Companies, FHFA made the implausible assumption that the Companies would *never again* generate taxable income and that their deferred tax assets were therefore worthless. That incomprehensibly flawed decision dramatically reduced the Companies' reported net worth.

85.     The decision to designate excessive loan loss reserves was another important factor in the artificial decline in the Companies' reported net worth during the early years of conservatorship. Loan loss reserves are an entry on the Companies' balance sheets that reduces their reported net worth to reflect anticipated losses on the mortgages they own. Beginning when FHFA took control of the Companies in the third quarter of 2008 and continuing through 2009, the Companies were forced to provision additional loan loss reserves far in excess of the credit losses they were actually experiencing. The extent to which excess loan loss reserve provisioning reduced the Companies' net worth is dramatically illustrated by the following chart, which compares Fannie's loan loss reserve provisioning to its actual credit losses for 2006 through 2014. As the chart shows, FHFA caused Fannie to make grossly excessive loan loss reserve provisions in 2008 and 2009. The excessive nature of these loan loss provisions was readily apparent by 2012, and the inevitable reversals would flow through to income on Fannie's balance sheet.

**Companies' Loan Loss Reserve Provisions vs. Credit Expenses**



86.     Despite the fact that the Companies' mortgage portfolios were safer than the similar portfolios held by banks involved in the mortgage business, banks were much more accurate—and, with the consent of their regulators, far less aggressive—in reducing their net worth to reflect expected loan losses. The following chart illustrates this fact:



87.     To date, the Companies have drawn a total of $187 billion from Treasury, in large part to fill the holes in the Companies' balance sheets created by these artificial non-cash losses imposed under conservatorship. Including Treasury's initial $1 billion liquidation preference in each Company, Treasury's liquidation preference for its Government Stock amounts to approximately $117 billion for Fannie and approximately $72 billion for Freddie. Approximately $26 billion of these combined amounts were drawn simply to pay the 10% dividend payments owed to Treasury. (In other words, FHFA requested draws to pay Treasury this $26 billion in cash that was not otherwise available rather than electing to pay the dividends in kind. Had the dividends been paid in kind, FHFA would not have had to draw from—and, consequently, reduce the remaining size of—Treasury's commitment to pay them.) Thus, Treasury actually disbursed approximately $161 billion to the Companies, primarily reflecting temporary changes in the valuation estimates of assets and liabilities.

## The Companies Return to Profitability and Stability

88.     As explained above, the "losses" Fannie and Freddie experienced under conservatorship were driven primarily by temporary and unrealistically pessimistic accounting decisions, not by a failure to generate enough revenue to cover their expenses. Indeed, although they reported significant declines in their net worth as a result of highly questionable accounting decisions, throughout the conservatorship they have had more than enough cash reserves and operational revenues to cover their expenses.

89.     By 2012, Fannie and Freddie began generating consistent profits notwithstanding the anchor of their overstated loss reserves and the write-down of their deferred tax assets. Fannie has not drawn on Treasury's commitment since the fourth quarter of 2011, and Freddie has not drawn on Treasury's commitment since the first quarter of 2012. In fact, in the first two quarters of 2012, the Companies posted sizable profits totaling more than $11 billion.

90.     By 2012, the Companies were well-positioned to continue generating robust profits for the foreseeable future. Fannie's and Freddie's financial results are strongly influenced by home prices. And as FHFA's own Home Price Index shows, the market reached its bottom in 2011:



91.     The improving housing market was coupled with stricter underwriting standards at Fannie and Freddie. As a result—and as the Agencies knew—Fannie- and Freddie-backed loans issued after 2008 had dramatically lower serious delinquency rates than loans issued between 2005 and 2008. The strong quality of these newer "vintages" of loans boded well for Fannie's and Freddie's future financial prospects.

92.     Together, the Companies' return to robust profitability and the stable recovery of the housing market showed in early 2012 that the Companies could in time redeem Treasury's Government Stock and that value remained in their preferred and common stock. Indeed, a presentation sent to senior Treasury officials in February 2012 indicated that "Fannie and Freddie could have the earnings power to provide taxpayers with enough value to repay Treasury's net cash investments in the two entities." The Companies' financial performance and outlook only further improved in the ensuing months.  In the weeks leading up to the Net Worth Sweep, one Treasury official observed that Freddie's second quarter 2012 results were "very

positive," and a report circulated among senior FHFA officials said that the agency deserved a "high five" for the Companies' strong financial outlook.

93.     Furthermore, as a result of Fannie's and Freddie's return to sustained profitability, it was clear that the overly pessimistic accounting decisions weighing down the Companies' balance sheets would have to be reversed. Indeed, by early August 2012, the Agencies knew that Fannie and Freddie were poised to generate massive profits well in excess of the Companies' dividend obligations to Treasury—profits that would make the $11 billion the Companies generated in the first half of 2012 look small by comparison.

94.     By August 2012, the Agencies knew that the Companies' reserves for loan losses far exceeded their actual losses. These excess loss reserves artificially depressed the Companies' net worth, and reversing them would increase the Companies' net worth accordingly. Indeed, on July 19, 2012, a Treasury official observed that the release of loan loss reserves could "increase the [Companies'] net [worth] substantially." And the Agencies were focused on this issue. An internal briefing memorandum prepared for Under Secretary Miller in advance of the August 9, 2012 meetings with Fannie and Freddie executives reveals that the number one question Treasury had for the Companies was "how quickly they forecast releasing credit reserves." And a handwritten note on a presentation from the August 9 meeting with Freddie says to "expect material release of loan loss reserves in the future." FHFA also knew that loan loss reserve releases would boost the Companies' profits going forward, as FHFA officials attended a meeting of Freddie's Loan Loss Reserve Governance Committee on August 8, 2012. FHFA's knowledge of the status of the Companies' loan loss reserves is also dramatically illustrated by a July 2012 FHFA presentation showing that starting in 2008 the Companies had set aside loan loss reserves far in excess of their actual losses.

95.     Another principal driver of the outsized profits that the Companies would inevitably generate was the mandated release of the Companies' deferred tax assets valuation allowances. By mid-2012, Fannie and Freddie had combined deferred tax assets valuation allowances of nearly $100 billion. Under relevant accounting rules, those valuation allowances would have to be reversed if the Companies determined that it was more likely than not that they would generate taxable income and therefore be able to use their deferred tax assets. The Treasury Department was intimately familiar with these issues, having seen such a reversal in February 2012 in connection with its massive investment in AIG. In 2011, it was also known within Fannie that the valuation allowance would be reversed; the only question was the timing.

96.     Indeed, by the time the Net Worth Sweep was announced, it was apparent to the Agencies that Fannie and Freddie would soon be in a position to reverse the valuation allowances for their deferred tax assets. On July 13, 2012, Bradford Martin, Principal Advisor in FHFA's Office of Conservatorship Operations, broadly circulated within FHFA minutes from a July 9, 2012 Fannie executive management meeting. The recipients of the email included Acting Director DeMarco and Mr. Ugoletti. The minutes stated that Fannie Treasurer David Benson "referred to the next 8 years as likely to be 'the golden years of GSE earnings.' " Projections were attached to the email containing the following slide:



97.     Those projections expressly stated the assumption that Fannie would not be paying taxes because it would be using its deferred tax assets—and if Fannie was expecting to use its deferred tax assets, it would have to release the valuation allowance it had established for them. FHFA knew this; indeed, FHFA accountants were monitoring the Companies' deferred tax assets situation, and FHFA knew that the Companies' audit committees were assessing the status of the valuation allowances on a quarterly basis. In addition, Ms. McFarland testified in the CFC case that in July 2012 she would have mentioned the potential release of the valuation allowance at a Fannie executive committee meeting attended by at least one FHFA official, and she also testified that FHFA was on notice of a statement she made to Under Secretary Miller on August 9, 2012 regarding the potential release of the valuation allowance before the Agencies entered the third amendment to the PSPAs on August 17, 2012.

98.     Like FHFA, Treasury was in possession of information showing that the Companies would soon generate substantial profits, thus making it inevitable that they would release their deferred tax asset valuation allowances.  In November 2011, Treasury consultant Grant Thornton prepared projections based on September 2011 data reporting combined profits of over $20 billion in 2014, with annual profits then gradually declining to a long-term figure of about $13.5 billion. Profits of this magnitude necessarily would have led to the reversal of the valuation allowances. And Treasury took notice. Hand-written notes on a Grant Thornton document produced by Treasury displaying Freddie's results through the first quarter of 2012 anticipate that Freddie could release its valuation allowance "probably [in] 2013, 2014." And the agenda for a meeting indicates that by May 2012 Treasury and Grant Thornton were discussing "[r]eturning the deferred tax asset to the GSE balance sheets" and that Treasury planned to discuss this issue with FHFA and the Companies in early June.

99.     The manager of Grant Thornton's valuation services to Treasury, Anne Eberhardt, admitted in a deposition in the CFC case that the projections based on September 2011 data were no longer valid 11 months later, and Fannie's CFO, Susan McFarland, has testified that it was particularly important to have fresh financial forecasts at that time. Mr. Ugoletti and Ms. Eberhardt likewise have testified to the importance of using up-to-date financial information, and Mr. DeMarco testified that FHFA as conservator was "constantly responding to a changing economic environment." And as Mr. DeMarco also testified, one change that took place between September 2011 and mid-August 2012 "was strengthening in the housing market." Thus, by August 2012, it was apparent that the outdated Grant Thornton projections drastically *underestimated* Fannie's and Freddie's earning capacity. (Mr. Ugoletti also has admitted that FHFA's own projections consistently were overly pessimistic leading up to August

2012.) Treasury and FHFA knew this, and they knew that reversal of the deferred tax asset valuation allowances was mandated by applicable accounting rules and was imminent. As previously detailed, this fact came into sharp focus on August 9, 2012, when Under Secretary Miller and other senior Treasury officials had meetings with the senior executives of both Fannie and Freddie. During the meeting with Fannie's management, Treasury was presented with ten-year projections substantially similar to those that Fannie had previously shared with FHFA, showing the Company earning an average of more than $11 billion per year from 2012 through 2022 and having over $116 billion left of Treasury's funding commitment at the end of that time period. Those projections are reproduced below:

## Annual Detail of Cumulative Dividends and SPSPA Draws

**Fannie Mae**

($ in Billions)

| | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 11.6 | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| Preferred Dividend Payment | 19.8 | 11.6 | 11.8 | 12.1 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.3 | 12.5 |
| Residual Equity | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 1.8 | 2.8 | 2.7 | 1.9 | 0.5 | 0.0 | 0.0 |
| Cumulative Dividends | 19.8 | 31.4 | 43.2 | 55.3 | 67.6 | 79.8 | 92.1 | 104.3 | 116.6 | 128.8 | 141.1 | 153.6 |
| Cumulative SPSPA Draws | (116.1) | (116.1) | (119.0) | (121.2) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (122.9) | (124.8) |
| Cumulative Dividends Less Draws | (96.3) | (84.7) | (75.8) | (65.9) | (53.9) | (41.7) | (29.4) | (17.2) | (4.9) | 7.3 | 18.3 | 28.8 |
| SPSPA Funding Cap | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 |
| Remaining Funding under SPSPA | 124.8 | 124.8 | 122.0 | 119.7 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 118.1 | 116.1 |

Note: 2012-2016 figures from Fannie Mae July BOD corporate forecast. 2017-2022 figures are based on simplifying assumptions derived from trends observed within the 2012-2016 horizon.

**Freddie Mac**

($ in Billions)

| | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 11.6 | 7.5 | 8.2 | 8.6 | 9.0 | 8.7 | 8.3 | 7.7 | 7.1 | 6.7 | 6.5 |
| Preferred Dividend Payment | 16.3 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 |
| Residual Equity | 0.0 | 0.0 | 0.4 | 1.7 | 3.5 | 5.6 | 6.9 | 7.9 | 8.1 | 7.9 | 7.2 | 6.3 |
| Cumulative Dividends | 16.3 | 23.7 | 31.1 | 38.4 | 45.8 | 53.2 | 60.6 | 68.0 | 75.4 | 82.8 | 90.2 | 97.6 |
| Cumulative SPSPA Draws | (72.2) | (116.1) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) |
| Cumulative Dividends Less Draws | (55.9) | (92.4) | (41.9) | (34.5) | (27.1) | (19.7) | (12.3) | (4.9) | 2.5 | 9.9 | 17.3 | 24.7 |
| SPSPA Funding Cap | 220.5 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 |
| Remaining Funding under SPSPA | 148.3 | 105.2 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 |

Note: 2012-2022 figures are based on simplifying assumptions derived from Fannie Mae forecast trends and observed relationships between key Fannie Mae and Freddie Mac performance metrics. Reported 2011 results re-aligned as necessary to correspond to Fannie Mae management reporting.

Note: Numbers may not foot due to rounding

7

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested



100.	Furthermore, Treasury learned that Fannie's near-term earnings likely would be even higher than those in the projections due to the release of the Companies' deferred tax assets valuation allowance. During the August 9 meeting, Fannie CFO Susan McFarland informed Treasury that the criteria for reversing the deferred tax assets valuation allowance could be met in the not-so-distant future. And when asked for more specifics by Under Secretary

Miller, Ms. McFarland stated that the reversal would be probably in the $50-billion range and probably sometime mid-2013, an assessment that proved remarkably accurate.

101.    While Mr. Ugoletti stated in a sworn declaration in the United States District Court for the District of Columbia that "neither the Conservator nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013," his deposition testimony in the CFC case contradicts that statement: "I don't know who else in FHFA or what they knew about the potential for that [i.e., that the deferred tax assets might be written back up in 2013], but . . . our accountants were monitoring this situation, they were monitoring . . . whether to revalue, they had to do it all the time, revalue or not revalue, and I do not recall knowing about that this was going to be an issue until really '13 when it became imminent that, oh, this has to happen now, and I don't know what anybody else thought about it." And when asked whether he knew "what Treasury thought about it," he answered, "I do not."

102.    In sum, by August 2012 the Agencies knew that Fannie and Freddie were poised to add tens of billions of dollars of deferred tax assets to their balance sheets and to reverse billions of dollars of loan loss reserves. These inevitable accounting decisions, coupled with Fannie's and Freddie's strong earnings from their day-to-day operations, meant that Fannie and Freddie would generate earnings well in excess of the Companies' dividend obligations to Treasury for the foreseeable future.

103.    In addition to the release of loan loss reserves and deferred tax assets valuation allowances, Fannie and Freddie also had sizeable assets in the form of claims and suits brought by FHFA as conservator relating to securities law violations and fraud in the sale of private-label securities to Fannie and Freddie between 2005 and 2007. Although federal regulators were aware

of the probable value of these claims even before the Companies were placed in conservatorship, the Companies were not permitted to aggressively pursue these claims against many of the Nation's largest banks until the financial crisis had ended. In 2013 and 2014, the Companies recovered over $18 billion from financial institutions via settlements of such claims and suits. The Companies, FHFA, and Treasury knew in August 2012 that the Companies would reap substantial profits from such settlements.

### FHFA and Treasury Amend the PSPAs To Expropriate Private Shareholders' Investment and Ensure Fannie and Freddie Cannot Exit Conservatorship

104.      On August 17, 2012, within days after the Companies had announced their return to profitability and just as it was becoming clear that they had regained the earnings power to redeem Treasury's Government Stock and exit conservatorship, the Agencies unilaterally amended the PSPAs for a third time. At the time that this third amendment was under consideration, Fannie and Freddie were experiencing a dramatic turnaround in their profitability. Due to rising house prices and reductions in credit losses, in early August 2012 the Companies reported significant income for the second quarter 2012 and neither required a draw from Treasury under the PSPAs. What is more, the Agencies knew that Fannie and Freddie were poised to generate massive profits from the reversal of overly pessimistic accounting decisions made in the early years of the conservatorships. But rather than fulfilling its statutory responsibility as conservator to return the Companies to sound and solvent business operations and, ultimately, to private control, FHFA entered into the Net Worth Sweep with Treasury, which transfers all of the Companies' substantial profits to Treasury, prevents them from ever exiting government control, and deprives private shareholders of any residual value in the Companies.

105.     The timing of the Net Worth Sweep was driven by the Companies' return to profitability. Given that return to profitability, there was no imminent risk that Fannie and Freddie would be depleting Treasury's funding commitment—that risk was at its lowest point since the start of the conservatorships. Communications within both FHFA and Treasury in the months leading up to the Net Worth Sweep confirm that fact by indicating that the Companies' bond investors regarded Treasury's funding commitment as sufficient. Rather than worry over exhausting Treasury's funding commitment, the "risk" that concerned the Agencies—indeed, their expectation—was that Fannie and Freddie would recognize extraordinary profits that would allow them to begin rebuilding their capital levels and position themselves to exit conservatorship and deliver value to their private shareholders.

106.     But notwithstanding the Agencies' statutory duties, the Administration had decided that Fannie and Freddie would *not* be allowed to exit conservatorship in their current form. Allowing Fannie and Freddie to rebuild their capital levels, however, would make that political decision more difficult to explain and sustain. It is thus not surprising that a document prepared for internal Treasury consumption and dated August 16, 2012 listed the Companies' "improving operating performance" and the "potential for near-term earnings to exceed the 10% dividend" as reasons for "putting in place a better deal for taxpayers" by promptly adopting the Net Worth Sweep. And it also is not surprising that FHFA perceived a "renewed push" from Treasury to implement the Net Worth Sweep on August 9, 2012.

107.     Communications involving White House official Jim Parrott provide further proof that the Net Worth Sweep was intended to keep Fannie and Freddie under the government's control and to dash the hopes of private investors of ever seeing any return on their investments. At the time of the Net Worth Sweep, Mr. Parrott was a senior advisor at the

48

National Economic Council, where he led a team of advisors charged with counseling President

Obama and the cabinet on housing issues. He worked closely with Treasury in the development

and rollout of the Net Worth Sweep. Indeed, the day after the Net Worth Sweep was announced,

he emailed Treasury officials congratulating them on achieving an important policy goal: "Team

Tsy, You guys did a remarkable job on the PSPAs this week. You delivered on a policy change

of enormous importance that's actually being recognized as such by the outside world . . . , and

as a credit to the Secretary and the President. It was a very high risk exercise, which could have

gone sideways on us any number of ways, but it didn't." What Treasury had accomplished, Mr.

Parrott's emails make clear, was guaranteeing that Fannie and Freddie would remain in perpetual

conservatorship and never again be run for the benefit of their private shareholders:

- In an email to a Treasury official on the day the Net Worth Sweep was announced, Mr. Parrott stated that "we've closed off [the] possibility that [Fannie and Freddie] ever[] go (pretend) private again."

- That same day, Mr. Parrott received an email from a market analyst stating that the Net Worth Sweep "should lay to rest permanently the idea that the outstanding privately held pref[ferred stock] will ever get turned back on." He forwarded the email to Treasury officials and commented that "all the investors will get this very quickly." (Mr. Ugoletti similarly was not surprised "that the preferred stock got hammered the day the Net Worth Sweep was announced.")

- At 8:30 a.m. on August 17, Mr. Parrott wrote an email to Alex Pollock, Peter Wallison, and Edward Pinto offering "to walk you through the changes we're announcing on the pspas today. Feel like fellow travelers at this point so I owe it to you." Pollock, Wallison, and Pinto had written a policy paper for the American Enterprise Institute in 2011

49

recommending that "Fannie Mae and Freddie Mac should be eliminated as government-sponsored enterprises (GSEs) over time."

- Also on August 17, Mr. Wallison was quoted in Bloomberg saying the following: "The most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government. . . . What the Treasury Department seems to be doing here, and I think it's a really good idea, is to deprive them of all their capital so that doesn't happen." In an email to Wallison that evening, Mr. Parrott stated, "Good comment in Bloomberg—**you are exactly right on substance and intent.**"

Mr. Parrott, who has left the Administration and is now with the Urban Institute, recently told The Economist that "[i]n the aftermath of the crisis there was widespread agreement that [Fannie and Freddie] needed to be replaced or overhauled." *A Funny Form of Conservation*, THE ECONOMIST, Nov. 21, 2015, *available at* http:goo.gl/gJVJrN. The Net Worth Sweep ensured that the Companies' return to profitability did not threaten this goal.

108.    This understanding of the purpose of the Net Worth Sweep is further supported by the testimony of Ms. McFarland, Fannie's CFO at the time. She believed that the Agencies imposed the Net Worth Sweep in response to what she told Treasury on August 9, and she thought its purpose "was probably a desire not to allow capital to build up within the enterprises and not to allow the enterprises to recapitalize themselves." According to Ms. McFarland, Fannie "didn't believe that Treasury would be too fond of a significant amount of capital buildup inside the enterprises."

50

109.     As Treasury stated when the Net Worth Sweep was announced, the dividend sweep of all of the Companies' net worth requires that "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012). The Net Worth Sweep, in short, effectively nationalized the Companies and confiscated the existing and potential value of all privately held equity interests, including the stock held by Plaintiff. Indeed, the government itself has stated in a brief in another case that an "interest in residual profits is the defining feature of an equity interest in a corporation." *Starr International Co. v. United States*, at 24, No. 2015-5103 (Fed. Cir. June 1, 2016). After the Net Worth Sweep, Treasury has the right to all residual profits, and it hence owns all the equity. All other equity interests have been eliminated.

110.     As a Staff Report from the Federal Reserve Bank of New York acknowledged, the Net Worth Sweep "effectively narrows the difference between conservatorship and nationalization, by transferring essentially all profits and losses from the firms to the Treasury." W. Scott Frame, et al., *The Rescue of Fannie Mae and Freddie Mac* at 21, FEDERAL RESERVE BANK OF NEW YORK STAFF REPORTS, no. 719 (Mar. 2015). The Economist stated the obvious in reporting that the Net Worth Sweep "squashe[d] hopes that [Fannie and Freddie] may ever be private again" and, as a result, "the companies' status as public utilities . . . appear[ed] crystal clear." Fannie Mae and Freddie Mac, *Back to Black*, THE ECONOMIST, Aug. 25, 2012, *available at* http:goo.gl/1PHMs. Secretary Geithner apparently believed that even before the Net Worth Sweep was imposed, "we had already effectively nationalized the GSEs . . ., and could decide how to carve up, dismember, sell or restructure those institutions." Plaintiff's Corrected Post-

Trial Proposed Findings of Fact 26.2.1(a), *Starr Int'l Co. v. United States*, No. 1:11-cv-779-TCW (Fed. Cl. March 2, 2015), ECF No. 430.

111.    As a result of the Net Worth Sweep, it is clear that FHFA will not allow Fannie and Freddie to exit conservatorship but rather will continue to operate them essentially as wards of the state, unless and until Congress takes action. Indeed, FHFA's website states that "FHFA will continue to carry out its responsibilities as Conservator" until "Congress determines the future of Fannie Mae and Freddie Mac and the housing finance market." FHFA as Conservator of Fannie Mae and Freddie Mac, http://goo.gl/PjyPZb. This is consistent with the testimony of former Acting Director DeMarco, who stated that he had no intention of returning Fannie and Freddie to private control under charters he perceived to be "flawed." Mr. Ugoletti also testified that FHFA's objective "was not for Fannie and Freddie Mac to emerge from conservatorship." HERA does not contemplate that FHFA will operate a perpetual conservatorship that is entirely contingent on the hope of unspecified legislative action at some point in the future.

112.    The Net Worth Sweep fundamentally changed the nature of Treasury's investment in the Companies. Instead of quarterly dividend payments at an annual rate of 10% (if paid in cash) or 12% (if paid in kind) of the total amount of Treasury's liquidation preference, the Net Worth Sweep entitles Treasury to quarterly payments of *all—100%—*of the Companies' existing net worth and future profits. Beginning January 1, 2013, the Companies have been required to pay Treasury a quarterly dividend equal to their *entire net worth*, minus a capital reserve amount that starts at $3 billion and decreases to $0 by January 1, 2018.

113.    The Net Worth Sweep is particularly egregious because it makes the Companies unique in financial regulation. All other financial institutions are required to retain minimum levels of capital that ensure that they can withstand the vicissitudes of the economic

cycle and are prohibited from paying dividends when they are not adequately capitalized. The FDIC's Risk Management Manual of Examination Policies explains why capital is critical to any financial institution: "It absorbs losses, promotes public confidence, helps restrict excessive asset growth, and provides protection to [market participants]." For this reason, in all other contexts financial regulators work to ensure that financial institutions maintain minimum capital levels.

114.    The Companies, in contrast, are not allowed to retain capital but instead must pay their entire net worth over to Treasury as a quarterly dividend. In other words, whereas other financial institutions are subject to *minimum* capital standards, the Net Worth Sweep makes the Companies subject to a capital *maximum*—any amount of retained capital that they hold in excess of a small and diminishing capital buffer is swept to Treasury on a quarterly basis. The effect of the Net Worth Sweep is thus to force the Companies to operate in perpetuity on the brink of insolvency and to immediately nullify the rights of private shareholders to any return *of* their principal or any return *on* their principal (i.e., in the form of dividends). In other contexts, federal regulators understand such an arrangement to be fundamentally unsafe and unsound. And indeed, HERA itself recognizes that a fundamental aspect of the Companies' soundness is the "maintenance of adequate capital."   12 U.S.C. § 4513(a)(1)(B)(i). Director Watt has expressed the same view, describing the Companies' inability to build capital reserves under the Net Worth Sweep as a "serious risk" that erodes investor confidence in the Companies because they have "no ability to weather quarterly losses."

115.    This dramatic departure from accepted practices is demonstrated by the following chart, which compares the equity to assets ratio of Fannie and Freddie to that

maintained by large insurers:



116.     This departure from sound and solvent operation has not gone unnoticed by Congress. Representatives Stephen Lee Fincher and Mick Mulvaney wrote to Secretary Lew and Director Watt to "express [their] concerns about [Fannie] and [Freddie] and the effect that the non-enforcement of statutory capital reserve requirements will have on the risk they pose to taxpayers." HERA, the Representatives wrote, "specifically tasked the newly-created Federal Housing Finance Agency with establishing and enforcing more stringent capital standards for Fannie and Freddie. Inexplicably, and in violation of that statute, Fannie and Freddie currently hold far less capital than required, and according to Treasury's [PSPAs], are required to reduce their capital reserves by $600 million a year until they reach zero on January 1, 2018." "It is extremely troubling," the Congressmen continued, that Fannie and Freddie "are being

specifically directed to deplete their capital reserves. . . . In a post-Dodd-Frank world, Fannie and Freddie will be the only significant financial institutions not voluntarily or mandatorily raising their capital; instead, they are being told to lower their capital—to zero. This does not make sense." Representative Michael Capuano recently expressed similar sentiments, observing that "Fannie and Freddie are basically being used as a piggy bank by the Treasury, and at some point they will lose the lawsuits being brought on by investors and owe someone an awful lot of money." And Fortune has reported that the Net Worth Sweep "effectively nationalized" the Companies.

117.     Forcing the Companies to operate in an inherently unsafe and unsound condition also has deleterious effects on their borrowing costs, which is a major expense for both Companies. As former Acting Director DeMarco has admitted, if the Companies are highly leveraged and have a relatively small amount of capital then, all other things being equal, their cost of borrowing will be higher.

118.     The Companies did not receive any meaningful consideration for agreeing to the Net Worth Sweep. Because the Companies always had the option to pay dividends "in kind" at a 12% interest rate, the Net Worth Sweep did not provide the Companies with any additional flexibility or benefit. Rather than accruing a dividend at 12% (which never had to be paid in cash), FHFA unlawfully agreed to make a payment of substantially all the Companies' net worth each quarter.

119.     The Net Worth Sweep also provides that the Companies will not have to pay a periodic commitment fee under the PSPAs while the Net Worth Sweep is in effect. But Treasury had consistently waived the periodic commitment fee before the Net Worth Sweep, and it could only set the amount of such a fee with the agreement of the Companies and at a market rate. And

that rate likely would have been, at most, a small fraction of the outstanding amount of Treasury's commitment. Freddie forecasted its "sensitivity" to imposition of a periodic commitment fee as follows: "Our sensitivity to a commitment fee based on remaining commitment available beginning in 2013 of $149 billion shows that a 25 bps fee results in a $0.4 billion annual impact on Stockholders' Equity." Further, the purpose of the fee was to compensate Treasury for its ongoing support in the form of the commitment to invest in the Companies' Government Stock. By the time of the Net Worth Sweep, the 10 percent return on the Government Stock and the warrants for 79.9 percent of the common stock provided a more than adequate return on the government's stand-by commitment, and thus any additional fee would have been inappropriate. In August of 2012, the Companies had returned to stable profitability and were no longer drawing from Treasury's commitment. Given the Companies' return to profitability, the market rate for the periodic commitment fee in 2012, 2013, and 2014 would have been zero. And, of course, by the time of the Net Worth Sweep, Treasury's temporary authority to purchase the Companies' securities had already expired, making any further purchases contrary to law. Finally, even if a market-rate fee had been agreed between Treasury and FHFA and imposed pursuant to the PSPA, the Companies had sufficient market power to pass the entire amount of this fee through to their customers—as the Companies do for other operating and financing costs—without affecting profitability or the value of the Companies' equity securities.

120.    For the foregoing reasons, Mr. Ugoletti's statement, in his sworn declaration to the District Court for the District of Columbia, that the value of the periodic commitment fee was "incalculably large" is wholly inaccurate. Indeed, Mr. Ugoletti subsequently testified that he could not recall discussing his idea that the value of the fee was incalculably large with anyone at

FHFA or Treasury, that he did not know whether anybody shared that view, that he is neither "an expert on periodic commitment fees," nor "in the business of calculating" such fees, and that he did not know whether anyone at FHFA or Treasury ever tried to calculate the value of the periodic commitment fee. Mr. DeMarco also testified that he could not recall anyone at FHFA attempting to quantify what the periodic commitment fee would have been in the absence of the Net Worth Sweep.

121.    As the Agencies anticipated, Fannie and Freddie have been extraordinarily profitable since the imposition of the Net Worth Sweep. From the third quarter of 2012 through the first quarter of 2016, Fannie and Freddie have reported total comprehensive income of $119 billion and $72 billion, respectively.

122.    As the Agencies also anticipated, Fannie's 2013 net income included the release of over $50 billion of the company's deferred tax assets valuation allowance. The release of this valuation allowance underscores Fannie's financial strength, as it demonstrates Fannie's expectation that it will generate sizable taxable income moving forward. Fannie relied on the following evidence of future profitability in support of the release of its valuation allowance:

- Its profitability in 2012 and the first quarter of 2013 and expectations regarding the sustainability of these profits;
- Its three-year cumulative income position as of March 31, 2013;
- The strong credit profile of the loans it had acquired since 2009;
- The significant size of its guaranty book of business and its contractual rights for future revenue from this book of business;
- Its taxable income for 2012 and its expectations regarding the likelihood of future taxable income; and
- That its net operating loss carryforwards will not expire until 2030 through 2031 and its expectation that it would utilize all of these carryforwards within the next few years.

123.    Freddie's 2013 earnings also reflect the Company's decision to release a sizeable (in excess of $20 billion) deferred tax assets valuation allowance. Freddie relied on the following evidence in support of its release of its valuation allowance:

- Its three-year cumulative income position as of September 30, 2013;
- The strong positive trend in its financial performance over the preceding six quarters, including the quarter ended September 30, 2013;
- The 2012 taxable income reported in its federal tax return which was filed in the quarter ended September 30, 2013;
- Its forecasted 2013 and future period taxable income;
- Its net operating loss carryforwards do not begin to expire until 2030; and
- The continuing positive trend in the housing market.

124.    The Net Worth Sweep has proven to be immensely profitable for the federal government. The table below lists only the dividends Fannie and Freddie have paid under the Net Worth Sweep, and it does not include dividends paid before that time:

### Dividend Payments Under the Net Worth Sweep
### (in billions)

|      |    | Fannie | Freddie | Combined |
|------|----|--------|---------|----------|
| 2013 | Q1 | $4.2   | $5.8    | $10.0    |
|      | Q2 | $59.4  | $7.0    | $66.4    |
|      | Q3 | $10.2  | $4.4    | $14.6    |
|      | Q4 | $8.6   | $30.4   | $39.0    |
| 2014 | Q1 | $7.2   | $10.4   | $17.6    |
|      | Q2 | $5.7   | $4.5    | $10.2    |
|      | Q3 | $3.7   | $1.9    | $5.6     |
|      | Q4 | $4.0   | $2.8    | $6.8     |
| 2015 | Q1 | $1.9   | $0.9    | $2.8     |
|      | Q2 | $1.8   | $0.7    | $2.5     |

|  |  |  |  |  |
|---|---|---|---|---|
|  | Q3 | $4.4 | $3.9 | $8.3 |
|  | Q4 | $2.2 | $0.0 | $2.2 |
| **2016** | Q1 | $2.9 | $1.7 | $4.6 |
|  | Q2 | $0.9 | $0.0 | $0.9 |
|  | Q3 | $2.9 | $0.9 | $3.8 |
| **Total** |  | **$120.0** | **$75.3** | **$195.3** |

125.     As the above chart shows, the Companies have paid Treasury $195.3 billion in "dividends" under the Net Worth Sweep. Had they instead been paying 10% cash dividends, they would have paid Treasury approximately $71 billion. The following chart shows how imposition of the Net Worth Sweep dramatically increased the size of the Companies' dividend payments to Treasury through the first two quarters of 2016:



126.    Had the Companies used their quarterly profits in excess of Treasury's 10% dividend to partially retire Treasury's senior preferred stock, Treasury's remaining investment in the Companies would today be roughly $20 billion. But rather than using the Companies' massive profits to rebuild capital or reduce their dividend obligations to Treasury, the Net Worth Sweep required the Companies to simply pay these funds over to Treasury in exchange for nothing. As explained above, the Agencies knew that the Net Worth Sweep would result in this massive financial windfall for the federal government.

127.     The Net Worth Sweep is squarely contrary to FHFA's statutory responsibilities as conservator of Fannie and Freddie. As conservator FHFA is obligated to "take such action as may be—(i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). As FHFA itself has acknowledged, the agency "has a statutory charge to work to restore a regulated entity in conservatorship to a sound and solvent condition . . . ." 76 Fed. Reg. at 35,727. Accordingly, "allowing capital distributions to deplete the entity's conservatorship assets would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity." *Id.* Thus, FHFA's own regulations generally prohibit Fannie and Freddie from making a "capital distribution while in conservatorship," subject to certain exceptions. 12 C.F.R. § 1237.12(a). Indeed rather than putting Fannie and Freddie in sound and solvent condition the Net Worth Sweep's reduction and eventual elimination of the Companies' capital reserves *increases* the likelihood of additional Treasury investment in the Companies while eliminating the possibility that private shareholders will ever receive a return on their investment.  Fannie has acknowledged as much, describing the Net Worth Sweep as a "risk factor," Fannie Mae 2012 Annual Report at 46–47 (Form 10-K) (Apr. 2, 2013), http://goo.gl/rGVpQq, and observing that the Net Worth Sweep prevents Fannie from "retain[ing] capital to withstand a sudden, unexpected economic shock." Press Release, Statement by Kelli Parsons, Senior Vice President and Chief Communications Officer, on Stress Test Results (Apr. 30, 2014), http://goo.gl/g4pSNB.

128.     But for the Net Worth Sweep Fannie and Freddie would have over $124 billion of additional capital to cushion them from any future downturn in the housing market and to

reassure debtholders of the soundness of their investments. Alternatively, had the Companies used their profits in excess of Treasury's 10% dividend to partially redeem Treasury's senior preferred stock, Treasury's remaining investment would be roughly $20 billion. Instead, because of the Net Worth Sweep, the Companies are required to operate at the edge of insolvency, with no prospect of ever generating value for private shareholders, rendering the Companies fundamentally unsafe and unsound and more likely to require an additional—albeit entirely avoidable—government bailout in the future. Depleting capital in this way is antithetical to the basic mission of a conservator. Indeed, former Acting Director DeMarco has testified that capital levels are "a key component of the safety and soundness of a regulated financial institution" and that, as a general matter, he thought that there should be more capital in the Companies to increase their safety and soundness.

129.     The Net Worth Sweep's quarterly sweep of all net profits thus plainly prevents the Companies from operating in a sound and solvent manner by prohibiting them from rebuilding their capital. Nor can distributing the entire net worth of the Companies to Treasury be reconciled with FHFA's statutory obligation to preserve and conserve their assets and property.

130.     FHFA fully understood that stripping capital out of a financial institution is the antithesis of operating it in a sound manner. Its recognition of the importance of capital levels is demonstrated by an event that took place shortly after the Net Worth Sweep was announced. Fannie initially determined that the Company should reverse its deferred tax assets valuation allowance as of December 31, 2012. Doing so, however, would reduce the amount of Treasury's remaining funding commitment under the formula established by the second amendment to the PSPAs. FHFA strongly opposed this reduction of the funding commitment, which it viewed as a

form of capital available to the Companies: "Capital is key driver for composite rating of critical concerns. The reduction in capital capacity from the U.S. Treasury and the SPSA agreements places undue risk on the future of Fannie Mae in conservatorship." Indeed, FHFA threatened Fannie that "if the amount of funds available under the agreement was reduced as a result of our releasing the valuation allowance in the fourth quarter of 2012, they would need to ensure the preservation of our remaining capital and undertake regulatory actions that could severely restrict our operations, increase our costs, or otherwise substantially limit or change our business in order to ensure the continued safety and soundness of our operations." As a result of this pressure from FHFA, Fannie reconsidered its decision and waited until the following quarter to release its valuation allowance, when the release would no longer affect the size of Treasury's funding commitment under the PSPAs. Waiting this extra quarter preserved approximately $34 billion of Treasury's funding commitment. The Net Worth Sweep, by contrast, has *reduced* the capital available to Fannie by a much larger amount—$124 billion, to date.

131.    The Net Worth Sweep is just one example of FHFA's efforts to use its status as the Companies' conservator and regulator to reform the Nation's housing finance system by eliminating Fannie and Freddie. FHFA also directed the Companies to develop the Common Securitization Platform—a de facto merger of the information technology systems the Companies use to issue mortgage-backed securities. FHFA has described the Common Securitization Platform as a "cornerstone[]" of housing finance reform that is intended to facilitate the entry of new competitors into the mortgage securitization business. The Common Securitization Platform is also part of FHFA's broader effort to force the Companies to issue "single securities"—mortgage-backed securities with identical characteristics that financial markets will regard as interchangeable. As with the Common Securitization Platform, the

ultimate goal of FHFA's single security initiative is to change the basic structure of the Nation's housing finance market to advantage the Companies' competitors.

132.     FHFA's efforts to use its powers to transform the Nation's housing finance system are further illustrated by "credit risk transfer" deals the Companies have agreed to in recent months. Under these deals, the Companies pay investors to share a portion of the risk associated with the portfolios of mortgages the Companies guarantee.  Such risk sharing deals are a priority for FHFA because they further its policy goal of increasing the role of financial institutions other than the Companies in the housing finance markets.  But because investors have little interest in participating in these risk sharing arrangements, the Companies have been forced to enter into them at FHFA's direction on extremely unfavorable terms.   As the prospectuses associated with these deals acknowledge, in many instances investors are being paid considerable sums to enter into risk-sharing arrangements in which the investors would only lose money if mortgage default rates precipitously rose far beyond the default rates that occurred during the height of the 2008 financial crisis. Entering into such deals is economically irrational for the Companies. On information and belief, FHFA understands this fact but is imposing credit risk transfers on the Companies in order to further its housing finance reform policy goals.

133.     The Net Worth Sweep is likewise one element of a broader plan to transform the housing finance market and to eliminate Fannie and Freddie. Indeed, a housing finance reform plan drafted by Treasury in early 2012 listed "restructur[ing] the PSPAs to allow for variable dividend payment based on positive net worth"—i.e., implementing a net worth sweep—as among the first steps to take in transitioning to the desired outcome.

134.     Contrary to statutory authority, both Treasury and FHFA understood the Net Worth Sweep to be a step toward the liquidation, not the rehabilitation, of the Companies. This

was in stark contrast to FHFA's then-Acting Director's statement two years earlier that, absent legislative action, "the only [post-conservatorship option] that FHFA may implement today under existing law is to reconstitute [Fannie and Freddie] under their current charters." February 2, 2010 Letter of Acting Director DeMarco to Chairmen and Ranking Members of the Senate Committee on Banking, Housing, and Urban Affairs and the House Committee on Financial Services. Communications between FHFA and Treasury, however, indicate that by January 2012 the Agencies shared common goals that included providing the public and financial markets with a clear plan to wind down Fannie and Freddie.

135.    Statements by both FHFA and Treasury provide further confirmation that the Net Worth Sweep violates FHFA's statutory restrictions as conservator. Treasury, for example, said the Net Worth Sweep would "expedite the wind down of Fannie Mae and Freddie Mac," and it emphasized that the "quarterly sweep of every dollar of profit that each firm earns going forward" would make "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012). Indeed, Treasury emphasized that the Net Worth Sweep would ensure that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." *Id*.

136.    Unbeknownst to the public, as early as December 2010, an internal Treasury memorandum acknowledged the "Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." Action Memorandum for Secretary Geithner (Dec. 20, 2010). Just weeks later, however, in another internal document the author of this memorandum acknowledged that "the path laid out

65

under HERA and the Paulson Treasury when the [the Companies] were put into conservatorship in September 2008" was for Fannie and Freddie to "becom[e] adequately capitalized" and "exit conservatorship as private companies" with "existing common shareholders" being "substantially diluted"—but not eliminated. Memorandum from Jeffery A. Goldstein, Undersecretary of Domestic Finance, to Timothy Geithner, United States Secretary of the Treasury at 4 (Jan. 4, 2011). The memorandum also acknowledged that any threat to Treasury's funding commitment from dividend payments potentially could be addressed by "converting [Treasury's] preferred stock into common or cutting or deferring payment of the dividend (under legal review)." *Id.* In other words, the problem Treasury was purportedly trying to solve with the Net Worth Sweep, a cash dividend too high to be serviced by earnings, could be addressed by other means already known to Treasury, such as cutting or deferring payment of the dividend.

137.     Several additional facts further show that the purported "circular dividend" problem the Agencies have used to explain the Net Worth Sweep was entirely illusory and is a mere pretext for the Agencies' decision. First, as explained above, the original terms of the PSPAs entitled the Companies to pay Treasury's dividends in kind with additional stock, thus avoiding the need to make draws on Treasury's funding commitment to finance cash dividends they could not otherwise afford.

138.     Second, the Agencies actually considered an alternative to the arrangement they ultimately adopted that would have had the Net Worth Sweep only kick in if Treasury's remaining funding commitment fell below $100 billion. The only plausible explanation for the Agencies' decision not to embrace that alternative is that they knew it would allow the Companies to rebuild capital in contravention of the Agencies' secret and unauthorized commitment to wipe out private shareholders.

139.     Third, the structure and timing of the Net Worth Sweep—coming when the Companies were about to add tens of billions of dollars to their balance sheets—had the effect of *reducing* the amount of money available to guarantee that the Companies would maintain a positive net worth. If the Agencies were genuinely concerned about reassuring the Companies' bond investors that they would be repaid, the Agencies would have delayed imposing the Net Worth Sweep so long as the Companies maintained a substantial positive net worth. Instead, they adopted the Net Worth Sweep at a time when they knew that its near-term effect would be to transfer to Treasury massive profits that the Companies could have otherwise retained as a capital buffer and used to avoid making draws on Treasury's funding commitment in any subsequent unprofitable quarters. FHFA recently acknowledged how the Net Worth Sweep increases the chances of further draws on Treasury's funding commitment, observing that the Companies "are constrained by the PSPAs from building capital" and that the lack of retained capital combined with "mark-to-market volatility from the [Companies'] derivatives portfolio" has the effect of increasing "the likelihood of negative net worth in future quarters." Thus, even if the Agencies believed that the Companies could not generate enough profits in the long term to finance a 10% dividend on Treasury's investment, they would not have imposed the Net Worth Sweep when they did if their goal was to preserve Treasury's funding commitment. Doing so only increased the likelihood of future draws.

140.     FHFA Acting Director Edward DeMarco informed a Senate Committee that the "recent changes to the PSPAs, replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status." Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Sen. Comm. on Banking & Urban Affairs 3 (Apr. 18, 2013). In its 2012 report to

Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac." FHFA, 2012 REP. at 13. Thus, according to FHFA, the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." *Id.* at 1, 13. In short, the Net Worth Sweep plainly is central to the FHFA's new plan to "wind[] up the affairs of Fannie and Freddie," Remarks of Edward J. DeMarco, Getting Our House in Order at 6 (Wash., D.C., Oct. 24, 2013), and thus cannot be reconciled with the agency's statutory obligations as conservator of Fannie and Freddie.

141.    While purportedly waiting for Congress to initiate potential legislative action on Fannie and Freddie, FHFA has resolved to operate the Companies for the exclusive benefit of the federal government rather than for the benefit of the Companies themselves and their private stakeholders. The Net Worth Sweep is only the most blatant manifestation of this egregious decision, which is reflected in numerous additional FHFA statements and actions. In short, while HERA directs FHFA to operate the Companies in a manner that rebuilds their capital and returns them to private control, FHFA has resolved to operate Fannie and Freddie with a view toward "minimiz[ing] losses on behalf of taxpayers," FHFA, A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIPS: THE NEXT CHAPTER IN A STORY THAT NEEDS AN ENDING 7 (Feb. 21, 2012)—a goal that ignores a simple reality: no such losses have been incurred, and Treasury has to date realized a $63 billion profit on its investment in the Companies. Indeed, FHFA has made clear that its "overriding objectives" are to operate Fannie and Freddie to serve the federal government's policy goals of "[g]etting the most value for taxpayers and bringing stability and liquidity to housing finance . . . ." *Id.* at 21. Director Watt summed up the situation succinctly when stating that he does not "lay awake at night worrying about what's fair to the shareholders"

but rather focuses on "what is responsible for the taxpayers." Nick Timiraos, *FHFA's Watt 'Comfortable' with U.S. Sweep of Fannie, Freddie Profits*, WALL STREET JOURNAL MONEY BEAT BLOG (May 16, 2014, 3:40 PM), http://goo.gl/Tltl0U.

142.     Following FHFA's lead, Fannie's management has publicly acknowledged that it does not routinely consider the interests of private shareholders when operating the company. Timothy Mayopoulos, Fannie's CEO, recently said that his company's management is "not looking to maximize profits for investors" and that he is "less interested in what happens to Fannie Mae as a legal entity." Fannie has also expressly disavowed any fiduciary duty to its private shareholders in its SEC filings. *See* Fannie Mae 2014 Annual Report at 1 (Form 10-K) (Feb. 20, 2015), http://goo.gl/FZofs6 ("Our directors do not have any fiduciary duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, [or] the holders of our equity or debt securities . . . unless specifically directed to do so by the conservator.").

143.     The dramatically negative impact of the Net Worth Sweep on the Companies' private shareholders is demonstrated by Fannie's results in the first quarter of 2013. At the end of the first quarter Fannie's net worth stood at $62.4 billion. Under the prior versions of the PSPAs, if Fannie chose to declare a cash dividend it would have been obligated to pay Treasury a dividend of only $2.9 billion, and the balance—$59.5 billion—would have been credited to its capital. Private shareholders would have been entitled to a pro rata share of any additional amount of that residual capital paid out to Treasury in dividends. The Net Worth Sweep, however, required Fannie to pay Treasury $59.4 billion, while private shareholders received nothing.

69

144.     Contrary to FHFA's statutory authority, FHFA has ensured that the Companies cannot operate independently and must remain wards of the federal government. FHFA has announced that, during the conservatorship, existing statutory and FHFA-directed regulatory capital requirements will not be binding on the Companies. And at the end of 2012, Fannie had a deficit of core capital in relation to statutory minimum capital of $141.2 billion. This deficit decreased to $88.3 billion by the end of the first quarter of 2013. When adjusted for the $59.4 billion dividend payment to Treasury, however, Fannie's core capital deficit jumped back up to $147.7 billion. Thus, because of the Net Worth Sweep, Fannie was in a *worse* position with respect to its core capital—and thus further from being able to generate a return on private shareholders' investments—than it was before the record-breaking profitability it achieved in the first quarter of 2013.

145.     Furthermore, under FHFA's conservatorship Fannie and Freddie have elected to pay Treasury its dividend in cash, even though their net worth includes changes in both cash and non-cash assets. In the first quarter of 2013, for example, over $50 billion of Fannie's profitability resulted from the release of the Company's deferred tax assets valuation allowance—the same non-cash asset that previously created massive paper losses for the Company. As a result, Fannie was required to "fund [its] second quarter dividend payment of $59.4 billion primarily through the issuance of debt securities." Fannie, 2013 First Quarter Report, at 42.

146.     Borrowing money to pay an enormous dividend on a non-cash profit (due to an accounting reversal) is without precedent in a conservatorship. It also is clearly contrary to FHFA's statutory obligations as conservator, as FHFA is operating the Companies in an

inherently unsafe and unsound manner and hindering the ability of the Companies to restore their financial health so that they can be returned to normal business operations.

147.    FHFA's decision to direct the Companies to declare and pay Treasury's dividends in cash not only forced the Companies to pay out vast sums of cash to Treasury but also compelled them to make interest payments on subordinated debt that they could have otherwise deferred. When the Companies were forced into conservatorship, both had significant amounts of outstanding subordinated debt. Under the terms of their agreements with subordinated debt holders, the Companies were entitled to defer paying interest on that debt when their retained capital fell below a specified threshold. If the Companies chose to exercise this option, however, they were contractually obliged not to pay cash dividends on any stock—including Treasury's Government Stock. Despite announcing during the early days of conservatorship that its capital reserves had fallen below levels that entitled it to withhold subordinated debt payments, FHFA directed Fannie to continue making these interest payments, citing the fact that deferring subordinated debt payments would have required Fannie to stop paying cash dividends on its stock. Similarly, Freddie disclosed that FHFA directed it to continue paying interest on its subordinated debt and not to exercise its contractual right to defer those payments. FHFA's decision to direct the Companies to make unnecessary subordinated debt payments that could have been used to build up their capital reserves shows that it is operating the Companies with the aim of maximizing dividend payments to Treasury and with no concern for the soundness and safety of the Companies, the preservation of their assets, or the interests of private shareholders. If FHFA had been genuinely concerned about preserving the Companies' assets and avoiding a purported "death spiral" in which the Companies exhausted Treasury's funding commitment, it would not have ordered them to make gratuitous payments on their subordinated

debt. Instead, it directed the Companies to make payments to subordinated debtholders so that they could also pay cash dividends to Treasury.

148.     The Net Worth Sweep has become a major revenue source for the United States Government at the expense of Plaintiffs and other private shareholders. For example, the federal government's record-breaking $53.2 billion surplus for the month of December 2013 was driven in large part by the $39 billion swept from Fannie and Freddie. Fannie's and Freddie's outsize dividend payments in 2013 also extended Treasury's ability to meet federal obligations during the debt ceiling crisis.

149.     As previously noted, Treasury's temporary statutory authority to purchase the securities of the Companies was conditioned on its consideration of certain statutory factors, including "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and the Companies' plans "for the orderly resumption of private market funding or capital market access." *See* 12 U.S.C. §§ 1455(*l*)(1)(C), 1719(g)(1)(C). There is no public record that Treasury considered these factors before executing the Net Worth Sweep, and Treasury has asserted that it did not need to consider them. Indeed, the terms of the Net Worth Sweep requiring the quarterly payment of all profits and the winding down of the Companies' operations are wholly inconsistent with these factors. There is also no evidence that Treasury adequately considered alternatives to the Net Worth Sweep that would have been consistent with its statutory obligations, less harmful to Plaintiffs and other private shareholders, and more likely to ensure the Companies' future solvency. Finally, there is no evidence that Treasury fulfilled the statutory requirement to report exercises of its temporary purchase authority to Congress upon entering the Net Worth Sweep. *See* 12 U.S.C. §§ 1455(*l*)(1)(D); 1719(g)(1)(D).

150.     Finally, there is no public record that Treasury considered whether the Net Worth Sweep is consistent with its fiduciary duties, and the Companies controlling shareholder, to Fannie's and Freddie's shareholders. And the Net Worth Sweep is wholly inconsistent with those duties.

## Dividend Payments Under the Purchase Agreements

151.     Treasury has disbursed $116.1 billion to Fannie under the PSPAs, and Treasury has recouped a total of $151.4 billion from Fannie in the form of purported "dividends." Treasury has disbursed $71.3 to Freddie under the PSPAs and Treasury has recouped a total of $99.1 billion from Freddie in the form of purported "dividends." Combined, Fannie and Freddie have paid Treasury approximately $63 billion more than they have received.

152.     Yet, under the Net Worth Sweep, these purported dividend payments do not operate to pay down the liquidation preference or otherwise redeem any of Treasury's Government Stock. The liquidation preference of Treasury's Government Stock in the Companies purportedly remains at approximately $189 billion (due to the Companies' draws and the $1 billion initial valuation of Treasury's Government Stock in each) and will remain at that amount regardless of how many billions of dollars the Companies pay to Treasury in dividends going forward. The Government's rate of return is infinite, like that of a common equity holder.

153.     Indeed, the fundamental nature of the change in Treasury's investment resulting from the Net Worth Sweep is illustrated by the facts that Treasury is now effectively Fannie's and Freddie's *sole* equity shareholder and that Treasury's securities in the Companies are now effectively equivalent to 100% of the Companies' common stock. After giving effect to the Net Worth Sweep, Treasury has both the right to receive all profits of the Companies as well as control over the manner in which the Companies conduct business. Accordingly, following

the Net Worth Sweep, Treasury's Government Stock should be characterized in a manner consistent with its economic fundamentals as 100% of the Companies' common stock. Indeed, the Government Stock must be deemed as common or voided altogether because, by definition, preferred stock must have preferences over other classes of stock. *See* 8 DEL. CODE tit. 8, § 151(c); VA. CODE § 13.1-638(C)(4). After the Net Worth Sweep, of course, the economic rights of other classes of Fannie and Freddie stock have been effectively eliminated, leaving nothing for the Government Stock to have preference over. The Government Stock simply takes *everything*.

154.    That FHFA and Treasury continue to label the Government Stock as a preferred equity security—or the imposition of the Net Worth Sweep as a mere "amendment"—is not controlling or persuasive, particularly in light of the fact that the Net Worth Sweep was not an arms-length business transaction. Rather it was a self-dealing arrangement between two agencies of the federal government for the benefit of the federal government. Moreover, as explained above, statements by Treasury and FHFA make clear that the Net Worth Sweep was designed with the intent to grant the federal government the right to all of Fannie's and Freddie's future profits and to ensure that the Companies will remain under the control of the federal government and never return to the control of their private shareholders.

## CLAIMS FOR RELIEF

### COUNT I

#### FHFA's Conduct Exceeded Its Statutory Authority As Conservator

155.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

156.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D). In

addition to the limitations established under the APA, FHFA's authority as conservator of the Companies is strictly limited by statute. *See* 12 U.S.C. § 4617(b)(2)(D).

157.   The Net Worth Sweep is inimical to the very definition of what it means to be a conservator, which is a term with a well-established meaning in financial regulation. A conservator is charged with seeking to rehabilitate the company under its control, not to operate the company for its own benefit while stripping it of its assets.

158.   The Net Worth Sweep is in direct contravention of the statutory command that FHFA as conservator must undertake those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D). Indeed, rather than seeking to put the Companies in a "sound and solvent" condition and to preserve and conserve the Companies' assets and property, FHFA has expropriated the Companies' entire net worth for the benefit of the federal government, to the detriment of private shareholders such as Plaintiff.

159.   Furthermore, FHFA's purpose as conservator is to seek to rehabilitate Fannie and Freddie, but the Net Worth Sweep makes such rehabilitation impossible. Rather, the Net Worth Sweep makes clear that FHFA and Treasury intend to keep Fannie and Freddie in conservatorship indefinitely, operating them for the sole benefit of the federal government, unless Congress passes legislation resolving the situation.

160.   FHFA also acted beyond its authority by re-interpreting its statutory duty as a conservator under HERA to be a duty to taxpayers only and by resolving to hold Fannie and Freddie in a perpetual conservatorship to be operated for the benefit of the federal government.

161.   FHFA's conduct was therefore outside of FHFA's authority under HERA and "in excess of statutory . . . authority" and "without observance of procedure required by law," and

Plaintiffs are therefore entitled to relief against FHFA pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT II

### Treasury's Conduct Exceeded Its Statutory Authority

162.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

163.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D). Treasury's statutory authority to purchase securities issued by the Companies expired on December 31, 2009. 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4). The Net Worth Sweep, which was executed on August 17, 2012, contravenes this unambiguous limit on Treasury's authority.

164.    The Net Worth Sweep created an entirely new security. Under the original Purchase Agreements, Treasury purchased Government Stock that entitled it to a 10% cash or 12% in-kind quarterly dividend on an amount equal to the aggregate liquidation preference of the Government Stock. The Government Stock was a fixed return security not otherwise entitled to participate in the unlimited upside of the Companies' earnings. By contrast, the Net Worth Sweep entitles Treasury to a quarterly distribution of *all* of the Companies' earnings for as long as they remain in operation. The Net Worth Sweep thus effected a wholesale change to the nature of Treasury's securities after its statutory authority to purchase new securities had expired, and it converted Treasury's Government Stock into new securities that nationalize the Companies and entitle Treasury to 100% of their net worth as if Treasury were the outright owner of all common stock in the Companies. Treasury cannot evade this clear statutory restriction on its authority to purchase securities of the Companies by the simple expedient of calling these new securities an "amendment" to the old securities. As former Acting Director

DeMarco has testified, the Net Worth Sweep amounted to "an *exchange* [of] one set of compensation to Treasury for another one."

165.     In addition, before exercising its temporary authority to purchase securities, Treasury is required to "determine that such actions are necessary to . . . (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer." 12 U.S.C. § 1719(g)(1)(B). In making the statutorily required determinations, Treasury must consider such factors as "the [Companies'] plan[s] for the orderly resumption of private market funding or capital market access" and "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]," among other factors. *Id.* § 1719(g)(1)(C)(iii), (v).

166.     These statutory criteria must apply to any and all "amendments" to the Purchase Agreements. Were it otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired and effectively turn Treasury's limited, temporary grant of authority to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority and subvert the statutory limitations imposed by Congress.

167.     As far as the public record discloses, Treasury did not make any of the required determinations or consider any of the necessary factors before imposing the Net Worth Sweep. It therefore exceeded its statutory authority.

168.     The Net Worth Sweep is beyond Treasury's authority because it is not compatible with due consideration of factors that Treasury must consider before purchasing the Companies' securities or amending its agreements to purchase such securities. The Net Worth Sweep destroys the value of the Companies' private stock. The Net Worth Sweep is therefore

wholly incompatible with "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and with the "orderly resumption of private market funding or capital market access."

169.   Finally, the Net Worth Sweep increased the probability of future Treasury disbursements by preventing the Companies from rebuilding their capital levels. As Secretary Paulson has admitted, disbursements pursuant to Treasury's funding commitment amount to purchases of additional Government Stock. But Treasury's authority to make such purchases expired after December 31, 2009.

170.   Treasury's conduct was therefore outside of Treasury's authority under HERA and "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiffs are therefore entitled to relief against Treasury pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT III

### Treasury's Conduct Was Arbitrary and Capricious

171.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

172.   The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This means, among other things, that agency action is unlawful unless it is the product of "reasoned decisionmaking" that considers every responsible alternative. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52. Decisionmaking that relies on inadequate evidence or that results in inconsistent or contradictory conclusions cannot satisfy that standard.

173.   Before Treasury exercises its temporary authority to purchase the Companies' securities, it is required to determine that the financial support is necessary to "provide stability

to the financial markets," "prevent disruptions in the availability of mortgage finance," and "protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B). In making these determinations, Treasury is further required to "take into consideration" several factors, including the "plan for the orderly resumption of private market funding or capital market access," and the "need to maintain [the] status [of Fannie and Freddie] as . . . private shareholder-owned compan[ies]." *Id.* §§ 1455(*l*)(1)(C); 1719(g)(1)(C).

174.    These statutory criteria plainly apply to any and all "amendments" of the Purchase Agreements. Were it otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired and effectively turn Treasury's limited, temporary grant of authority to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority and subvert the statutory limitations imposed by Congress.

175.    There is no evidence in the public record that Treasury made the required determinations or considered the necessary factors before imposing the Net Worth Sweep. Indeed, the available evidence reveals that none of the necessary conditions was satisfied. Further, Treasury also has not explained whether it considered alternatives to the Net Worth Sweep that would have been both consistent with its statutory obligations and less harmful to Plaintiffs and other private shareholders. Treasury has thus arbitrarily and capriciously failed to provide a reasoned explanation for its conduct, which results in the Government's expropriation of all private shareholder value in the Companies' stock.

176.    Treasury also arbitrarily and capriciously failed to consider alternatives to the Net Worth Sweep that would have better promoted stability in the mortgage markets by leaving the Companies on a sound financial footing. There is no evidence in the public record that

Treasury considered alternatives to the Net Worth Sweep that would have provided greater assurance to investors that the Companies will be able to service their debts in the future.

177.     Treasury also acted in an arbitrary and capricious manner by failing to consider whether the Net Worth Sweep is consistent with its fiduciary duties to minority shareholders as the Companies' dominant shareholder.

178.     Treasury also acted arbitrarily and capriciously by relying on outdated and demonstrably inaccurate projections of Fannie's and Freddie's future financial performance while ignoring or failing adequately to account for more timely and accurate information on that subject.

179.     Under applicable state law governing shareholders' relationship with Fannie and with Freddie, a corporation's dominant shareholders owe fiduciary duties to minority shareholders.

180.     Treasury is the dominant shareholder and de facto controlling entity of the Companies. For example, Treasury serves as the Companies' only permitted source of capital, and Treasury must give permission to the Companies before they can issue other equity securities and before they can sell assets valued above $250 million.

181.     The Net Worth Sweep effectively transfers the value of other classes of Fannie and Freddie stock from Plaintiffs and other private holders to the Companies' dominant shareholder. And as Treasury admits, the Net Worth Sweep's express purpose is to wind down the Companies' operations. Treasury's actions in preventing Plaintiffs and other minority shareholders from receiving any dividends or value from their stock, combined with Treasury's intent to wind down the Companies, render the private stock devoid of any value or prospect of return.

182.    Treasury's conduct was therefore arbitrary and capricious, and Plaintiffs are entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

## COUNT IV

### Violation of the Separation of Powers

183.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

184.    The Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. Those provisions vest all executive power in the President of the United States.

185.    By making FHFA's head a single Director rather than a multi-member Board and eliminating the President's power to remove the Director at will, HERA violates the Constitution's separation of powers.  An independent agency headed by a single Director is virtually unprecedented in our Nation's history, and this structure impermissibly concentrates power in a single person who is not the President.

186.    The constitutional defect in FHFA's structure is exacerbated by the fact that FHFA has broad power over the housing sector, a vital part of the economy that represents between 15% and 18% of Gross Domestic Product. FHFA oversees entities that provide more than $5.8 trillion in funding for the U.S. mortgage markets and financial institutions, and it has used its conservatorship and regulatory authority in an effort to reform this vast sector of the economy.

187.    Neither Congress nor the President can negate the constitution's structural requirements by signing or enacting (and thereby acceding to) HERA. "Perhaps an individual President"—or Congress—"might find advantages in tying his own hands," the Supreme Court has noted, "[b]ut the separation of powers does not depend on the views of individual

81

Presidents"—or particular Congresses. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3155 (2010). The Constitution's separation of powers does not depend "on whether 'the encroached-upon branch approves the encroachment.'" *Id.* (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).

188.   "The diffusion of power" away from Congress and the President, to the independent FHFA, "carries with it a diffusion of accountability. . . . Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." *Id.* (quoting The Federalist No. 70, p. 476 (J. Cooke ed. 1961) (A. Hamilton)).

189.   Accordingly, because the Net Worth Sweep was adopted by FHFA when it was headed by a single person who was not removable by the President at will, it must be vacated and set aside.

## PRAYER FOR RELIEF

190.   WHEREFORE, Plaintiffs pray for an order and judgment:

a.   Declaring that the Net Worth Sweep, and its adoption, are not in accordance with and violate HERA within the meaning of 5 U.S.C. § 706(2)(C), that Treasury acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) by executing the Net Worth Sweep, and that FHFA's structure violates the separation of powers;

b.   Enjoining Treasury and its officers, employees, and agents to return to Fannie and Freddie all dividend payments made pursuant to the Net Worth Sweep or, alternatively, recharacterizing such payments as a pay down of the liquidation preference

and a corresponding redemption of Treasury's Government Stock rather than mere dividends;

        c.      Vacating and setting aside the Net Worth Sweep, including its provision sweeping all of the Companies' net worth to Treasury every quarter;

        d.      Enjoining FHFA and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep;

        e.      Enjoining Treasury and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep;

        f.      Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

        g.      Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

**Beck Redden LLP**

By: /s/ Chad Flores
     Chad Flores, Attorney-in-charge
       Texas Bar No. 24059759
       S.D. Tex. Bar. No. 1060324
     Owen J. McGovern, Of counsel
       Texas Bar No. 24092804
       S.D. Tex. Bar. No. 2523814
     Parth S. Gejji, Of counsel
       Texas Bar No. 24087575
       S.D. Tex. Bar No. 2917332
1221 McKinney St., Suite 4500
Houston, TX 77010
(713) 951-3700 Telephone
(713) 951-3720 Facsimile

Counsel for Plaintiffs