### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

---

J. PATRICK COLLINS, MARCUS J.
LIOTTA, and WILLIAM M. HITCHCOCK,

                               Plaintiffs,

   -vs-

THE FEDERAL HOUSING FINANCE
AGENCY, SANDRA L. THOMPSON, in her
official capacity as Director of the Federal
Housing Finance Agency, THE
DEPARTMENT OF THE TREASURY, and
JANET L. YELLEN, in her official capacity as
Secretary of the Treasury,

                              Defendants.

**PLAINTIFFS' FIRST AMENDED
COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

**CIVIL ACTION NO. 4:16-CV-03113**

---

      Plaintiffs J. Patrick Collins, Marcus J. Liotta, and William M. Hitchcock, state and allege as follows:

## INTRODUCTION

      1.    This is an action challenging past exercises of federal power by an agency head who the Supreme Court has already held was unconstitutionally insulated from presidential supervision. A key question remaining after that Supreme Court decision is whether the unconstitutional insulation made a difference in who was leading the agency. Here, the former President of the United States has already told us that it did. Were it not for a statutory provision restricting his ability to remove the director of the Federal Housing Finance Agency ("FHFA"), former President Trump wrote, he would have removed the Obama-era director at the very beginning of his administration. Given the statutory removal restriction, however, he did not believe he had the power to do so. The result was that, for the first two years of President Trump's

1

administration, he was stuck with an FHFA director who did not share the President's goals of (1) ending the agency's decade-long conservatorship of two federally chartered, privately owned entities—the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (respectively, "Fannie" and "Freddie," and, together, the "Companies")—and (2) selling Treasury's common stock in those companies for a large profit.

2. Once that director's tenure finally came to an end, President Trump's own appointee took office and relentlessly pursued the steps necessary to achieve the President's objectives. Although the Trump administration made significant progress in pursuing these goals, two years was too little time to complete the final actions, including the necessary elimination of the "liquidation preference" on the Treasury Department's senior preferred stock in the Companies. Under the Supreme Court's earlier decision in this case, *Collins v. Yellen*, 141 S. Ct. 1761 (2021), Plaintiffs are therefore entitled to retrospective relief to put them in the position they would have been in were it not for the unconstitutional removal restriction.

3. Independently, FHFA's structure violates the Constitution's separation of powers by empowering it to act without oversight from Congress through the appropriations process. Congress's constitutional power of the purse precludes the operation of an executive agency headed by a single person wielding significant executive power other than through funds periodically appropriated by Congress. Yet, FHFA regulates the massively important housing finance market and is funded through assessments on the entities it regulates and that FHFA's single director sets with no congressional oversight. So long as this constitutional infirmity in FHFA's funding structure persists, FHFA lacks constitutional authority to act. *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 242 (5th Cir. 2022) (en banc) (Jones, J., concurring).

## JURISDICTION AND VENUE

4.      This action arises under the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. § 706. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because this is an action against agencies of the United States and officers of the United States in their official capacities, the Plaintiffs reside in this judicial district, and no real property is involved in the action.

## PARTIES

6.      Plaintiff J. Patrick Collins is a citizen of the United States and a resident of Montgomery County, Texas. Mr. Collins has continuously owned shares of Freddie's preferred stock since before the Net Worth Sweep was announced in 2012 and has continuously owned shares of Fannie's preferred stock since before the conservatorship was imposed in 2008.

7.      Plaintiff Marcus J. Liotta is a citizen of the United States and a resident of Dallas County, Texas. Mr. Liotta owns shares of common and preferred stock in both Companies.

8.      Plaintiff William M. Hitchcock is a citizen of the United States and a resident of Harris County, Texas. Mr. Hitchcock owns shares of Fannie's preferred stock.

9.      Defendant FHFA is by statute an independent agency of the United States Government headed by a single Director. FHFA was created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 (HERA). FHFA is located at 400 7th Street, S.W., Washington, D.C. 20024. FHFA is named as a defendant in its capacities as both regulator and conservator for Fannie Mae and Freddie Mac.

10. Defendant Sandra L. Thompson is the Director of FHFA.[1] Her official address is 400 7th Street, S.W., Washington, D.C. 20024. She is being sued in her official capacity.

11. Defendant Department of the Treasury is an executive agency of the United States Government. Treasury is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

12. Defendant Janet L. Yellen is the Secretary of the Treasury.[2] Her official address is 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220. She is being sued in her official capacity.

## FACTUAL ALLEGATIONS

### Fannie and Freddie

13. Fannie Mae is a for-profit, stockholder-owned corporation organized and existing under the Federal National Mortgage Act.

14. Freddie Mac is a for-profit, stockholder-owned corporation organized and existing under the Federal Home Loan Corporation Act.

15. Fannie and Freddie (the "Companies") inject funds for mortgage lending into the U.S. economy by purchasing mortgages made to homeowners by commercial banks, savings institutions, mortgage bankers, and other mortgage originators, and bundling those mortgages into securities that the Companies guarantee and sell to investors.

16. Prior to conservatorship, both Fannie and Freddie had issued common stock and several series of junior preferred stock. The various series of junior preferred stock of the

---

[1] Sandra L. Thompson became the Director of FHFA after the filing of the original complaint. Pursuant to Federal Rule of Civil Procedure 25(d), a public "officer's successor is automatically substituted as a party."

[2] Janet L. Yellen became the Secretary of the Treasury after the filing of the original complaint. Pursuant to Federal Rule of Civil Procedure 25(d), a public "officer's successor is automatically substituted as a party."

4

Companies are in parity with each other, but they have priority over the Companies' common stock. Under the terms of the Companies' junior preferred stock, dividends cannot be paid on the Companies' common stock unless any dividends due on the junior preferred stock are first declared and paid. Likewise, if the Companies are liquidated, their junior preferred shareholders are entitled to receive preferential payments before any sums generated by the liquidation are paid to common shareholders.  The Companies' common stock has the lowest priority of any of its equity.

### Congress Creates FHFA as An Independent Agency Headed by a Single Director Who Was Insulated from Presidential Removal and from the Congressional Appropriations Process

17.     From 1992 until 2008, the Companies were regulated by the Office of Federal Housing Enterprise Oversight ("OFHEO")—an office within the Department of Housing and Urban Development. OFHEO was not an independent agency; its Director could be removed from office by the President for any reason. *See* Housing and Community Development Act of 1992 § 1312. To fund OFHEO's operations, Congress permitted the office to impose annual assessments on the Companies "to the extent provided in appropriation Acts." Housing and Community Development Act of 1992 § 1316(a). By statute, OFHEO's annual spending plans had to be included in the President's budget. *Id.* § 1316(g)(3). The President's control over OFHEO's Director and the fact that OFHEO was subject to the congressional appropriations process ensured that the office remained accountable to the People through their democratically elected representatives.

18.     During the summer of 2008, Congress passed and the President signed HERA, which established FHFA as the successor to OFHEO. Unlike its predecessor, Congress labeled FHFA an "independent" agency, 12 U.S.C. § 4511(a); 44 U.S.C. § 3502(5). The statute provides that FHFA is to be headed by a single Director who serves for a five-year term. 12 U.S.C.

§ 4512(b)(2). Under the statute, FHFA's Director may be removed by the President before the end of his or her term only "for cause." 12 U.S.C. § 4512(b)(2).

19.     HERA vests the FHFA Director with sweeping powers over the Companies. The statute authorizes the Director not only to regulate Fannie and Freddie, but also to appoint FHFA to serve as the Companies' conservator or receiver. 12 U.S.C. § 4617(a). If the Director exercises the power to place the Companies in conservatorship, FHFA is not "subject to the direction or supervision of any other agency of the United States." 12 U.S.C. § 4617(a) (7).

20.     In addition, HERA grants the Director full control over FHFA's funding with no oversight from Congress through the normal appropriations process. The Director has the power to establish and collect assessments directly from the entities that FHFA regulates, not only for expenses but also "to maintain a working capital fund." 12 U.S.C. § 4516(a). The Director alone determines the amount of those assessments. *See id.* In fiscal year 2020, for example, "the FHFA collected more than $311 million." *Collins v. Yellen*, 141 S. Ct. 1761, 1772 (2021). HERA empowers the Director to decide how to use assessed funds for compensation and "all other expenses of the Director and the Agency." 12 U.S.C § 4516(f)(4). The Director "has regulatory and enforcement authority over two companies," i.e., Fannie and Freddie, "that dominate the secondary mortgage market and have the power to reshape the housing sector." *Collins*, 141 S. Ct. at 1785. All these powers belong to the Director permanently. *See* 12 U.S.C § 4516.

21.     Despite being exempted from the normal appropriations process, FHFA's regulatory and conservatorship roles are extremely significant. The housing sector accounts for over seventeen percent of the United States's gross domestic product.

22.     HERA also gave Treasury temporary authority to purchase securities from the Companies. *See* 12 U.S.C. §§ 1455(*l*), 1719(g).

6

**Fannie and Freddie Are Forced into Conservatorship**
**and Enter Into the Preferred Stock Purchase Agreements**

23.     By HERA's terms, the director of OFHEO, James Lockhart, became FHFA's

Transitional Director when FHFA was established. *See* 12 U.S.C. § 4512(b)(5). On September 6,

2008, Transitional Director Lockhart announced that FHFA was placing the Companies into

conservatorship. The next day, FHFA entered into two agreements on behalf of the Companies

with Treasury, which exercised its statutory authority to purchase the Companies' securities.

24.     These agreements—the Preferred Stock Purchase Agreements ("PSPAs")—were

materially identical for both Companies. Under the terms of the original agreements, Treasury

committed to provide up to $100 billion in funding to each Company. The Companies could draw

upon this funding commitment in any quarter in which their liabilities exceeded their assets as

calculated under Generally Accepted Accounting Principles.

25.     In return for Treasury's funding commitment, FHFA agreed to provide Treasury

with several forms of consideration. First, FHFA agreed to sell to the Treasury warrants to

purchase 79.9% of the common stock of each Company at a nominal price. If Treasury exercised

these warrants, it would hold common stock entitling it to 79.9% of any dividends or liquidation

payments the Companies made to common shareholders. The other holders of the Companies'

common stock would in turn receive the remaining 20.1%.

26.     One consequence of specifying a 79.9% common stock ownership stake for

Treasury was to avoid triggering "push down" accounting rules. Under those rules, if Treasury

acquires 80% or more of the Companies' common stock, the assets and liabilities of Fannie and

Freddie would need to be recognized on the federal government's books and records. The

government intentionally structured the PSPAs to avoid having to carry the assets and liabilities

on the government's books and records.

7

27.     A second form of consideration Treasury received as part of the PSPAs was 1 million shares of senior preferred stock in each Company. Treasury's senior preferred stock has priority over the Companies' junior preferred and common stock.

28.     The senior preferred stock had an initial "liquidation preference" of $1 billion for each Company, meaning that if the Companies are liquidated, Treasury would be entitled to $1 billion before any other shareholders received anything. Under the terms of the PSPAs, the liquidation preference increases by one dollar for each dollar the Companies draw from Treasury's funding commitment.

29.     Treasury was also entitled to quarterly dividends on its senior preferred stock if the Companies chose to declare such dividends. If declared, the dividend was originally to be calculated at an annualized rate equal to 10% of Treasury's outstanding liquidation preference. If the Companies elected not to declare cash dividends on Treasury's senior preferred stock, the liquidation preference would increase at an annualized rate of 12%.

30.     The PSPAs prohibit Fannie and Freddie from declaring and paying dividends on any securities junior to Treasury's senior preferred stock unless full cumulative dividends have been paid to Treasury on its senior preferred stock for the then current and all past dividend periods.

31.     Finally, the PSPAs provided for the Companies to pay Treasury a quarterly periodic commitment fee. The periodic commitment fee was to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive it for up to a year at a time. Treasury exercised this option repeatedly and never deemed it necessary to receive a periodic commitment fee under the PSPAs. Moreover, Treasury could only set the amount of such a fee with the agreement of the Companies, at a market rate, and in consultation with the Chairman of the Federal Reserve..

32.     FHFA and Treasury amended the PSPAs several times. In May 2009, they amended the PSPAs to increase Treasury's funding commitment for each Company from $100 billion to $200 billion. On December 24, 2009, the agencies again amended the terms of Treasury's funding commitment. Instead of resetting the commitment at a specific dollar amount, the second amendment established a formula to allow Treasury's total commitment to each Company to exceed (but not fall below) $200 billion depending upon any net worth deficiencies experienced in 2010, 2011, and 2012, and any surplus existing as of December 31, 2012.

### Fannie and Freddie Return to Profitability and the Obama Administration Imposes the Net Worth Sweep

33.     Starting when FHFA took control of the Companies as conservator, the Companies began to make overly pessimistic and unjustified assumptions about their future financial prospects. Those assumptions triggered adjustments to the Companies' balance sheets, most notably write-downs of significant deferred tax assets and the establishment of large loan loss reserves, which caused the Companies to report large non-cash losses. Although reflecting nothing more than faulty assumptions about the Companies' prospects and having no effect on the cash flow the Companies were generating, these non-cash losses temporarily decreased the Companies' reported net worth by hundreds of billions of dollars. For example, in the first year and a half after imposition of the conservatorship, Fannie reported $127 billion in losses, but only $16 billion of that amount reflected actual credit-related losses. As conservator, FHFA was directly involved in and responsible for the decision to record these excessive non-cash losses.

34.     By the summer of 2012, the Companies had drawn a total of $187 billion from Treasury, in large part to fill the holes in their balance sheets created by these non-cash losses. Including Treasury's initial $1 billion liquidation preference in each Company, Treasury's

liquidation preference for its senior preferred stock ballooned to approximately $117 billion for Fannie and approximately $72 billion for Freddie.

35.       In 2012, Fannie and Freddie began generating consistent profits notwithstanding their overstated loss reserves and the write-down of their deferred tax assets. The Companies were well-positioned and expected by the government to continue generating robust profits (more than enough to pay cash dividends under the PSPAs) for the foreseeable future thanks to rising home prices coupled with stricter underwriting standards the Companies adopted in the aftermath of the 2008 financial crisis. As a result—and as FHFA and Treasury knew—Fannie and Freddie-backed mortgages issued after 2008 had dramatically lower serious delinquency rates than mortgages issued between 2005 and 2008. The strong quality of these newer "vintages" of loans boded well for the Companies' future financial prospects.

36.       Together, the Companies' return to robust profitability and the stable recovery of the housing market showed in early 2012 that the Companies could in time redeem Treasury's senior preferred stock and that value remained in their privately owned junior preferred and common stock. Furthermore, as a result of Fannie's and Freddie's return to sustained profitability, it was clear that the overly pessimistic accounting decisions weighing down the Companies' balance sheets would have to be reversed. By early August 2012, FHFA and Treasury knew that Fannie and Freddie were poised to generate profits massively in excess of the 10% cash dividend the Companies had previously paid Treasury.

37.       On August 17, 2012, days after the Companies had announced their return to profitability and just as it was becoming clear that they had regained the earnings power to redeem Treasury's senior preferred stock and exit conservatorship, FHFA and Treasury amended the PSPAs for a third time. The third amendment imposed the Net Worth Sweep, under which the

Companies were required to pay Treasury a quarterly dividend starting in 2013 and continuing forever that is equal to their entire net worth, less a small capital buffer. Thus, rather than paying Treasury a fixed 10% cash dividend (or declining to declare cash dividends and allowing the liquidation preference to increase at a 12% rate), the Companies would be required to pay Treasury *100%* of their comprehensive income and retained assets in perpetuity. Since the Net Worth Sweep guaranteed that Treasury would receive all the Companies' comprehensive income anyway, the third amendment suspended the periodic commitment fee.

38.      Obama White House officials were involved in the development of the Net Worth Sweep, and this change to the PSPAs furthered the Obama administration's objectives of expropriating private shareholders' investments and winding down the Companies. As a senior White House official stated in an email to a senior Treasury official on the day the Net Worth Sweep was announced, "we've closed off [the] possibility that [Fannie and Freddie] ever[] go (pretend) private again." That same official stated in another email that Peter Wallison of the American Enterprise Institute, who spoke with Bloomberg News about the Net Worth Sweep, was "exactly right on substance and intent" when he said that "[t]he most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government. . . . What the Treasury Department seems to be doing here . . . is to deprive them of all their capital so that doesn't happen." An internal Treasury document dated August 16, 2012, expressed the same sentiment: "By taking all of their profits going forward, we are making clear that the GSEs will *not* ever be allowed to return to profitable entities . . . ."

39.      The Net Worth Sweep stripped the Companies' junior preferred and common stock of all economic value. It did this by guaranteeing that any profits the Companies generate

for equity investors will ultimately go to Treasury, either in the form of dividend payments or payments in liquidation. So long as the Net Worth Sweep remains in place, it is impossible for holders of the Companies' junior preferred or common stock to receive dividends or liquidaiton payments.

40.     As FHFA and Treasury anticipated, Fannie and Freddie were extraordinarily profitable in the years following the imposition of the Net Worth Sweep. From January 2013 through the end of President Obama's second term, the Companies paid Treasury $200 billion in Net Worth Sweep "dividends"—over $124 billion more than they would have paid had they declared cash dividends under the prior contractual arrangement.

41.     Had the Companies used their quarterly profits in excess of Treasury's 10% dividend to pay down the liquidation preference on Treasury's senior preferred stock, the liquidation preferences on both Companies' senior preferred stock would have been reduced to zero. Instead, the Net Worth Sweep required the Companies to simply pay these funds over to Treasury in exchange for nothing.

42.     Treasury has disbursed $119 billion to Fannie under the PSPAs, and Treasury has recouped a total of $181 billion from Fannie in the form of purported "dividends." Treasury has disbursed $71 billion to Freddie under the PSPAs and Treasury has recouped a total of $119 billion from Freddie in the form of purported "dividends." Fannie and Freddie have collectively paid Treasury approximately $109 billion more than they have received. Yet, thanks to the Net Worth Sweep, these dividend payments did not reduce the liquidation preference or otherwise redeem any of Treasury's senior preferred stock.

**President Obama Appoints Longtime Democratic Congressman Mel Watt To Lead FHFA and President Trump Fails to Fire Director Watt Due to the Unconstitutional Removal Restriction**

43.       The third amendment was signed in August 2012 on behalf of the Companies by FHFA Acting Director Edward DeMarco. In May 2013, President Obama announced his nominee for a permanent FHFA Director. He nominated Democratic Congressman Mel Watt, who had served in the House of Representatives for two decades.

44.       Republican Senators voiced opposition to President Obama's pick. Senator Bob Corker stated that he "'could not be more disappointed in th[e] nomination,'" explaining that "he [did]n't believe a politician should lead the agency." Jon Prior & MJ Lee, *Mel Watt Nomination Faces Long Odds*, POLITICO (May 1, 2013), https://politi.co/3G4jP1m**.** Senator Mike Crapo, the top Republican on the Banking Committee, agreed, referring to Watt's nomination as "a political appointment." *Id.*

45.       Watt's nomination barely succeeded. In October 2013, Senate Majority Leader Harry Reid sought to invoke cloture on Watt's nomination, but Reid's motion failed to garner the necessary 60 votes. The following month, Senator Reid led his Senate majority to invoke the "nuclear option" to abolish the filibuster (*i.e.*, the 60-vote threshold) for presidential nominations to federal agencies. With the benefit of the new rule, Watt was confirmed in December 2013. Only two Republican Senators voted in favor of Director Watt's confirmation.

46.       As FHFA director, Watt made clear he had no intention of leading Fannie and Freddie out of conservatorship. In his first year at the helm, FHFA released its "FHFA Strategic Plan" for 2015 through 2019. FHFA, *FHFA Strategic Plan: Fiscal Years 2015-2019* (Nov. 21, 2014), https://bit.ly/3nXbjL9. This plan—which purported to cover FHFA's plans for the next *four years*—made no mention of exiting conservatorship. Instead, it expressed FHFA's intent to merely

"manage the [Companies'] ongoing conservatorships" and to "oversee the conservatorships in their current state." *Id.* at 14.

47.     Throughout the first few years of Director Watt's tenure, he consistently stated his view that ending the conservatorships was a decision for Congress, not FHFA. For example, in his first appearance before Congress as Director, he explained that, "[i]n every speech," he had made clear that, although conservatorship "should not be a permanent state," "it is the role of Congress to define what the future state is." *The Federal Housing Finance Agency: Balancing Stability, Growth, and Affordability in the Mortgage Market: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs*, 113th Cong. 7 (Nov. 19, 2014). "[O]ur role at FHFA," he explained, "is in the here and the now." *Id.* at 22. Indeed, Watt suggested that the statute *prohibited* FHFA from doing anything more than managing the Companies as conservator and waiting for Congress to enact new legislation—stating that "our task is to continue to fill our statutory mandates . . . to *manage the present status* of Fannie Mae and Freddie Mac." Melvin L. Watt, *Prepared Remarks at the Brookings Inst. Forum on the Future of Fannie Mae and Freddie Mac* (May 13, 2014) (emphasis added), https://bit.ly/3KLzxSt. Anything beyond merely managing the conservatorship, he added, is "not part of our statutory mandate" and was instead a subject for future legislation. *Id.*

48.     In June 2016, Watt submitted FHFA's annual report to Congress. Yet again, it made no mention of FHFA leading the Companies out of conservatorship or helping to facilitate an end to government ownership of these financial institutions. Instead, in the report's "Legislative Recommendations," it stated simply that "FHFA continues to believe that conservatorship is not a desirable end state, and that *Congress* needs to undertake the important work of housing finance

reform." FHFA, *2015 Report to Congress: Federal Housing Finance Agency* 61 (June 15, 2015) (emphasis added), https://bit.ly/3FSmfjf.

49.     In November 2016, Republican Donald J. Trump, was elected President. Almost immediately, the President-elect set about pursuing his financial and economic policy. The President-elect swiftly named officials to lead many of the federal government's financial regulatory agencies. In November alone, he announced his choices for Treasury Secretary, SEC Chair, the Secretary of Housing and Urban Development, and the Administrator of the Small Business Administration. In December, he named his Commerce Secretary. Within the first week of his administration, he also took actions to assert control over other financial regulators. He designated an acting CFTC Chair (on day 1), an acting SEC Chair (on day 3), an acting FTC Chair (on day 5), and an acting NCUA Chair (on day 6).

50.     Because of the statutory removal restriction, however, President Trump did not remove Director Watt at the beginning of his administration. But for the statutory removal restriction, President Trump would have fired Director Watt in January 2017 and nominated someone else to serve as FHFA Director. Former President Trump confirmed this in a November 2021 letter to Senator Rand Paul, stating that he would have fired Director Watt on "day one of [his] Administration" if the law had allowed him to do so. Ex. A.

51.     More than two years after his election, President Trump finally had the opportunity to appoint his own FHFA director when Director Watt's five-year term ended. Reflecting his desire to replace Director Watt as soon as possible, President Trump announced who he would choose to serve as acting FHFA director and nominated a permanent director the month before Director Watt's term expired in January 2019. And although President Trump could have permitted Director Watt to serve in a holdover capacity beyond the end of his statutory term,

*see* 12 U.S.C. § 4512(b)(4), the President installed an acting director, political appointee Comptroller of the Currency Joseph Otting, on January 6, 2019—the day Watt's term concluded. By then, Director Watt was "the last remaining Obama-appointed regulator" leading a federal agency. Katy O'Donnell, *Housing regulator settles sexual harassment suit tied to Mel Watt*, POLITICO (Sept. 27, 2019), https://politi.co/36UJR7U.

### The Trump Administration Sets Out Housing Finance Policy Objectives that Cannot Be Achieved Without Eliminating the Liquidation Preference on Treasury's Senior Preferred Stock

52.     From the beginning, the Trump administration had two primary policy objectives for Fannie and Freddie: (1) releasing the Companies from conservatorship as promptly as practicable; and (2) ending government ownership of the Companies by selling Treasury's stake at a large profit.

53.     President Trump and various Trump administration officials have repeatedly stated that a key policy objective of the Trump administration was to **end the conservatorships** as promptly as practicable:

    a.   In a November 2021 letter to Senator Rand Paul, former President Trump wrote that if he could have fired Director Watt, he would have done so and then "ordered FHFA to release [Fannie and Freddie] from conservatorship." Ex. A.

    b.   Steven Mnuchin said in an interview shortly after President-elect Trump nominated him to serve as Treasury Secretary that the new administration intended to "get [Fannie and Freddie] out of government control." *Mnuchin: Get Fannie Mae, Freddie Mac Out of Government Ownership*, Fox Business News 00:22-00:30 (Nov. 30, 2016), https://bit.ly/3iKDZUc.

16

c.   In testimony before the House Financial Services Committee in the summer of 2017, Secretary Mnuchin stated that "leaving [Fannie and Freddie] in conservatorship makes no sense." *The Annual Testimony of the Secretary of the Treasury on the State of the Int'l Finance System: Before the H. Comm. on Fin. Servs.*, 115th Cong. 33 (Jul. 27, 2017).

d.   President Trump's eventual pick for FHFA Director, Mark Calabria, then serving as Vice President Pence's chief economist, said that "the Trump administration is 'committed' to ending the conservatorship of Fannie Mae and Freddie Mac." Kelsey Ramirez, *Mark Calabria: Trump administration 'committed' to ending conservatorship*, HousingWire (Nov. 1, 2017), https://bit.ly/33FAonb. "Calabria said the Trump administration is committed to not handing Fannie Mae and Freddie Mac in conservatorship over to the next administration." *Id.*

e.   In 2018, the Executive Office of the President issued a report outlining numerous proposals to "end the conservatorship of Fannie Mae and Freddie Mac" and "transition[] Fannie Mae and Freddie Mac to fully private entities." *See* Executive Office of the President of the United States, *Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations* 75 (June 21, 2018), https://bit.ly/3rKXAbl.

f.   In a March 2019 directive, President Trump instructed Treasury to consult with FHFA and develop proposals for "[e]nding the conservatorships" of Fannie and Freddie. *See* Federal Housing Finance Reform, 84 Fed. Reg. 12,479, 12,479-80 (Mar. 27, 2019).

g.   In a speech after becoming FHFA Director, Mr. Calabria stated that the "centerpiece of our strategy is to end the Fannie and Freddie conservatorships." *Prepared*

*Remarks at Mortg. Bankers Assoc. Nat'l Secondary Mkt. Conf. & Expo* (May 20, 2019), https://bit.ly/3AtBWfH.

h.   In September 2019, Treasury issued a report in response to the President's March 2019 directive. *See* U.S. Dep't of the Treasury, *Housing Reform Plan: Pursuant to the Presidential Memorandum Issued March 27, 2019* (Sept. 5, 2019), https://bit.ly/2Uyvzre ("2019 Housing Reform Plan"). On page one, the report stated that the Companies' "conservatorships should come to an end." *Id.* at 1. The Treasury report also stated that the Companies "should be recapitalized" and exit conservatorship as "promptly as practicable." *Id.* at A-1, A-3. On the same day, FHFA issued a press release praising the Treasury report and saying that "[a]fter nearly 11 years, ending the conservatorships of Fannie Mae and Freddie Mac is now a top priority for this Administration and the FHFA." *Statement of FHFA Director Mark Calabria on the Administration's Plans for Housing Finance Reform* (Sept. 5, 2019), https://bit.ly/32BIxbC.

i.   In a departure from similar documents prepared by his Democratic-appointed predecessors, Director Calabria issued a scorecard for Fannie and Freddie that directed the Companies to "undertake those activities necessary to support an exit from conservatorship." FHFA, 2020 Scorecard for Fannie Mae, Freddie Mac, and Common Securitization Solutions 2 (Oct. 28, 2019), https://bit.ly/32fqWFW. In a speech given the day the scorecard was issued, Director Calabria accurately stated that "[t]hese plans represent a fundamental shift from past policies." *Prepared Remarks of Dr. Mark A. Calabria, Director of FHFA at MBA 2019 Annual Convention & Expo* (Oct. 28, 2019), https://bit.ly/3KTPmXt.

j.   At Director Calabria's direction, both Fannie and Freddie hired financial advisors to help them recapitalize and exit conservatorship "as soon as possible." *Freddie Mac Announces J.P. Morgan as Financial Advisor* (June 15, 2020), https://bit.ly/3KFUoq5.

k.   During Director Calabria's tenure, FHFA also sent an annual report to Congress stating that "FHFA's end-state vision for the Enterprises" is "to return [them] to operating as fully-private companies outside of conservatorship." *FHFA Report to Congress* (June 15, 2020), https://bit.ly/3u34z2o.

54.     When President Trump took office, the Companies had massive capital shortfalls thanks in significant part to the enormous dividend payments they had been forced to make to Treasury under the Net Worth Sweep. As of the end of 2016, Fannie reported that it needed an additional $136.2 billion of capital to satisfy its statutory minimum capital requirement. Fannie Mae 2016 Form 10-K, at F-57, https://bit.ly/3G7w2SK. Freddie reported that as of the end of 2016, it needed an additional $86.65 billion of capital to satisfy its statutory minimum capital requirement. Freddie Mac 2016 Form 10-K, at 332, https://bit.ly/3IG5g5y. FHFA could not responsibly release the Companies from conservatorship while they were in this condition. *See* Statement of Dr. Mark A. Calabria, FHFA Director, Before the U.S. House of Representatives Committee on Financial Services (Oct. 22, 2019), https://bit.ly/33HPKYj ("A precondition for responsibly ending the conservatorships is that the Enterprises must be well-regulated and well-capitalized, such that once Fannie Mae and Freddie Mac exit, they never have to return").

55.     Although the Companies had returned to sustained profitability by 2017, building up the capital reserves necessary to exit conservatorship solely through retained earnings would have taken many years. In 2016, Fannie's comprehensive income was $11.7 billion, and

Freddie's comprehensive income was $7.1 billion. Fannie 2016 Form 10-K, *supra*, at 2; Freddie Mac 2016 Form 10-K, *supra*, at 11.

56.     To achieve its objective of ending the conservatorships as promptly as practicable, the Trump administration's policy was to recapitalize the Companies in part by having the Companies sell new shares of common stock to private investors. Secretary Mnuchin outlined the broad strokes of the plan: "So we really see two things. One, retaining earnings, that is one way we will accumulate capital. And then, two, we will have to raise third-party capital." *Housing Finance Reform: Next Steps: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 116th Cong. 30 (Sept. 10, 2019). Secretary Mnuchin also stated that, in his view, the Companies "can raise a very significant amount of capital from the private sector." *The End of Affordable Housing? A Review of the Trump Administration's Plans to Change Housing Finance in America: Hearing Before the H. Comm. on Fin. Servs.*, 116th Cong. 39 (Oct. 22, 2019); *see also CNBC Interview with FHFA Director Mark Calabria*, CNBC 07:02-07:09 (Apr. 1, 2020), https://cnb.cx/3KRDGV9 ("It's always been my view that an exit from conservatorship is going to require a large capital raise by Fannie and Freddie.").

57.     The Trump administration did not plan to raise all of the needed capital in a single stock issuance but instead through a series of issuances.

58.     To raise billions of dollars of capital in the private markets, the new issuances of common stock that the Trump administration intended for the Companies to sell would need to be attractive to private investors. The only way to make such stock attractive to private investors was to eliminate the liquidation preference on Treasury's senior preferred stock. The large liquidation preference on Treasury's senior preferred stock, combined with the fact that Treasury's senior preferred stock has priority over all other stock issued by the Companies, prevented all

shareholders in the Companies other than Treasury from ever receiving a return on their investments. Private investors would not purchase a new issuance of common stock in the Companies so long as the liquidation preference remained.

59.     Therefore, a necessary step in fulfilling the Trump administration's goal of recapitalizing the Companies through a new issuance of common stock and releasing them from conservatorship was to eliminate the liquidation preference on Treasury's senior preferred stock. That step could be accomplished in either of two ways: (1) by writing down the liquidation preference to zero and promising not to further increase the liquidation preference in the absence of additional draws on Treasury's funding commitment; or (2) by converting Treasury's senior preferred stock to common stock.

60.     A second policy objective of the Trump administration was to **end government ownership** of Fannie and Freddie. President Trump and numerous Trump administration officials have articulated this objective:

     a.     In his November 2021 letter to Senator Paul, former President Trump wrote: "[H]ad I controlled FHFA from the beginning of my Administration, . . . [m]y Administration would have . . . sold the government's common stock in these companies at a huge profit and fully privatized [Fannie and Freddie]." Ex. A.

     b.     In November 2016, Mr. Mnuchin said the new administration wanted to "privatize" the Companies and that "[i]t makes no sense that these are owned by the government." *Mnuchin: Get Fannie Mae, Freddie Mac Out of Government Ownership*, FOX BUSINESS NEWS 00:09-00:12 (Nov. 30, 2016), https://bit.ly/3iKDZUc.

     c.     Director Calabria said he expected that, as part of a public offering of new shares of Fannie and Freddie stock, Treasury would "sell off its shares to recoup the

taxpayer investment." *Hearing Before H. Comm. on Fin. Servs.* 2:18:18 (Sept. 16, 2020), https://bit.ly/3Kzu557. According to Director Calabria, a public offering "would allow Treasury to exercise its [common stock] warrants to recoup its investment." *Id.* at 2:18:26-2:18:30.

61.     The statements quoted above reflect the fact that the Trump administration intended to end government ownership of the Companies by having Treasury exercise its common stock warrants and sell the resulting 79.9% stake in the Companies' common stock to private investors. But for Treasury's common stock to be attractive to private investors such that it could be sold for a "huge profit" as President Trump intended, it was necessary to eliminate the large liquidation preference on Treasury's senior preferred stock. As detailed above, the Companies' common stock has no economic value so long as that liquidation preference remains.

62.     Therefore, both Trump administration policy objectives necessarily required eliminating the liquidation preference on Treasury's senior preferred stock—either by writing the liquidation preference down to zero or by converting Treasury's senior preferred stock to common stock. Treasury recognized as much in its September 2019 report, which responded to the President's March 2019 directive and listed ending the conservatorships as a top priority in fulfilling the President's mandate. In that report, Treasury recommended that the administration consider (1) "[e]liminating all or a portion of the liquidation preference of Treasury's senior preferred shares"; or (2) "exchanging all or a portion of that interest for common stock or other interests" in the Companies. 2019 Housing Reform Plan, *supra*, at 27.

63.     Although Treasury's report also listed receivership "to the extent permitted by law," *id.*, all signs show that the federal government had no intention of pursuing that course. First, none of the public statements by the President, Secretary Mnuchin, or Director Calabria suggest

they were even considering taking the Companies into receivership. Instead, both Mnuchin and Calabria consistently stated that the plan was to recapitalize the Companies first through retained earnings and then through a public offering. President Trump was emphatic: "My Administration would have . . . sold the government's common stock in these companies at a huge profit and fully privatized the companies." Ex. A. That publicly announced plan is irreconcilable with an intent to pursue receivership. Second, receivership would have been too risky. Taking the Companies into receivership would have potentially caused severe market disruptions. Third, the Companies' financial condition was far too strong to justify receivership. Treasury's report seemingly acknowledged this point, hedging that receivership was an option only "to the extent permitted by law." 2019 Housing Reform Plan, *supra*, at 27.

64.    The other options listed by Treasury were fully consistent with eliminating the liquidation preference or exchanging it for common stock or other interests. For example, the Report discusses issuing convertible debt or other loss-absorbing instruments—but only *in addition to* issuing shares of common or preferred stock, *id.*, which (as explained) would require eliminating the liquidation preference. The same goes for the report's recommendation of negotiating an exchange for particular classes of the Companies' existing junior preferred stock. *Id.* The purpose of such an exchange would be to make the Companies' *common* stock more attractive by reducing or altering the junior preferred shareholders' dividend payments. And the point of making the common stock more attractive would be to allow for a capital raise through the sale of common stock—which, again, would require eliminating the liquidation preference. In addition, the more attractive the Companies' common stock, the more Treasury could profit from selling its shares of that common stock.

## President Trump's Housing Finance Policies
## Are Stymied by Director Watt

65.     So long as Director Watt was at the helm of FHFA, the Trump Administration was unable to make progress on its policy objectives for Fannie and Freddie. Contrary to the Administration's view and the law as amended in 2008, Director Watt claimed that it was necessary for Congress to enact further legislation before ending the conservatorships. Just a few months into the Trump administration, Director Watt testified before a Senate committee and delivered a written statement describing his view: "[T]he second point I want to make unequivocally is that it is the role of Congress, not FHFA, to make the decisions that chart the path out of conservatorship and to the future housing finance system." *See The Status of the Housing Finance System After Nine Years of Conservatorship: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 115th Cong. 4 (May 11, 2017). And during Director Watt's tenure, FHFA's website stated that it would continue in its role as conservator until "Congress determines the future of Fannie Mae and Freddie Mac and the housing finance market." *History of Fannie Mae and Freddie Mac Conservatorships*, FHFA, https://bit.ly/3GOLIw1.

66.     Director Watt's view that FHFA should wait for Congress to enact legislation before ending the conservatorships was very different from the perspective of the Trump administration. As Treasury explained in a report after Director Watt left office, the Trump administration's position was that "reform should not and need not wait on Congress" because "FHFA already has expansive statutory authorities to implement reforms." 2019 Housing Reform Plan, *supra*, at 2. Secretary Mnuchin also testified before Congress that, although the administration would welcome Congress's assistance, if Congress delayed, the administration would pursue "administrative options" for ending the conservatorships. *The Annual Testimony of*

*the Secretary of the Treasury on the State of the Int'l Finance Sys.: Hearing Before the H. Comm. on Fin. Servs.*, 115th Cong. 47 (July 12, 2018).

67.     President Trump's choice to lead FHFA, Director Calabria, likewise disagreed with Director Watt about whether to wait for Congress to enact legislation before releasing the Companies from conservatorship. He stated in a speech that "while I'm committed to working with Congress, I'm not going to wait on Congress" because HERA "requires me to do what I can within my powers to fix the [Companies] and then release them from conservatorship—and that's exactly what I intend to do." *Prepared Remarks at Mortg. Bankers Assoc. Nat'l Secondary Mkt. Conf. & Expo 2019* (May 20, 2019), https://bit.ly/3AtBWfH. When Calabria was asked if he could lead the Companies out of conservatorship without Congress, he responded that, based on his reading of HERA, he was "obligated" to take them out of conservatorship. *Fannie, Freddie IPO could come in 2020: FHFA Mark Calabria*, FOX BUSINESS 12:02-12:13 (May 10, 2019), https://fxn.ws/3rROmds. "As far as I see it," he said, "I don't really have any choice but to fix them and get them out because that's what the statute demands." *Id.* at 12:45-12:51; *see also* Tr. of FHFA Webinar: Re-proposed Rule on Capital Requirements for Fannie Mae and Freddie Mac, at 2 (June 4, 2020) (statement of Principal Deputy Director Adolfo Marzol acknowledging that FHFA has a "statutory responsibility to end the conservatorships"), https://bit.ly/34fxQfq.

68.     Another key policy difference between Director Watt and the Trump administration was over the Net Worth Sweep. When asked about the Net Worth Sweep, Director Watt said that he does not "lay awake at night worrying about what's fair to shareholders" but rather focuses on "what is responsible for the taxpayers." Nick Timiraos, *FHFA's Watt 'Comfortable' with U.S. Sweep of Fannie, Freddie Profits*, WALL STREET JOURNAL, Money Beat Bog (May 16, 2014), https://on.wsj.com/3FWdgNZ.

69.      In contrast to Director Watt's perspective, President Trump has described the Net Worth Sweep as a "scam," "socialism," and "a travesty brought to you by the Obama/Biden administration." Ex. A. Mr. Calabria, whom President Trump chose to lead FHFA, was a prominent public critic of the Net Worth Sweep before he joined the Trump administration. *See* Michael Krimminger & Mark A. Calabria, *The Conservatorships of Fannie Mae and Freddie Mac: Actions Violate HERA and Established Insolvency Principles*, CATO INSTITUTE (Feb. 9, 2015), https://bit.ly/3bO8bdg; *Banking With Interest: Former FHFA Chief: The Next Collapse of Fannie, Freddie "May Well Be an Inevitability"* at 15:00, INTRAFI NETWORK, (May 17, 2022), https://apple.co/3NQX0lN (criticizing work of prior directors and observing that Fannie and Freddie "were essentially looted for a decade"). And rather than supporting Treasury continuing to collect the Companies' entire net worth as "dividends" in perpetuity, Secretary Mnuchin's top housing finance advisor said that "the taxpayer has actually been, in some ways, many ways, repaid from the bailout of Fannie and Freddie." *Interview with Craig Phillips, Counselor to the Secretary of the Treasury*, ANTONIN SCALIA LAW & ECONOMICS CENTER, at 34:20-34:35 (May 16, 2019), https://bit.ly/2Wpjlld.

70.      The difference in perspectives between Watt and the Trump administration was not lost on members of Congress. Senator Corker explained that some of Watt's conduct "makes it appear as if there is a different approach that is being taken by the Administration," which "is working with us, working with others to move ahead with reform." *See The Status of the Housing Finance System After Nine Years of Conservatorship: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 115th Cong. 9 (May 11, 2017). Watt nevertheless saw no role for FHFA in guiding the Companies out of conservatorship: "I have gotten a lot of criticism because I took FHFA out of the housing finance discussion because it seemed to me that our role was to

manage the enterprises in conservatorship in what I affectionately called 'the here and now.'" *Id.* at 18.

71.     The dissonance continued throughout the first two years of the Trump administration. Just seven days after Watt's testimony, Secretary Mnuchin told the same Senate committee that "the status quo is unsustainable" and that "we need to fix Fannie and Freddie." *Domestic and Int'l Policy Update: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 115th Cong. 5 (May 18, 2017). "Housing finance reform is a priority of Treasury and of the Administration," he added in response to written questions. *Id.* at 67. That same day, Director Watt gave a public speech stating that, though he could take actions while the Companies "are under FHFA's control in conservatorship," questions regarding the steps necessary to move *out* of conservatorship "are questions that only Congress can answer." Melvin L. Watt, *Prepared Remarks at Am. Mortg. Conf., N.C. Bankers Assoc.* (May 1, 2017), https://bit.ly/3AK2vh7.

72.     Eventually, as Secretary Mnuchin's top housing-finance advisor, Craig Phillips, would later say, the Trump administration reached the conclusion that "'we need to wait really for Director Watt's term to end to and to have our appointee,'" so "[t]he decision was made to wait for a nominee.'" *Interview with Craig Phillips, Former Counselor to the Secretary of the Treasury,* SITUSAMC—ON THE HILL, at 10:14 to 11:05, https://bit.ly/3sl08yU. Mr. Phillips explained that the Trump administration reached this conclusion in part because it considered Director Watt too liberal to partner with the Republican administration on housing finance reform issues. *Id.*

73.     In sum, although the Administration was committed to selling Treasury's stake in the Companies and ending the conservatorships, Director Watt's unconstitutionally protected tenure did nothing but cost the Administration critical time—two full years—in pursuing those goals.

74.     That Director Watt prevented the Trump administration from accomplishing its goals was no secret. During what would be Director Watt's final appearance before the Senate Banking Committee, Democratic Senator Mark Warner explained that a Trump appointee would take FHFA a different direction from Watt: "So all of the work that you have been able to move forward by leaving these entities in conservatorship, a new Director, particularly appointed by *this Administration*, could roll back all that progress and do it administratively without any input from Congress." *Ten Years of Conservatorship: The Status of the Housing Finance System: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs* 15 (May 23, 2018) (emphasis added). Senator Warner told Director Watt: "I am not sure I would make a large wager on an appointee that would follow your direction in the agency." *Id.* Senator Warner also expressed his view that Watt's "*progressive leadership* [wa]s going to [be] replaced by this Administration's appointee come January when that person will be put forward." *Id.* (emphasis added).

75.     In the fall of 2018, Watt's tenure was winding down. In his final appearance before Congress, he reiterated that, under his leadership, FHFA would play no role in leading the Companies out of conservatorship. Melvin L. Watt, *Statement of Melvin L. Watt, Director, FHFA, Before the U.S. House of Representatives Comm. on Fin. Servs.* (Sept. 27, 2018), https://bit.ly/349kp0b. Watt said he thought it was "extremely important" for him to "plainly and unequivocally reiterate [his] view that it is the responsibility of Congress, not FHFA, to decide on housing finance reform." *Id.*

### Two Years After Taking Office, President Trump Is Finally Able To Begin Pursuing His Housing Finance Policy Objectives

76.     Director Watt's term ended on January 6, 2019, and he was replaced that same day by Acting Director Otting who wasted no time in changing course at FHFA. According to one report, Otting stressed "that the administration would not wait on Congress." Victoria Grudia &

Katy O'Donnell, *White House plans to overhaul housing finance system, top regulator says*, Politico (Jan. 24, 2019), https://politi.co/3rS34RR. He also "referred to Treasury Secretary Steven Mnuchin's past statements that he wants to wind down the government's control under his tenure—'and I will tell you that is a commitment,' Otting said." *Id.*

77.     President Trump's nominee for FHFA director, Mr. Calabria, was confirmed by the Senate in April 2019. With President Trump's own appointee finally leading FHFA, the Trump administration could at last begin the process of planning and implementing the concrete steps necessary to release the Companies from conservatorship and end government ownership. In a public speech, Director Calabria emphasized that his plans for the Companies "represent a new approach to operating the conservatorships" and a "fundamental shift from past policies." *Prepared Remarks of Dr. Mark A. Calabria, Dir. of FHFA at MBA 2019 Annual Convention & Expo* (Oct. 28, 2019), https://bit.ly/3KTPmXt.

78.     There were five key steps necessary for the Companies to exit conservatorship— the first four of which Director Calabria and Treasury completed in whole or in part.

79.     First, with the crisis in the past and Treasury's investment in Fannie and Freddie more than repaid in full, the PSPAs would have to be modified so that the Companies could begin to retain the profits they were earning and build their net worth back up rather than being forced to hand every dollar over to Treasury via Net Worth Sweep dividends and being kept imprisoned in conservatorship because of insufficient net worth to operate on their own. *See Fannie, Freddie IPO Could Come in 2020: FHFA Mark Calabria*, Fox Business 13:32-13:36 (May 10, 2019), https://fxn.ws/3rROmds (interview in which Director Calabria stated that to exit conservatorship "you need to end what was called the Net Worth Sweep so that [the Companies] can start building capital"); *FHFA Chief: Won't wait for Congress to take Fannie and Freddie public*, CNBC 00:01-

00:04 (May 20, 2019), https://cnb.cx/3H1fZHv (interview in which Director Calabria recognized that "to build capital, you need to be able to end the sweep so they can retain earnings").

80.     Amending the PSPAs to allow the Companies to retain net worth would allow them to build capital in two ways: the Companies could retain earnings and add to their net worth; and the Companies could raise additional capital through the issuance of new stock. To that end, in September 2019, Director Calabria and Treasury amended the PSPAs to permit Fannie and Freddie to build a combined $45 billion in net worth without paying dividends on Treasury's senior preferred stock. Just before the Trump administration ended in January 2021, FHFA and Treasury again agreed to amend the PSPAs to further increase the amount of net worth the Companies could retain. In addition, these amendments permitted the liquidation preference to increase in an amount equal to the retained earnings. That increase preserved Treasury's ability to maximize its profit if it chose to eliminate the liquidation preference by converting its shares (rather than writing down the liquidation preference) because, all else being equal, the larger the liquidation preference, the more common stock that Treasury would receive when converting its senior preferred shares and thus the more profit Treasury would gain from the sale of that common stock.

81.     Second, the Companies had to cease paying Treasury quarterly cash dividends. Director Calabria implemented this change within months of coming into office. *See* FHFA, TABLE 2: DIVIDENDS ON ENTERPRISE DRAWS FROM TREASURY, https://bit.ly/3tmDbKa.

82.     Third, the Companies needed a regulatory framework for determining the amount of capital that would be required once they were under private control. Director Calabria issued a rule adopting such a framework. *See* 85 Fed. Reg. 82,150 (Dec. 17, 2020). The rule addressed a number of complex, highly technical issues and did not become final until December 17, 2020, only a few short weeks before the end of the Trump administration.  The capital rule was

important to potential investors so that they could assess how much capital the companies needed and the return on equity that might be anticipated.

83.     Fourth, FHFA and the Companies needed to develop regulatory and business plans for how they would raise the capital necessary to exit conservatorship. At Director Calabria's direction, the Companies hired financial advisors to help them do just that. *See Fannie Mae Hires Financial Advisor* (June 15, 2020), https://bit.ly/3kQGuHa; *Freddie Mac Announces J.P. Morgan as Financial Advisor* (June 15, 2020), https://bit.ly/3zUxR32; see also *Prepared Remarks of Dr. Mark A. Calabria, Dir. of FHFA at MBA 2019 Annual Convention & Expo* (Oct. 28, 2019), https://bit.ly/3KTPmXt (explaining that "FHFA is in the process of reviewing potential financial advisors that can provide needed expertise to evaluate different capital raising options and help chart a roadmap to responsibly end the conservatorships").

84.     Fifth, the Companies' capital structures needed to change so that their earnings would not go exclusively to Treasury; no one would buy the new stock the Companies needed to issue to raise capital so long as Treasury held a large amount of senior preferred stock that was senior to all other stock issued by the Companies in terms of taking dividends on earnings and the value of the assets in any future liquidation. *See* James Kleimann, *Calabria: We need another round of PSPA amendments*, HOUSING WIRE (Apr. 20, 2021), https://bit.ly/38RxU40 (quoting Director Calabria as saying that the PSPAs should be further amended "to deal with the capital stack" and that "given the structure of the balance sheets as they are today, it will be very difficult if not impossible to raise outside capital"). In fact, that would be the only way that 79.9% of the common equity warrants that Treasury held on behalf of U.S. taxpayers would ever have any real value as marketable securities. President Trump's term ended, and the Trump administration ran out of time before completing this step.

85.     Significantly, several of the steps described above are *sequential*. For example, the Companies and their financial advisors could not complete a plan for raising the necessary capital until FHFA finalized a capital rule specifying how much capital would be required. A final capital rule was likewise needed before the Companies could successfully raise capital by selling new shares of common stock because private investors would want to know how much total capital the Companies would be required to raise before exiting conservatorship. *See Prepared Remarks of Dr. Mark A. Calabria, Dir. of FHFA, at Nat'l Assoc. of Homebuilders Int'l Builders' Show* (Jan. 23, 2020), https://bit.ly/3KJFY8C ("FHFA is working on finishing the capital rule for Fannie and Freddie, which must be in place for them to be able to raise capital."). And until the specifics about how the Companies would raise new capital were worked out with the help of the Companies' financial advisors, Treasury and FHFA could not determine how to eliminate the liquidation preference on Treasury's senior preferred stock in a manner that would maximize Treasury's return on its investment while also enabling the Companies to raise the necessary capital from private investors. To preserve the avenue of eliminating its liquidation preference by converting its senior preferred shares to common stock (rather than writing down the liquidation preference) Treasury permitted the liquidation preference to increase. That increase, all things being equal, would allow Treasury to receive more common stock if it chose to convert its senior preferred shares and thus receive more profit when later selling those shares.

86.     Also significantly, the steps described above could not be carried out unilaterally by Treasury. It was the statutory responsibility of *FHFA* to promulgate a rule specifying how much capital the Companies would be required to maintain once released from conservatorship. Treasury is not the Companies' conservator and so could not direct them to work with financial advisors on a plan for raising additional capital. Treasury also lacks the authority to unilaterally amend the

PSPAs—any changes to those bilateral agreements requires consent from FHFA, acting on behalf of the Companies as their conservator.

87.      As Director Calabria and Treasury worked to achieve the Trump administration's goals for Fannie and Freddie, Director Calabria repeatedly said that he anticipated that the Companies would sell new shares of stock to private investors in 2021. *See* Ben Lane, *Calabria Now Expects Fannie Mae and Freddie Mac IPOs in 2021*, HOUSINGWIRE (Feb. 28, 2020), https://bit.ly/3hXsKJ4; *Prepared Remarks of Dr. Mark A. Calabria, Dir. of FHFA, at Credit Union Nat'l Ass'n (CUNA) Gov't Affairs Conf.* (Feb. 24, 2020), https://bit.ly/3484rna ("2021 is the most likely target for an external capital raise by the Enterprises."); Diana Olick, *CNBC Interview with FHFA Director Mark Calabria*, CNBC 07:26-07:29 (Apr. 1, 2020) ("I still expect initial equity raises by Fannie and Freddie in 2021."), https://cnb.cx/3KRDGV9. In a speech in 2019, Director Calabria explained that, after modifying the PSPAs to allow the Companies to retain their earnings, the plan was to "go nine to eighteen months of retaining earnings" to build up capital. *Meet the Policymakers Forum—Mark Calabria*, ANTONIN SCALIA LAW & ECONOMICS CENTER 13:02-13:50 (Oct. 10, 2019), https://bit.ly/33KeJdx. He stated that the "expectation is 2021" for "public offerings." *Id.*

88.      When the Trump administration ended, FHFA and Treasury were on track to position the Companies to sell a new issuance of common stock in 2021—roughly two and a half or three years after Director Watt's term ended in January 2019.

89.      If President Trump had fired Director Watt and installed his own FHFA director in January 2017, the administration would have been able to start pursuing its policy objectives for Fannie and Freddie two years sooner. But for the removal restriction, President Trump would have fired Director Watt at the start of his administration and the Companies would have raised capital

by selling new shares of common stock in 2019. Before such a stock issuance occurred, FHFA and Treasury would have taken the actions necessary from a business perspective to remove the liquidation preference on Treasury's senior preferred stock because the liquidation preference impeded the Companies' ability to sell new stock and Treasury's ability to monetize its warrants in subsequent stock offerings by the Companies.

**Two Years Was Too Short To Implement
the Trump Administration's Housing Finance Policy**

90. On November 3, 2020, Joseph Biden was elected President of the United States.

91. When the Trump administration came to an end, so did the hopes of the Companies exiting conservatorship anytime soon. "The Biden administration has said it isn't in any rush to return Fannie and Freddie to private hands, a reversal from the Trump administration." Andrew Ackerman, *Biden to Nominate Sandra Thompson to Lead Fannie and Freddie's Overseer*, WALL ST. J. (Dec. 14, 2021), https://on.wsj.com/3e0IZSI.

92. Although the Trump administration "pushed to put the companies on a path to exit conservatorship," it "ultimately ran out of time." *Id.* The Administration pursued its policy as quickly as possible, but the two-year delay caused by Director Watt's tenure was too much to overcome. Former President Trump explained the situation in his letter to Senator Paul: "My Administration was denied the time it needed to fix this problem because of the unconstitutional restriction on firing Mel Watt." Ex. A. During a recent podcast, former Director Calabria made the same point when asked why he did not complete housing finance reform during his tenure: "I ran out of time." *Banking With Interest: Former FHFA Chief: The Next Collapse of Fannie, Freddie "May Well Be an Inevitability"* at 16:32, INTRAFI NETWORK (May 17, 2022), https://apple.co/3NQX0lN; *see also id.* at 18:00 ("[T]he biggest thing ultimately is trying to raise outside capital, and we just never got there.").

34

93.     The Trump Administration's commitment to the policy objectives and reforms outlined above is demonstrated by the final provision of the January 14, 2021 amendments the administration made to the PSPAs, just before President Trump left office: "In order to facilitate the exit from conservatorship, Treasury and the Enterprise[s] commit to work to restructure Treasury's investment and dividend amount in a manner that facilitates the orderly exit from conservatorship, ensures Treasury is appropriately compensated, and permits the Enterprise[s] to raise third-party capital and make distributions as appropriate. Treasury, in consultation with [FHFA] should endeavor to transmit a proposal that details this work to both Houses of Congress on or prior to September 20, 2021." *Executed Letter Agreement for Fannie Mae* IX at 10, DEPT. OF THE TREASURY (Jan. 14, 2021), https://bit.ly/3PWT3hn; *Executed Letter Agreement for Freddie Mac* IX at 10, DEPT. OF THE TREASURY (Jan. 14, 2021), https://bit.ly/38LSAxV.

94.     On June 21, 2021, the Supreme Court released its decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), which held that HERA's for-cause removal restriction for the FHFA director violates the Constitution. Within hours of the Supreme Court's decision, President Biden fired Director Calabria. That same day, President Biden named Sandra Thompson as the Acting Director of FHFA. As one administration official put it, "Biden was 'moving forward today to replace the current director with an appointee who reflects the administration's values.'" Katy O'Donnell, *Biden removes FHFA director after Supreme Court ruling*, POLITICO (June 23, 2021), https://politi.co/3y1cT1L.

95.     Ten days later, FHFA released its Performance Accountability Report for 2021, which stated that many but not all of the tasks required to "[r]esponsibly end the conservatorships" had been completed. *FHFA FY2021 Performance Accountability Report* 38 (Nov. 15, 2021), https://bit.ly/33Q9Gbo.

96.     In December 2021, President Biden nominated Acting Director Thompson to serve as the permanent director of FHFA. At her confirmation hearing the following January, she testified that the Biden administration would not attempt to lead the Companies out of conservatorship but "would defer to Congress on the exit from the conservatorship." *Nomination Hearing Before S. Comm. on Banking, Housing, and Urban Affairs* 1:29:01-1:29:07 (Jan. 13, 2022), https://bit.ly/3G40FZc. On May 25, 2022, the Senate confirmed Thompson as FHFA's permanent director. *Roll Call Vote 117th Cong. – 2nd Sess.*, U.S. SENATE, https://bit.ly/3maqsaG. Thus, Director Thompson's leadership represents a return to the Mel Watt policy of ignoring HERA's mandate to end the conservatorship and instead claiming, without any legal support, that further congressional action is required.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the President's Constitutional Removal Authority
Against All Defendants**

97.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

98.     The Supreme Court has recognized a cause of action for equitable relief to redress constitutional violations by federal officials. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010).

99.     In *Collins v. Yellen*, the Supreme Court held that the statutory restriction on the President's ability to remove the FHFA director from office violated the Constitution's separation of powers. 141 S. Ct. at 1783-84. *Collins* further explained that "it is . . . possible for an unconstitutional [removal restriction] to inflict compensable harm." *Id.* at 1789. For example, the Court explained, if "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand

in the way," then "the statutory provision would clearly cause harm." *Id.* Here, the former President's letter to Senator Paul conclusively shows that the removal restriction harmed Plaintiffs.

100.     Even if the President's letter were not dispositive, other facts show that the removal restriction harmed Plaintiffs. Director Watt had major policy differences with the Trump administration, and President Trump lacked confidence in him. President Trump would have fired Director Watt but for the unconstitutional removal restriction.

101.     During Director Watt's two years leading FHFA while President Trump was in office, Director Watt's leadership at FHFA prevented the Trump administration from pursuing its policy objectives of (1) ending government ownership of Fannie and Freddie by selling Treasury's common stock in the Companies at a large profit; and (2) ending the conservatorships as promptly as practicable. To achieve either of those goals, Defendants or their predecessors in office would have necessarily eliminated the liquidation preference on Treasury's senior preferred stock—either by writing the liquidation preference down to zero or by converting Treasury's senior preferred stock to common stock. One, if not both, of those two things would have occurred during the Trump administration if President Trump had installed his own FHFA director at the start of his presidency.

102.     To remedy the harm caused by the unconstitutional removal restriction, the Court should enter an injunction placing plaintiffs in the position they would be in but for the constitutional violation.

## COUNT II

### Violation of Congress's Constitutional Power of the Purse
### Against All Defendants

103.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

104.     The Supreme Court has recognized a cause of action for equitable relief to redress constitutional violations by federal officials. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010).

105.     Article I of the United States Constitution grants Congress the "power over the purse," FED. NO. 58; *see also* FED. NO. 78, including control over the funding of Executive Branch operations via periodic, temporally bound appropriations.

106.     The American Colonies inherited, as part of fundamental constitutional tradition, the core axiom that the Executive Branch regularly depends on the Legislative Branch for funding. *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 225–32 (5th Cir. 2022) (en banc) (Jones, J., concurring).

107.     The Founders codified this principle in the Constitution, particularly in Article I, Section 9, Clause 7: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

108.     An executive agency that lacks constitutionally authorized funding to operate lacks the authority necessary "to carry out the functions of the office," *Collins*, 141 S. Ct. at 1788; *see also All Am. Check Cashing*, 33 F.4th at 242.

109.     Under *Collins*, FHFA is an executive agency with a single person who heads the agency. 141 S. Ct. at 1786, 1787.

110.     "FHFA actions with respect to [Fannie and Freddie] could have an immediate impact on millions of private individuals and the economy at large." *Id.* at 1785.

111.     FHFA possesses the power to self-fund by drawing assessments from Fannie, Freddie, and the other entities FHFA regulates. 12 U.S.C. § 4516(a); *id.* § 4502(20).

112.    Indeed, FHFA's assessments are within the Director's discretion, limited only by the Director's determination of the "reasonable costs . . . and expenses of the Agency" and the funds necessary for "a working capital fund." 12 U.S.C. § 4516(a).

113.    FHFA's funding structure is not temporally bound. The agency's power to self-fund is a permanent power. *See* 12 U.S.C. § 4516.

114.    While Fannie and Freddie have been in conservatorship since 2008, the FHFA has had control over these central sources of its own funding, including, for example, their ability to petition Congress. *See* 12 U.S.C. § 4617(b).

115.    The FHFA adopted the Third Amendment at a time when it lacked constitutionally authorized funding to operate.

116.    Accordingly, the Third Amendment must be vacated and set aside.

## COUNT III

### Agency Action Contrary to Constitutional Right under the APA – Presidential Removal Against All Defendants

117.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

118.    The APA provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

119.    In *Collins v. Yellen*, the Supreme Court held that the statutory restriction on the President's ability to remove the FHFA director from office violated the Constitution's separation of powers. 141 S. Ct. at 1783-84. *Collins* further explained that "it is . . . possible for an unconstitutional [removal restriction] to inflict compensable harm." *Id.* at 1789. For example, the Court explained, if "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand

39

in the way," then "the statutory provision would clearly cause harm." *Id.* Here, the former President's letter to Senator Paul conclusively shows that the removal restriction harmed Plaintiffs.

120.     Even if the President's letter were not dispositive, other facts show that the removal restriction harmed Plaintiffs. Director Watt had major policy differences with the Trump administration, and President Trump lacked confidence in him. President Trump would have fired Director Watt but for the unconstitutional removal restriction.

121.     During Director Watt's two years leading FHFA while President Trump was in office, Director Watt's leadership at FHFA prevented the Trump administration from pursuing its policy objectives of (1) ending government ownership of Fannie and Freddie by selling Treasury's common stock in the Companies at a large profit; and (2) ending the conservatorships as promptly as practicable. To achieve either of those goals, Defendants or their predecessors in office would have necessarily eliminated the liquidation preference on Treasury's senior preferred stock—either by writing the liquidation preference down to zero or by converting Treasury's senior preferred stock to common stock. One, if not both, of those two things would have occurred during the Trump administration if President Trump had installed his own FHFA director at the start of his presidency.

122.     To remedy the harm caused by the unconstitutional removal restriction, the Court should enter an injunction placing plaintiffs in the position they would be in but for the constitutional violation and enter an order setting aside the agency action maintaining Treasury's liquidation preference.

## COUNT IV

### Agency Action Contrary to Constitutional Right under the APA –
### Congress's Constitutional Power of the Purse
### Against All Defendants

123.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

124.     The APA provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

125.     Article I of the United States Constitution grants Congress the "power over the purse," Fed. No. 58; *see also* Fed. No. 78, including control over the funding of Executive Branch operations via periodic, temporally bound appropriations.

126.     The American Colonies inherited, as part of fundamental constitutional tradition, the core axiom that the Executive Branch regularly depends on the Legislative Branch for funding. *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 225–32 (5th Cir. 2022) (en banc) (Jones, J., concurring).

127.     The Founders codified this principle in the Constitution, particularly in Article I, Section 9, Clause 7: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

128.     An executive agency that lacks constitutionally authorized funding to operate lacks the authority necessary "to carry out the functions of the office," *Collins*, 141 S. Ct. at 1788; *see also All Am. Check Cashing*, 33 F.4th at 242.

129.     Under *Collins*, FHFA is an executive agency with a single person who heads the agency. 141 S. Ct. at 1786, 1787.

130.     "FHFA actions with respect to [Fannie and Freddie] could have an immediate impact on millions of private individuals and the economy at large." *Id.* at 1785.

131.     FHFA possesses the power to self-fund by drawing assessments from Fannie, Freddie, and the other entities FHFA regulates. 12 U.S.C. § 4516(a); *id.* § 4502(20).

132.     Indeed, FHFA's assessments are within the Director's discretion, limited only by the Director's determination of the "reasonable costs . . . and expenses of the Agency" and the funds necessary for "a working capital fund." 12 U.S.C. § 4516(a).

133.     FHFA's funding structure is not temporally bound. The agency's power to self-fund is a permanent power. *See* 12 U.S.C. § 4516.

134.     While Fannie and Freddie have been in conservatorship since 2008, the FHFA has had control over these central sources of its own funding, including, for example, their ability to petition Congress. *See* 12 U.S.C. § 4617(b).

135.     The FHFA adopted the Third Amendment at a time when it lacked constitutionally authorized funding to operate.

136.     Accordingly, the Third Amendment must be vacated and set aside.

## COUNT V

**Agency Action That Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law under the APA**
**Against All Defendants**

137.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

138.     The APA provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law," *id.* § 706(2)(D).

42

139.     In *Collins v. Yellen*, the Supreme Court held that the statutory restriction on the President's ability to remove the FHFA director from office violated the Constitution's separation of powers. 141 S. Ct. at 1783-84. *Collins* further explained that "it is . . . possible for an unconstitutional [removal restriction] to inflict compensable harm." *Id.* at 1789. For example, the Court explained, if "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way," then "the statutory provision would clearly cause harm." *Id.* Here, the former President's letter to Senator Paul conclusively shows that the removal restriction harmed Plaintiffs.

140.     Even if the President's letter were not dispositive, other facts show that the removal restriction harmed Plaintiffs. Director Watt had major policy differences with the Trump administration, and President Trump lacked confidence in him. President Trump would have fired Director Watt but for the unconstitutional removal restriction.

141.     During Director Watt's two years leading FHFA while President Trump was in office, Director Watt's leadership at FHFA prevented the Trump administration from pursuing its policy objectives of (1) ending government ownership of Fannie and Freddie by selling Treasury's common stock in the Companies at a large profit; and (2) ending the conservatorships as promptly as practicable. To achieve either of those goals, Defendants or their predecessors in office would have necessarily eliminated the liquidation preference on Treasury's senior preferred stock—either by writing the liquidation preference down to zero or by converting Treasury's senior preferred stock to common stock. One, if not both, of those two actions would have occurred during the Trump administration if President Trump had installed his own FHFA director at the start of his presidency.

142.     The harm caused by the unconstitutional removal restriction resulted in agency action, findings, or conclusions that were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Collins*, 141 S. Ct. at 1794 n.7 (Thomas, J., concurring).

143.     Because of the unconstitutional removal restriction, Watt's actions as head of FHFA were taken without observance of procedure required by law—namely Article II of the Constitution.

144.     To remedy the harm caused by the unconstitutional removal restriction, the Court should enter an injunction placing plaintiffs in the position they would be in but for the constitutional violation and enter an order setting aside the agency action maintaining Treasury's liquidation preference.

## COUNT VI

### Agency Action That Is Unlawfully Withheld under the APA
### Against All Defendants

145.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

146.     The APA provides that courts "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

147.     In *Collins v. Yellen*, the Supreme Court held that the statutory restriction on the President's ability to remove the FHFA director from office violated the Constitution's separation of powers. 141 S. Ct. at 1783-84. *Collins* further explained that "it is . . . possible for an unconstitutional [removal restriction] to inflict compensable harm." *Id.* at 1789. For example, the Court explained, if "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way," then "the statutory provision would clearly cause harm." *Id.* Here, the former President's letter to Senator Paul conclusively shows that the removal restriction harmed Plaintiffs.

148.     Even if the President's letter were not dispositive, other facts show that the removal restriction harmed Plaintiffs. Director Watt had major policy differences with the Trump administration, and President Trump lacked confidence in him. President Trump would have fired Director Watt but for the unconstitutional removal restriction.

149.     During Director Watt's two years leading FHFA while President Trump was in office, Director Watt's leadership at FHFA prevented the Trump administration from pursuing its policy objectives of (1) ending government ownership of Fannie and Freddie by selling Treasury's common stock in the Companies at a large profit; and (2) ending the conservatorships as promptly as practicable. To achieve either of those goals, Defendants or their predecessors in office would have necessarily eliminated the liquidation preference on Treasury's senior preferred stock—either by writing the liquidation preference down to zero or by converting Treasury's senior preferred stock to common stock. One, if not both, of those two actions would have occurred during the Trump administration if President Trump had installed his own FHFA director at the start of his presidency.

150.     The harm caused by the unconstitutional removal restriction resulted in agency action, findings, or conclusions that were unlawfully withheld or unreasonably delayed.

151.     To remedy the harm caused by the unconstitutional removal restriction, the Court should enter an injunction placing plaintiffs in the position they would be in but for the constitutional violation and enter an order compelling the agency to eliminate Treasury's liquidation preference

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for an order and judgment:

1.      Declaring that FHFA's structure violates the separation of powers and declaring void the provisions of HERA that purport to insulate FHFA's director from oversight by the President.

2.      Entering an injunction that restores Plaintiffs to the position they would have been in were it not for the unconstitutional removal restriction. At a minimum, such an injunction should: (a) direct Defendants to eliminate the liquidation preference on Treasury's senior preferred stock (either by writing down the liquidation preference on Treasury's senior preferred stock to zero or by converting Treasury's senior preferred stock to common stock); and (b) prohibit Defendants from further increasing the liquidation preference on Treasury's senior preferred stock except as necessary to offset any further draws on Treasury's funding commitment.

3.      Entering an injunction directing Defendants to provide any other credits or adjustments that are necessary to put Plaintiffs in the position they would have been in were it not for the unconstitutional removal restriction.

4.      Entering an order setting aside the agency action maintaining Treasury's liquidation preference; or, in the alternative, entering an order compelling agency action to eliminate Treasury's liquidation preference

5.      Declaring that FHFA's structure violates the separation of powers and declaring void the provisions of HERA that purport to fund FHFA permanently by assessments on regulated entities, including entities currently under FHFA's conservatorship.

6.      Under Counts II and IV, deeming the Third Amendment to be void ab initio, vacating and setting aside the Third Amendment, or, to the extent the Court deems it appropriate, vacating and setting aside the PSPAs in their entirety.

7.      Under Counts II and IV, enjoining FHFA and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Third Amendment.

8.      Under Counts II and IV, enjoining Treasury and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Third Amendment.

9.      Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

10.     Granting such other and further relief as this Court deems just and proper.


Dated:  June 3, 2022                          Respectfully submitted,

/s/ Chad Flores                               /s/ David H. Thompson
Chad Flores                                   David H. Thompson
Texas Bar No. 24059759                        Charles J. Cooper
S.D. Tex. Bar No. 1060324                     Peter A. Patterson
Beck Redden LLP                               Brian W. Barnes
1221 McKinney St., Suite 4500                 Cooper & Kirk, PLLC
Houston, TX 77010                             1523 New Hampshire Avenue, N.W.
(713) 951-3700                                Washington, D.C. 20036
cflores@beckredden.com                        (202) 220-9600
                                              dthompson@cooperkirk.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 3, 2022, a copy of the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Southern District of Texas, using the CM/ECF system, which will send a Notice of Electronic filing to all parties of record.

/s/ Chad Flores
Chad Flores