United States District Court
Southern District of Texas
**ENTERED**
November 22, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **PATRICK J COLLINS**, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:16-CV-03113** |
| | § | |
| **JACOB J. LEW**, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM AND ORDER</u>

Shareholders of the Federal National Mortgage Association and the Federal Home Loan Mortgage Association (Fannie Mae and Freddie Mac, respectively) brought this case against the U.S. Department of the Treasury (Treasury) and the Federal Housing Finance Agency (FHFA). The Supreme Court (1) rejected Plaintiffs' claim that FHFA exceeded its statutory powers by amending its agreement with Treasury to agree to pay certain dividends; (2) held that FHFA's founding statute unconstitutionally restricted removal of FHFA's single director only for cause; and (3) held that actions taken by FHFA, when it was headed by a single director whom the president could remove only for cause, were not void. *Collins v. Yellen*, 141 S. Ct. 1761 (2021).

The Supreme Court directed lower courts to resolve the remaining issue of whether the unconstitutional removal restriction inflicted compensable harm to shareholders. The Fifth Circuit remanded for a ruling in the first instance.

Now pending before the Court are Defendants' Motions to Dismiss (Docs. 83, 84) Plaintiffs' Amended Complaint (Doc. 80). The Court heard argument on these motions at a

November 7, 2022 hearing. After considering the Motions and applicable law, the Court **GRANTS**

Defendants' Motions to Dismiss and dismisses Plaintiffs' claims **WITH PREJUDICE**.

## I.     BACKGROUND

### A.  Factual Background

Fannie Mae and Freddie Mac are government-sponsored enterprises (GSEs) created to provide liquidity to the mortgage market. In the wake of the 2008 financial crisis and housing market collapse, the GSEs experienced overwhelming losses due to increased default rates on residential mortgages. In response, Congress passed the Housing and Economic Recovery Act (HERA) of 2008. Pub. L. No. 110-289, 122 Stat. 2654. HERA created FHFA as an independent federal agency to supervise and regulate the GSEs. 12 U.S.C. § 4501 et seq.

HERA provided for FHFA to be headed by a single director, nominated by the president and confirmed by the Senate, and removable during his five-year term only for cause. 12 U.S.C. § 4512(a), (b)(1), (b)(2). HERA authorized the FHFA director to regulate companies and to appoint FHFA to serve as the GSEs' conservator or receiver. 12 U.S.C. § 4617(a). The statute gave FHFA control over its own funding, granting it the power to collect assessments from the entities it regulates. 12 U.S.C. § 4516(a). Finally, HERA gave Treasury temporary authority to purchase securities from the GSEs. *See* 12 U.S.C. §§ 1455(l), 1719(g).

A transitional director placed the GSEs into conservatorship on September 6, 2008. In two identical Preferred Stock Purchase Agreements (PSPAs), Treasury agreed to provide up to $100 billion in funding to each company in exchange for 79.9% of common stock, 1 million shares of preferred stock with a liquidation preference of $1 billion, quarterly dividends, and a quarterly periodic commitment fee.

Defendants amended the agreement several times to provide additional funding. By 2012, the GSEs had drawn about $187 billion from Treasury's funding commitment. In response to the GSEs' continued challenges, a third amendment (the Third Amendment) was signed in August 2012. The Third Amendment imposed an agreement called a Net Worth Sweep, which required the GSEs to pay Treasury a quarterly dividend based on net profit rather than a set rate.

In 2012, the GSEs started generating profits. For the first time since the beginning of the conservatorship, the GSEs paid more to Treasury than they received. The surplus did not reduce Treasury's liquidation preference or preferred stock holdings. Plaintiffs argue that "the large liquidation preference on Treasury's senior preferred stock, combined with the fact that Treasury's senior preferred stock has priority over all other stock issued by the GSEs, prevented all shareholders in the GSEs other than Treasury from ever receiving a return on their investments." *Id.* ¶ 58. However, the Third Amendment did not alter or amend these liquidation preference rights.

In 2013, President Obama appointed Melvin Watt to lead FHFA. *Id.* ¶¶ 43-45. Director Watt continued his directorship through the first two years of the Trump presidency, leaving him as the "last-remaining Obama-appointed regulator." *Id.* ¶ 46. Throughout his tenure, Director Watt maintained that FHFA should wait for Congress to enact legislation before ending the conservatorship. *Id.* ¶ 47. In December 2017, FHFA (under Director Watt) and Treasury negotiated another amendment to the PSPAs, under which Treasury agreed to permit the GSEs to retain internal capital. In exchange, Treasury received an equivalent increase in its liquidation preference for each GSE. (Doc. 83 at 10-11.)

Director Watt's term ended in January 2019. The Senate confirmed President Trump's nominee, Mark Calabria, in April 2019.

### B.  Procedural History

#### 1.  Initial Litigation and Remand

Three shareholders holding both common and preferred stock of the GSEs sued Treasury and FHFA alleging that (1) FHFA's Third Amendment exceeded its statutory powers under HERA and the Administrati; and (2) its actions were void because HERA unconstitutionally restricted removal of FHFA's single director only for cause. Judge Atlas dismissed Plaintiffs' claims. Plaintiffs appealed to the Fifth Circuit, then to the Supreme Court, which granted certiorari and issued its opinion in 2021.

In *Collins v. Yellen*, the Supreme Court (1) denied Plaintiffs' claim that FHFA exceeded its statutory powers by entering into an amendment of its agreement with Treasury that required the payment of dividends to the Treasury; (2) held that HERA unconstitutionally restricted removal of FHFA's single director only for cause; and (3) held that actions taken by FHFA, when it was headed by a single Director whom the president could remove only for cause, were not void. 141 S. Ct. 1761 (2021). The Supreme Court determined that (a) the Third Amendment was not constitutionally infirm at its inception; (b) the Senate-confirmed FHFA Directors who implemented the Third Amendment were properly appointed; and (c) the removal defect did not render "any of the actions taken by the FHFA in relation to the third amendment [] void." *Id.* at 1783-87.

The Supreme Court clarified that its holdings did "not necessarily mean . . . that the shareholders have no entitlement to retrospective relief." *Id.* at 1788. "[T]he possibility that the unconstitutional restriction on a President's power to remove a Director of the FHFA could have [inflicted compensable harm] cannot be ruled out." *Id.* at 1789. The Court went on to sketch possible causes and consequences of such harm:

Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

In the present case, the situation is less clear-cut, but the shareholders nevertheless claim that the unconstitutional removal provision inflicted harm. Were it not for that provision, they suggest, the President might have replaced one of the confirmed Directors who supervised the implementation of the third amendment, or a confirmed Director might have altered his behavior in a way that would have benefited the shareholders.

The federal parties dispute the possibility that the unconstitutional removal restriction caused any such harm. They argue that, irrespective of the President's power to remove the FHFA Director, he "retained the power to supervise the [Third] Amendment's adoption . . . because FHFA's counterparty to the Amendment was Treasury—an executive department led by a Secretary subject to removal at will by the President." The parties' arguments should be resolved in the first instance by the lower courts.

*Id.* (internal citation omitted).

Three concurrences, reflecting the opinions of five justices, suggested that Plaintiffs would struggle to establish cognizable harm on remand. *See id.* at 1795 (Thomas, J., concurring) ("I seriously doubt that the shareholders can demonstrate that any relevant action by an FHFA Director violated the Constitution. And, absent an unlawful act, the shareholders are not entitled to a remedy."); *id.* at 1799 (Gorsuch, J., concurring in part) (labeling the remand a "speculative enterprise" that would "intrude on often-privileged executive deliberations"); *id.* at 1802 (Kagan, J., concurring in part) (stating remand proceedings "may be brief indeed" because the Fifth Circuit has already found that "the President, acting through the Secretary of the Treasury," had "oversight" of FHFA's actions).

The Fifth Circuit, sitting en banc, held oral arguments on the issue of retrospective relief earlier this year. The Court reiterated that the Third Amendment "bore no constitutional infirmity in its inception" and that the "constitutional removal defect . . . did not render any of the actions

taken by the FHFA in relation to the third amendment [] void," but declined to rule and remanded to the district court. *Collins v. Yellen*, 27 F.4th 1068 (5th Cir. 2022). Five judges dissented, stating the circuit should resolve this case based on its previous conclusion that "the President, acting through the Secretary of the Treasury, could have stopped [the Net Worth Sweep] but did not." *Id.* at 1072 (citing *Collins v. Mnuchin*, 938 F.3d 553, 594 (5th Cir. 2019) (en banc)).

### 2. Amended Complaint

Plaintiffs filed an Amended Complaint (Doc. 80) with this Court. The Complaint seeks relief under the APA and the Constitution. Plaintiffs allege that the Trump Administration would have ended the Third Amendment but for the unconstitutional constraints on presidential removal. Plaintiffs seek relief on six separate counts. These counts can broadly be split into two categories: (1) removal authority claims (Counts I, III, V, VI), and (2) Appropriations Clause claims (Counts II, IV).

With respect to the removal authority claims, Plaintiffs request various forms of relief. First, Plaintiffs ask the Court to declare that FHFA's structures violate the separation of powers doctrine and declare void the provisions of HERA that insulate FHFA's director from oversight. Second, Plaintiffs ask the court to enter an injunction restoring Plaintiffs to the position they would have been in if not for the removal restriction, including by directing Defendants to eliminate the liquidation preference and by providing credits to Plaintiffs. Finally, Plaintiffs ask the Court to enter an order setting aside agency action maintaining Treasury's liquidation preference or compelling agency action to liquidate the preference. With respect to the Appropriations Clause claims, Plaintiffs ask the Court to declare FHFA's structures violate the separation of powers doctrine and declare void the provisions of HERA that fund FHFA permanently by assessments on regulated entities; vacate and set aside the Third Amendment or the PSPAs in their entirety;

and enjoin FHFA and Treasury from implementing action under the Third Amendment. Finally, Plaintiffs ask for reasonable costs and any other relief the Court deems proper.

## II.    SCOPE OF REVIEW

The Fifth Circuit's "mandate rule requires a district court on remand to effect our mandate and do nothing else." *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (internal quotations omitted). Following remand, district courts need not and do not ordinarily entertain claims "not within the scope of the remand." *Id.* at 453. The mandate rule bars not only "litigation of issues decided by the district court but foregone on appeal," but also issues "otherwise waived, for example because they were not raised in the district court" before the appeal. *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004). However, exceptions to the rule exist where "(1) the evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; (3) the earlier decision is clearly erroneous and would work a manifest injustice." *Ball v. LeBlanc*, 881 F.3d 346, 351 (5th Cir. 2018) (citing *United States v. McCrimmon*, 443 F.3d 454, 460 (5th Cir. 2006)).

## III.    DEFENDANTS' MOTIONS TO DISMISS

### A.  Removal Authority

Defendants first seek to dismiss Plaintiffs' removal restriction claims, including Counts I, III, V, and VI of the Amended Complaint. The Supreme Court and Fifth Circuit provided clear instructions regarding this Court's scope of inquiry. The Supreme Court directed lower courts to determine whether "retrospective relief" is available based on "compensable harm" caused by Director Watt's "implementation of the third amendment." 141 S. Ct. at 1788-89; *see also Collins*, 27 F.4th at 1069 (directing the district court to determine whether "the unconstitutional restriction on a President's power to remove a Director of the FHFA could have [inflicted harm]"). Plaintiffs

fail to plausibly demonstrate compensable harm or the Court's ability to provide the requested relief.

### 1. Compensable Harm

In *Community Financial Services Association of America v. Consumer Financial Protection Bureau*, the Fifth Circuit read the *Collins* directive to require a party challenging the agency action due to an unconstitutional removal scheme to establish "a nexus between the desire to remove and the challenged actions taken by the insulated actor." 51 F.4th 616, 632 (5th Cir. 2022). "Without this showing, the Plaintiffs could put themselves in a better place than otherwise warranted." *Id.* Several other circuits have similarly required findings of specific agency action causing the alleged harm. *See Calcutt v. FDIC*, 37 F.4th 293, 315 (6th Cir. 2022) (citing *Collins* for the proposition that "a petitioner would have to establish that an unconstitutional removal protection specifically caused an agency action in order to be entitled to judicial invalidation of that action"); *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (explaining that "[a] party challenging an agency's past actions must . . . show how the unconstitutional removal provision actually harmed the party"); *Bhatti v. Fed. Housing Fin. Agency*, 15 F.4th 848, 854 (8th Cir. 2021) (identifying issue under *Collins* as whether unconstitutional removal restriction "caused compensable harm").

Plaintiffs allege that, had President Trump been able to nominate his preferred director in January 2017, FHFA and Treasury would have ended the conservatorship and liquidated Treasury's shares by the end of the Administration. While Plaintiffs' evidence may plausibly suggest that the Trump Administration hoped to end the conservatorship, Plaintiffs do not demonstrate that the Administration had a concrete plan in place, that this plan necessarily

involved liquidating Treasury's preferred stock, or that the Administration would have completed these actions within four years.

First, Plaintiffs fail plausibly to allege that the administration had a concrete plan to end the conservatorship, or that that plan necessarily involved liquidating Treasury's preferred stocks. Plaintiffs provide a range of policy statements. The only official policy statement is a March 2019 directive from President Trump instructing FHFA and Treasury to develop proposals for "[e]nding the conservatorships". *See* Federal Housing Finance Reform, 84 Fed. Reg. 12,479, 12,479-80 (Mar. 27, 2019). (Doc. 80 ¶ 53(f).) The proposal does not specifically focus on reducing Treasury's priority stock holdings. It does, however, emphasize the importance of protecting Treasury's economic interests in the GSEs.

Plaintiffs' other proffered policy documents demonstrate that the Administration lacked a clear path for ending the conservatorship at least through September 2019—half a year after Director Watt's term ended, and two-and-a-half years into President Trump's term in office. For instance, a 2018 Executive Office report outlined proposals to end the conservatorship and "transition[] Fannie Mae and Freddie Mac to fully private entities." *See* Executive Office of the President of the United States, *Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations* 75 (June 21, 2018), https://bit.ly/3rKXAbl. (Doc. 80 ¶ 53(e).) Likewise, a September 2019 Treasury report states that GSEs "should be recapitalized" and taken out of conservatorship "as promptly as practicable," but only amongst a list of other policy options. *Housing Reform Plan: Pursuant to the Presidential Memorandum Issued March 27, 2019* 26-28 (Sept. 5, 2019), https://bit.ly/2Uyvzre. (Doc. 80 ¶ 53(h).)

Further, Plaintiffs offer statements by Director Calabria and Secretary Mnuchin and a November 2021 letter from former President Trump to Senator Paul. These sources do not

specifically outline a plan for ending the conservatorship. (Docs. 80 ¶¶ 53(a)-(d), (g), 60(b), (c); 80-1.) President Trump's post hoc letter—written after the *Collins* decision was released—should not be given significant weight. At no point during Director Watt's tenure did President Trump criticize or attempt to remove Director Watt. (Doc. 85 at 12.) "Considering only contemporaneous explanations for agency action [] instills confidence that the reasons given are not simply convenient litigating position[s]. Permitting agencies to invoke belated justifications . . . can upset the orderly functioning of the process of review." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020); *see also Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 925 (D.C. Cir. 2017) ("[A]fter-the-fact claims about agency intentions do not work when agency actions evince the opposite."); *Indep. Living Res. v. Or. Arena Corp.*, 982 F. Supp. 698, 737 (D. Or. 1997) (stating "agencies do not formulate policy . . . through post-hoc affidavits from former agency officials, on behalf of a private litigant, expressing the affiant's personal view" on agency policy).

Second, Plaintiffs do not effectively plead that the Administration would have been able to take the GSEs out of the conservatorship within four years, even if they had a clear plan to do so. Plaintiffs point to no specific action by Director Watt to obstruct the policy goals of the Trump Administration. Nor do they clarify how a Trump-appointed director's actions might have differed from Director Watt's actions. Under both Directors Watt and Calabria, FHFA took similar steps to enable the GSEs to retain capital while simultaneously amending the PSPAs to *increase* Treasury's liquidation preferences. (Doc. 80 ¶¶ 80, 83; Doc. 83 at 10; Doc. 85 at 12-13.) Plaintiffs contend that this increase would allow Treasury to receive more common stock if it chose to convert its senior partner shares. (Doc. 80 ¶ 85.) These steps may indicate a desire to move towards an end of the conservatorship—Plaintiffs themselves state that the GSEs were not in a condition

in which FHFA could have responsibly released them from their conservatorship at the end of 2016, and that affirmative steps were needed to prepare the GSEs. (Doc. 80 ¶ 54.) However, the actions do not indicate by more than mere speculation that an administration with four years to effectuate its policy preferences would have successfully taken different actions faster or otherwise reversed course to sell or eliminate these stocks.

## 2. Retrospective Relief

As Plaintiffs have failed to plead that they were harmed by the removal restrictions, they are unable to make a claim for relief. *CFSA v. CFTC*, 51 F.4th 616, 632 (5th Cir. 2022) ("Without [a] showing [of actual harm], the Plaintiffs could put themselves in a better place than otherwise warranted."). However, even had Plaintiffs demonstrated cognizable harm, their claims for relief far surpass this Court's mandate for retrospective relief.

*Collins* is, at its core, a separation-of-powers decision. *See Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021) ("The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote."). "[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996). Plaintiffs ask for injunctive and declaratory relief eliminating the liquidation preferences. This would require the Court to exercise sweeping administrative duties based on the unachieved policy preference of a prior administration, impeding the current administration's own ability to effectuate its policy preferences through the appointment of a new FHFA director.

In summary, the Court concludes that Plaintiffs' evidence of harm is contradictory and largely non-cognizable. Further, Plaintiffs' claims for relief are incongruous with the Supreme Court's remand. For these reasons, the Court grants Defendants' Motions to Dismiss with respect to Plaintiff's removal claims.

### B. Appropriations Clause Claims

In Counts II and IV, Plaintiffs seek to vacate the Third Amendment based on the theory that FHFA's self-funding structure violates the Appropriations Clause[1] and, therefore, FHFA lacks constitutional authority to act. Plaintiffs first introduced these claims in their Amended Complaint.

Before considering the merits of Plaintiffs' argument, this Court must consider whether Plaintiffs properly bring their claims at this point in the litigation. The mandate rule bars the litigation of issues that were previously "waived . . . because they were not raised in the district court." *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004). This rule "operates to create efficiency, finality and obedience within the judicial system." *Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1511 (11th Cir. 1987).

Plaintiffs argue that the Appropriations Clause claims fall into an exception to the mandate rule due to "an intervening change of law by a controlling authority." (Doc. 86 at 24 (quoting *United States v. McCrimmon*, 443 F.3d 454, 460 (5th Cir. 2006)). Plaintiffs theorized that the Supreme Court's removal authority ruling makes FHFA's appropriations scheme more suspect. This argument fails. The mandate rule exception imagines an *intervening* change in authority. Here, the allegedly changed law came from the very decision that prescribed this Court's remand

---

[1] "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. CONST. Art. I, § 9, CL. 7.

mandate.[2] Allowing parties to introduce new issues on remand because a higher court has decided the initial issue in that same decision would frustrate the very purpose of the mandate rule.

Plaintiffs first brought this case in 2016. The Supreme Court resolved the main issues and remanded for further proceedings on a narrow question. The time for raising new issues has passed. The Court finds that Plaintiffs' Appropriations Clause claims exceed the scope of its mandate. Having found cause to dismiss on procedural grounds, the Court does not reach the merits.

## IV.    CONCLUSION

The Supreme Court provided Plaintiffs with an opportunity to allege that they were concretely harmed by the unconstitutional provisions restricting President Trump's ability to appoint a new FHFA director in the first two years of his administration. Plaintiffs' Amended Complaint fails to plead that any harm was more than speculative. Their new Appropriations Clause claims exceed the scope of the remand. For these reasons, Defendants' Motions to Dismiss are **GRANTED**, and Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

Signed at Houston, Texas on November 21, 2022.

Keith P. Ellison
United States District Judge

---

[2] The Court also notes that, "absent exceptional circumstances, the mandate . . . forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Fuhrman v. Dretke*, 442 F.3d 893, 897 (5th Cir. 2006) (internal quotations omitted). While the *Collins* Court "did not consider an Appropriations Clause question, it found that the Third Amendment "bore no constitutional infirmity in its inception." *See Collins v. Yellen*, 27 F.4th 1068, 1069 (5th Cir. 2022). Plaintiffs' arguments would void all actions FHFA has taken since it began its work in 2008.